UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



CONSTRUTORA NORBERTO ODEBRECHT S.A.,

Plaintiff,

Civil Action No.

v.

GENERAL ELECTRIC COMPANY, GENERAL
ELECTRIC INTERNATIONAL, INC., GE
INFRASTRUCTURE, INC., GE POWER SYSTEMS,
INC., GE ENERGY LLC and GE HYDRO POWER, INC.,

Defendants.



## COMPLAINT

Plaintiff Construtora Norberto Odebrecht S.A. ("CNO"), by and through its

undersigned counsel, hereby files this Complaint against defendants General Electric

Company, General Electric International, Inc., GE Infrastructure, Inc., GE Power

Systems, Inc., GE Energy LLC and GE Hydro Power, Inc. (collectively "General

Electric"), seeking to enforce an express contractual obligation not to compete against

CNO on a public-works project known as the "Rio Madeira Project." In support of its

Complaint, CNO alleges:

## INTRODUCTION

1.      This is an action brought to enjoin General Electric from breaching an

express exclusivity agreement it specifically negotiated and voluntarily undertook with

CNO in exchange for the opportunity to participate in supporting CNO's bid on a

lucrative, multi-billion dollar contract to develop a massive hydroelectric project on the Madeira river in Brazil.

2.      On January 11, 2006, representatives of both General Electric and CNO executed a memorandum agreement that set forth the preliminary terms on which General Electric was to join a consortium of suppliers and manufacturers assembled by CNO to realize the Project. The contract prohibits General Electric from directly or indirectly joining or assisting any other consortium in competing for the concession to construct and operate the Project.

3.      Exclusivity agreements of this type are customary in the construction industry and essential to the construction of capital-intensive, highly technical infrastructure projects that are competitively bid. Exclusivity ensures that participants in a consortium devote their full energy to developing the group's bid and prevents them from withdrawing from the consortium and exploiting the know-how and investments of former partners to benefit competing groups. It also prevents companies that have agreed to exclusivity from using proprietary information learned during their association with the bidding group after withdrawl from the group, because they cannot participate in, sell to, advise or even communicate with, any other group vying for the project. Properly enforced, exclusivity agreements thus create an insurmountable barrier to unfair competition.

4.      After receiving extensive information from CNO and other members of its consortium, General Electric withdrew from the CNO consortium in March 2006. Although General Electric has repeatedly acknowledged that it is bound by the exclusivity agreement, upon information and belief, General Electric is assisting

2

Camargo Corrêa S.A., a Brazilian construction company, and IESA Projetos,

Equipamentos e Montagens, S.A.,("IESA") a Brazilian civil engineering group, in their

efforts to bid on the Rio Madeira Project. Unless the exclusivity provision is strictly, and

specifically enforced, CNO will find itself in competition with a former member of its

consortium.

5.      General Electric's participation in or provision of assistance to the

Camargo Corrêa consortium, or any other competing consortium, would be a major blow

to CNO. Not only does General Electric bring its technical resources and general

expertise to the consortium, it will also inevitably make use (if it has not already) of the

highly specific technical and financial information developed by the CNO consortium at

great effort and expense. Indeed, General Electric is aware of sufficient pricing and cost

information to enable it to calculate CNO's probable bid price and undermine the

integrity of the bidding process.

6.      The association of General Electric with Camargo Corrêa and IESA

threatens to undo the competitive advantage CNO and its partners have built through six

years of hard work in preparation for the auction. Injunctive relief is required to protect

CNO from the irreparable harm it would suffer if General Electric were allowed to

compete in any way for the Rio Madeira Project.


**PARTIES**

7.      Plaintiff CNO is a corporation organized under the laws of Brazil with its

principal place of business in Brazil. It is the largest construction company in Brazil and

3

is involved in building projects in nineteen countries, including the United States. In 2006, *Global Finance Magazine* named CNO the best Brazilian construction company.

8.    Defendant General Electric Co. is a corporation organized under the laws of New York with its principal place of business in Connecticut.

9.    Defendant General Electric International, Inc. is a corporation organized under the laws of Delaware and, on information and belief, with its principal place of business in New York.

10.    Defendant GE Infrastructure, Inc. is a corporation organized under the laws of Delaware and, on information and belief, with its principal place of business in New York.

11.    Defendant GE Power Systems, Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York.

12.    Defendant GE Energy LLC is a corporation organized under the laws of Delaware with its principal place of business in New York.

13.    Defendant GE Hydro Power, Inc. is a corporation organized under the laws of California with its principal place of business in California. On information and belief, GE Hydro Power, Inc. transacts business in New York.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because diversity of citizenship exists between plaintiff and all defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4

15.     This Court has personal jurisdiction over all defendants pursuant to

Federal Rule of Civil Procedure 4(k)(1)(A) and New York CPLR §§ 301, 302(a)(1),

because each defendant either does business in New York or contracts to supply goods or

services in New York.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and (c)

because one or more of the corporate defendants is subject to personal jurisdiction in this

District.

17.     The various General Electric entities named as defendants acted as agents,

alter egos and instrumentalities of the General Electric Company and one another in their

dealings with Plaintiff.

## FACTUAL BACKGROUND

**I.      CNO And Its Partner Conceived And Developed The Rio Madeira Project From Inception**

18.     In 2001, CNO first conceived the concept of developing a hydroelectric

project on the Rio Madeira, located between the city of Abunâ and downtown Porto

Velho, in the Amazon region of Brazil.  Until recently, conventional wisdom held that it

would be very difficult to build hydroelectric plants in the Amazon in a cost-efficient, yet

environmentally friendly way.  CNO alone believed otherwise, and, starting in 2001,

promoted and developed the Rio Madeira Project, spending tens of millions of dollars of

its own money in the process.

         A.     CNO Conducted Lengthy And Expensive Studies, At Its Own
               Expense And Risk, To Develop The Rio Madeira Project

19.    A project such as the Rio Madeira Project, which will use public lands and waterways, and which will require a government concession to operate the resulting power facility, is subject to a government auction process.

20.    The contract to build and operate each of the Rio Madeira hydroelectric facilities is a lump sum, turnkey contract known as an Engineering, Procurement and Construction ("EPC") contract.  Bidders are given detailed bidding packages outlining the specifications for the project and providing detailed information concerning the hydrological, geological, and environmental conditions at the site.  Based on these packages, the bidders are required to develop the engineering designs and financial solutions for the construction and operation of the facility.

21.    Before the government will even set a date for an auction, however, the project must go through three separate preliminary studies, each of which must be accepted by the Brazilian government.  A private party wishing to undertake these studies must apply for the right to do so, and does so at its own risk and expense.  The three required studies are:

  a. An "inventory study," which analyzes the river, or a part of it, and surrounding area to identify the existing hydroelectric potentials in the river and to estimate the energy capacity of each site identified by the study.

  b. A "feasibility study," which develops for each potential hydroelectric site a preliminary engineering design, including identification of the type of turbines to be used, and further collects the hydrological, pluviometric, geological and other data for each site.

6

c. An "environmental and social impact study," which analyzes the impact of the project on the physical environment, flora and fauna, and any surrounding populations.

### B.    CNO Spent Eighteen Months Conducting An Inventory Study

22.    Accordingly, as the first official step toward development of the Rio Madeira Project, in June 2001, CNO requested permission from the Agência Nacional de Energia Elétrica ("ANEEL"), Brazil's national electric power agency, to conduct an "inventory study" on the Madeira River between the city of Abunã and downtown Porto Velho, at CNO's own expense and risk.

23.    Upon obtaining permission to conduct the inventory study, CNO invited Furnas Centrais Elétricas, S.A. ("Furnas") to participate in the development of studies related to the Rio Madeira Project, and Furnas accepted. Furnas is a corporation formed under the laws of Brazil and controlled by the Brazilian government. It is the largest generator of electrical power in Brazil, and one of the largest generators of power in Latin America. Furnas is one of the most experienced companies in successfully developing hydroelectric projects in Brazil.

24.    The inventory study took roughly eighteen months to complete, and demanded that CNO and Furnas hire outside engineers and conduct analyses of potential sites between the city of Abunã and downtown Porto Velho on the Madeira River. CNO and Furnas filed the completed inventory study with ANEEL in November 2002, and received approval of that study in December 2002.

25.     The inventory study was made available to the public at that time and provided a true and accurate description of the possible hydroelectric opportunities in the area between the city of Abunã and downtown Porto Velho on the Rio Madeira in Brazil.

C.     CNO Spent Over Two Years Conducting Feasibility Studies Of Two Proposed Sites

26.     In January 2003, CNO requested and obtained permission from ANEEL to conduct feasibility studies for two sites identified in the inventory study, Santo Antônio and Jirau. Furnas again participated in these studies.

27.     To complete the feasibility studies, CNO and Furnas hired outside engineering experts (in particular, PCE Ltda.) to analyze the Madeira River and its surrounding lands to determine whether the Santo Antônio and Jirau sites had the potential to provide economic and reliable hydroelectric power to meet Brazil's growing energy needs. The results of the feasibility studies contained an accurate analysis of the economic potential of the Rio Madeira Project and laid the groundwork for the development of the detailed design for the hydroelectric plants by the winner of the bid competition. The feasibility studies for the two sites took two years and four months to complete: CNO and Furnas filed the completed feasibility study for Jirau in December 2004 and for Santo Antônio in April 2005. CNO and Furnas received approval of the studies on March 30, 2007.

28.     The feasibility studies have been available to the public since the dates they were filed. Any other entity that wished to develop this Project could have been developing its own feasibility studies.

8

### D.    CNO Devoted Almost Another Two Years To Conducting An Environmental Impact Study

29.    In August 2003, CNO and Furnas sent a request to Brazil's environmental regulatory agency, Instituto Brasileiro do Meio Ambiente e dos Recursos Naturais Renováveis ("IBAMA"), for the agency to issue a formal "term of reference" to conduct an environmental impact study. The term of reference is essentially a list of all the environmental aspects, both general and specific, that must be analyzed as a part of the study.

30.    IBAMA conducted a public hearing and visited the proposed future project sites, then issued the document in September 2004. CNO and Furnas officially began the environmental study immediately thereafter, although they had been conducting environmental analyses of the expected issues since August 2003.

31.    The environmental study again required CNO and Furnas to hire outside experts – including recognized research entities and universities – and to devote significant time and resources to developing a plan that would minimize the environmental impact of the Rio Madeira Project on the surrounding region and the environment generally.

32.    CNO and Furnas filed the completed environmental and social impact study in May 2005. After requesting various clarifications, IBAMA held public hearings on the study in November 2006. IBAMA issued approval of the Rio Madeira Project in July 2007. Based on the CNO environmental and social impact study, IBAMA imposed some thirty-three conditions that had to be satisfied by the winning bidder before construction could begin.

9

33.    The environmental and social impact study has been available to the public since its time of filing and is an exhaustive report on the environmental conditions at the Santo Antônio and Jirau sites. The winning contractor is required to develop a detailed plan to address the environmental concerns and impacts identified during the development of the studies.

II.    **The Contract For The Santo Antônio Concession Will Be Awarded By A Blind Auction Conducted In Accordance With The Brazilian Public Bidding Law (Law 8.666/1993)**

34.    In mid-August 2007, ANEEL published for public comment the official notice of the public auction for the award of the concession to construct and operate the hydroelectric plant at the Santo Antônio site. Bidding on this project is currently scheduled to commence on October 30, 2007, with pre-qualification of potential bidders required 30 days before the auction, or on September 30, 2007, when interested parties are required to submit detailed information about, among other things, their technical qualifications and financial strength.

35.    ANEEL provided detailed technical studies and other requirements for the construction of the Santo Antônio hydroelectric plant. The winning bidder is responsible for creating an acceptable basic engineering design ("projeto basico") that will meet ANEEL's basic design specifications and other requirements.

36.    ANEEL currently has scheduled October 30, 2007 as the auction date for the concession to construct and operate the hydroelectric plant at the Santo Antônio site. Before the auction date, ANEEL will set a ceiling price for the tariff to be charged for hydroelectric power during the thirty-year period for which the winner of the concession will be authorized to operate the plant pursuant to a set of Power Purchase Agreements

10

("PPAs") to be entered into with energy distributors throughout the country. Bidders are required to submit a price below that tariff. The price reflects the price per megawatt hour to be charged for the term of the PPA. The successful bidder must post performance bonds to guarantee that the Project will be completed as required by the contract.

37.    ANEEL will sign a concession contract with the winning bidder shortly after the winning bid is selected. The contract will require that the Santo Antônio hydroelectric plant commence operation in 2012.

38.    The auction for the construction and operation of the hydroelectric plant at the Jirau site has not yet been scheduled. Governmental authorities recently have suggested that the auction for the Jirau site will take place in 2008.

39.    Although CNO's efforts have resulted in ANEEL's decision to auction concessions for the Rio Madeira Project, it was not at all clear that the Project would go forward. Indeed, until the time of the public hearings on CNO's environmental and social impact studies, in November 2006, it generally was believed by CNO's competitors in the industry that the Project likely would not be approved due to its environmental aspects. Moreover, there were no public indications that any entities other than CNO and Furnas were interested in the Project or had taken any steps towards developing their own design and strategy for constructing and operating plants at the Santo Antônio and Jirau sites, despite the fact that many capable construction companies and turbine and generator suppliers are and were available to develop a competing bid.

40.    CNO's conduct and completion of the inventory, feasibility and environmental and social impact studies that enabled the Project to go forward cost CNO and Furnas in excess of 150 million Brazilian reals, or approximately US $75 million.

Had the Brazilian government turned down the Project, CNO would have had to absorb the costs of these studies. Now, even with the Project being presented for auction, CNO and Furnas will only be able to recover approximately half of their expenses from the eventual winner of the auction for the Santo Antônio site, should an entity other than CNO win the auction. The other half shall be reimbursed if and when the Jirau site is auctioned.

41.    In addition to having incurred enormous expense and risk, however, CNO also developed substantial proprietary and confidential information regarding the Rio Madeira Project, which CNO has been using to develop its submission for the auction on October 30, 2007. The value of this proprietary and confidential information to CNO's development of final plans to be used for the public auction process cannot be calculated.

II.    **CNO And Furnas Have Developed A Project With Profound Social Benefit To The People of Brazil And Minimal Environmental Impact, At Their Own Cost, And At Their Own Risk**

42.    As a result of CNO's and Furnas's efforts, the Brazilian public will be provided with state-of-the-art hydroelectric power plants that will help in the growth of the Brazilian economy.

a.    Brazil's gross domestic product is expected to grow approximately 4% per annum over the next ten years, while Brazil's energy demand is expected to increase an average of 5% per year for the next ten years.

b.    By 2015, the two plants that comprise the Rio Madeira Project will together represent 7% of the country's power generation.

12

43.    Moreover, because of the efforts of CNO and Furnas, these plants will have minimal environmental impact in the ecologically sensitive Amazon region. Examples of the contributions made by CNO and Furnas include:

a.    In order to limit the footprint of the accompanying reservoir to the size of the existing riverbed during the rainy season, the plants will use "bulb" turbine technology. This represents a "low head" concept, which minimizes the drop in the water level of the river downstream from the plants.

b.    The plants will require flooding of only very limited areas, unlike the flooding required for other types of hydroelectric plants. The Project will have one of the lowest ratios (.09) between the reservoir area and the total energy generation. By way of comparison, the Balbina hydroelectric plant in Brazil has a ratio of reservoir area to energy generation of 9.44.

c.    Only approximately 1,058 families reside along the relevant areas of the river, only 610 of which will have to be relocated as a result of the Project. By way of comparison, another hydroelectric plant built at the Itaipu site in Brazil relocated over 40,000 inhabitants.

d.    The Santo Antônio site is near a Brazilian highway, built in the 1970s, which already had an environmental impact on the region. The Madeira River Project will use areas already designated as eminent domain by the Brazilian government to transport the energy to other regions of the country, thereby reducing the degradation of flora and fauna that would result from building transport lines on untouched land.

13

III.    **CNO And Furnas Developed A Proprietary, Strategic Plan For
Implementing The Rio Madeira Project**

44.    While conducting the studies for the Rio Madeira Project, CNO and
Furnas began to put together teams to develop a confidential and proprietary technical
design and financial strategy for purposes of bidding for the concession to construct and
operate hydroelectric plants at the Santo Antônio and Jirau sites of the Madeira River.

45.    Undertaking an infrastructure project of this size and complexity requires
huge capital investments, meticulous planning, technological expertise in numerous
areas, and a high tolerance for risk. For these reasons, construction companies
customarily seek technology and financial partners with which to combine forces to
tackle the challenge of designing and building an enormous public works project, as well
as to finance the costs and spread the risk.

46.    To develop these plans, CNO sought engineering firms and
electromechanical equipment manufacturers that could meet the high demand for services
and supplies required by the Project and who could be part of an "EPC Consortium"
responsible for the construction and operation of the hydropower plants should CNO and
Furnas win the government concessions for the Project. At the same time, CNO and
Furnas also assembled a pool of banks and other financial institutions to develop a
financial deal structure and fund the Project.

47.    Both groups – the construction consortium and the group of banks and
financial institutions – were necessary to make the Rio Madeira Project financially
viable. In view of the five-year deadline for completion, design and planning had to
commence well in advance of the auction. To properly create financial and technical
solutions for a project of the magnitude of the Rio Madeira Project, a potential bidder

14

must devote substantial time and resources to develop solutions to challenges at the construction site, detailed plans and drawings, and the construction strategy itself.

48.    The participation of the turbine and generator manufacturers in the design and planning process is critical to the Project. This work cannot be developed in a project of the magnitude of the Rio Madeira Project without the participation of electromechanical equipment manufacturers in the EPC Consortium. Moreover, the Rio Madeira Project is of such size that it is critical that the consortium include more than one supplier of turbines and generators in order to meet the strict schedule for start-up implementation of the Project. Each of the two Rio Madeira hydroelectric plants will have forty-four turbines. These are long lead-time items. In view of the ambitious construction schedule set by the government, the prudent course is to have more than one turbine and generator vendor participate in a construction consortium in order to ensure that the Project can be completed on schedule and perform as designed.

49.    Thus, CNO's objective in putting together an EPC Consortium was not simply to hire equipment vendors, but to attract potential partners to a future EPC consortium that could bring resources and expertise to the Project that were beyond the capability of CNO acting alone.

50.    To this end, in mid-2005, CNO reached out to leading suppliers of electromechanical turbines and generators. CNO told each such supplier that CNO was seeking participants in the EPC Consortium that CNO would organize and lead to support CNO's and Furnas' bid for the Rio Madeira Project, and would like to invite that supplier to negotiate with CNO. CNO informed each such supplier, however, that before negotiations could begin, CNO would require the supplier to execute a confidentiality

agreement, so that CNO could provide the supplier with certain technical information about the Project that was proprietary to CNO.

51.     Among those who signed confidentiality agreements were VA Tech Hydro Brasil Ltda. ("VA Tech"), Alstom Hydro Energia Brasil Ltda. ("Alstom"), Voith Siemens Hydro Power Generation Ltda. ("Voith-Siemens"), Siemens, Areva Transmissaõ e Distribuição de Energia, Ltda. ("Areva"), ABB Ltda. ("ABB"), Energ Power Ltda., OSJC "Power Machines", IESA Projetos, Equipamentos e Montagens, S.A. ("IESA"), GE Hydro Inepar do Brasil S.A., Sojitz do Brasil, S.A., Bardella S/A Indústrias Mecânicas, Indústrias Metalúrgicas Pescarmona S.A.I.C. y F, and Hitachi, Ltd., among others.

52.     One of the entities to which CNO sent an invitation letter, and with which CNO chose to conduct initial discussions and enter into a non-disclosure agreement, was GE Hydro Inepar do Brasil S.A. (the "GE Joint Venture"), a joint venture between General Electric do Brasil Ltda. ("GE Brasil"), a Brazilian corporation that is a subsidiary of General Electric Co., and Inepar S.A. Indústria e Construções ("Inepar"), a Brazilian corporation. Inepar is itself partially owned by IESA Projetos, Equipamentos e Montagens, S.A., which also was a party to the non-disclosure agreement. The signatories to the non-disclosure agreement were Brazilians.

53.     GE Brasil and the GE Joint Venture are the Brazilian representatives of the General Electric Defendants, which are located in the United States, that design and supply turbines and generators for hydroelectric plants. GE's Brazilian employees carry business cards which identify them as acting variously for GE Hydro and GE Energy.

The GE employees of GE Brasil and the GE Joint Venture work hand-in-glove with the General Electric Defendants.

54.     On information and belief, General Electric was enthusiastic about being invited to join forces with CNO.  Not only is CNO the leading construction company in Brazil, it was the main force behind the development of the Rio Madeira Project.  As such, it was widely considered to have an advantage in bidding for the multi-billion dollar project.  General Electric would be in a position to land a huge turbine and generator order if it was chosen as a supplier by CNO.

55.     After the confidentiality agreement was signed and CNO narrowed down its possible choices for turbine and generator supplies to a smaller group that included General Electric, CNO further provided General Electric with detailed engineering documents concerning the hydrological profile of the Rio Madeira so that General Electric could adapt its bulb turbines' generation capacity to the demands of the Rio Madeira plants.  The additional documents provided by CNO included a design of the basic project, the executive project plans and the general layout for the plant developed by PCE, CNO's outside design team.  These are documents critical to the development of the final engineering plans, which will not be provided to ANEEL until after the contract is awarded.  The information in these documents would be of vital importance to any competitor because they would reveal the technical solutions that CNO had developed for constructing the Project.  CNO also further provided General Electric with substantial confidential information regarding the financial, commercial and logistical strategies for making the Project economically successful.

17

56.    On information and belief, the GE Joint Venture has as its primary asset a lease with IESA allowing the GE Joint Venture to use a certain amount of the manufacturing capacity (measured in hours) of a factory owned by IESA.. Only those certain companies that have high-level technological capabilities are able to supply the design of generators and turbines. In the case of General Electric, the engineering staff with the technical expertise is located outside of Brazil

57.    Although CNO sent the initial invitation to bid to the GE Joint Venture, it always was understood that the GE Joint Venture would be capable only of fabricating turbines for the EPC Consortium once a design and strategy were developed. It also always was understood that the technical and engineering expertise, as well as financial support for the Project, would come from General Electric entities located within the United States.

## IV.    CNO's Agreement With General Electric

58.    After the initial round of negotiations, CNO chose to further negotiate with a smaller subset of suppliers. This group included Alstom, Voith-Siemens, VA Tech, and General Electric.

59.    With regards to General Electric, the chief representative of the company, with whom CNO exchanged information and negotiated, was Jeffrey R. Wiener, who works at General Electric's offices in Schenectady, New York. Over the course of the negotiations, Mr. Wiener represented himself as a representative of GE Hydro, GE Energy, General Electric International, Inc., and "General Electric" generally, all of which are corporate entities based in the United States. CNO understood that it was necessary to negotiate with the U.S. entities rather than the GE Joint Venture because the

18

GE Joint Venture did not have the engineering, strategic, or financial capability to participate in the Project. Indeed, General Electric formed a Rio Madeira "team" which included engineers and other key personnel, many of which were from outside Brazil.

60. At this stage of the negotiations, CNO provided additional confidential proprietary information to General Electric and to the other three suppliers with which CNO was still negotiating.

61. Because of the highly confidential nature of information provided to General Electric, CNO insisted that General Electric agree to work exclusively with CNO on the Rio Madeira Project. To that end, CNO executed a new agreement with General Electric on January 11, 2006 (the "January 11, 2006 Agreement"), which required exclusivity. In this agreement, General Electric agreed that it would not pursue the Rio Madeira Project with any other party. The agreement was signed by Mr. Wiener, an American employee of General Electric.

## V. The Exclusivity Provisions Were The Product Of Arms-Length Negotiations Between Sophisticated Parties

62. Although the January 11, 2006 Agreement suggests that its terms were developed solely at a meeting held on that same date, the terms were in fact heavily negotiated ahead of time by Mr. Pinto and Mr. Wiener in 2005 and early 2006, after the initial confidentiality agreement had been executed. The January 11, 2006 Agreement was a wholly separate contract from the original confidentiality agreement signed with the GE Joint Venture. It provided not just for exclusivity, but also the outline of the commercial and financial deal between CNO and General Electric – including such matters as the number of turbines and generators to be supplied, the price, the timing for

delivery, and the penalties for late delivery. This was an entirely new contract of broad scope.

63.    In negotiating this binding contract on behalf of General Electric, Mr. Wiener engaged in multiple discussions with representatives at CNO, both in person and over the telephone. The two companies exchanged drafts of what would come to be the January 11, 2006 Agreement, signed by Mr. José Bonifácio Pinto Júnior on behalf of CNO and Mr. Wiener and Luiz Kuster on behalf of "General Electric." Moreover, Mr. Wiener informed Mr. Pinto during these negotiations that he was consulting with General Electric's legal department regarding the content of the Agreement.

64.    The provisions requiring that General Electric not pursue the Project with any other party were not in early drafts of the January 11, 2006 Agreement.

65.    After reviewing one of these early drafts, Mr. Wiener asked Mr. Pinto to add a provision that would specifically allow General Electric to pursue the Project with another entity if it chose not to enter, or to later leave, the Consortium. Mr. Pinto not only declined Mr. Wiener's proposal, but informed him that, in light of his request, CNO would have to insist that General Electric specifically "further agree[]" not to pursue the Project with any other party if it wished to continue to pursue a position within the EPC Consortium.

66.    The result of these negotiations was formalized in Sections 5(a) and 5(o) of the January 11, 2006 Agreement, which provide, respectively:

> … If GE does not enter the Construction Consortium or exits the Construction Consortium under any provision of this MOM [Minutes of Meeting], then GE shall maintain the Confidentiality Agreement until its expiry **and further agrees not to pursue this Project with any other party.**

... If no equipment supply contract is executed by the expiry of the Confidentiality Agreement, then this MOM shall expire **and GE agrees not to pursue this project with any other parties**.

(emphasis added).

67.    Had Mr. Wiener not agreed to these exclusivity provisions, CNO would have terminated negotiations with General Electric. General Electric was not forced to enter into the January 11, 2006 Agreement. It did so of its own free will for its own commercial advantage.

## V.    As a Result of Entering Negotiations With CNO, General Electric Was Given Access To Substantial Proprietary And Trade Secret Information Of CNO And The Other Consortium Members

68.    In the course of negotiating the Agreement, General Electric was provided with significant confidential information regarding CNO's technical engineering strategy and design for the Rio Madeira Project. General Electric also was provided with substantial confidential information regarding the financial, commercial and logistical strategies for making the Project economically successful. This information included, but was not limited to:

- The hydrologic data for each of the two sites, including the behavior of the river at different times of the year (during the rainy season and the dry season), which are essential for the appropriate sizing of the turbines and to define how such equipment will adequately perform;

- An advanced stage version of the detailed engineering design prepared by PCE for CNO;

- The "general arrangement" for the Project, which consists of detailed drawings of the technical plans;

- The final pricing of the turbines and generators, which were estimated to represent an approximate set percentage of total investment in the Project;

- The payment conditions both within the EPC consortium;

- The anticipated annual escalations of prices;

- The definition of the full scope of the suppliers;

- The technical performance required for the turbines and generators;

- The proprietary schedule for the delivery of the turbines and generators and the anticipated date for the delivery of the first set of machines at the Project site;

- The Project's transportation and logistic strategies;

- The financial structures dealing with limitations of liability between and among the EPC Consortium, CNO and Furnas;

- The provisions for liquidated damages in the event of delay or failure to perform;

- The structure and content of the guarantees to be given by the EPC Consortium to the Project company;

- The structure and content of the cross-guarantees to be provided between CNO, the EPC Consortium members and vice-versa;

- The anticipated discounts to be provided in the event that General Electric could provide improvements to the Project;

- The amount and terms of the down payment the EPC Consortium would be entitled to receive before the start-up of the Project.

- The cost of the spare parts to be delivered by the suppliers;

- The amount and terms of the leadership and development fee to be paid to CNO;

- The amount of reduction of the civil works side of the Project anticipated from the technical elevation of the machine's setting;

- The interface matrix attached to the Agreement, which defines the scope of the civil works side of the Project and the matters to be handled by the EPC Consortium;

- The strategy for the retention of equity by the suppliers, including both the amount of such participation and the innovative legal format relating to convertible debentures;

- The structure of the EPC Consortium; and

- The obligation of the suppliers to reimburse CNO for the studies performed by CNO and Furnas.

69.    In addition, after signing the January 11, 2006 Agreement, General Electric participated in at least two strategic meetings with CNO and the other anticipated members of the EPC Consortium (at that time, Alstom, VA Tech and Voith-Siemens).

70.    At these meetings, not only did the proposed members of the EPC Consortium learn additional valuable confidential information from CNO, but Alstom, VA Tech and Voith-Siemens further revealed their own confidential information to the group – confidential information that became incorporated within the collective knowledge developed for the Rio Madeira Project. Those companies would not have revealed their own sensitive information in the presence of General Electric had they not known that General Electric had agreed to keep such information confidential.

## VI. After Having Received And Internalized CNO's Confidential And Proprietary Information, General Electric Voluntarily Withdrew From The Project But Remained Subject To The Exclusivity Agreement

71.    In March 2006, Mr. Wiener called Mr. Pinto's colleague, Mr. Edwaldo T. Tamberg, one of CNO's Senior Managers, to ask for an in-person meeting. During the meeting, which took place on March 15, 2006, Mr. Wiener provided Mr. Tamberg with a letter in which General Electric officially withdrew from the Project.

72.    Mr. Wiener orally told Mr. Tamberg that General Electric was withdrawing from the Project for two purported reasons:  a) General Electric was not comfortable with revealing its confidential information to other members of the EPC Consortium, despite the fact that all other entities had executed non-disclosure

23

agreements; and b) General Electric did not want to be jointly and severally liable with the other members of the EPC Consortium, even though it had known ahead of time that members of the EPC Consortium would be jointly and severally liable with one another.

73.    Notably, in Mr. Wiener's letter to Mr. Tamberg, Mr. Wiener specifically reaffirmed that General Electric would abide by the exclusivity commitments it made to CNO in the Agreement.

## VI.    After Leaving The EPC Consortium Associated With The CNO/Furnas Bid, General Electric Has Sought To Join A Competing Consortium

74.    After General Electric withdrew from the Project, CNO negotiated with Alstom, VA Tech, Voith-Siemens and other suppliers to form a final EPC Consortium. That group has worked diligently towards developing a strategic plan that hopefully will result in a successful bid at the auction scheduled for October 30, 2007. The plan developed by CNO, Furnas and the EPC Consortium draws extensively from the confidential and proprietary information developed by CNO and Furnas through their independent studies of the Rio Madeira Project and the confidential and proprietary information shared among the potential EPC Consortium members prior to General Electric's withdrawal from the Project.

75.    Despite the fact that the information concerning the Rio Madeira Project had been publicly available for years, and despite CNO's early efforts to have other companies join CNO and Furnas in the development of the Project, the CNO/Furnas group was the only one publicly interested in developing the Rio Madeira Project until late 2006.

76.    Were General Electric to give a competitor to CNO access to CNO's proprietary and confidential information, either directly or indirectly, CNO's hard-earned competitive advantage could be lost.

77.    Once it became clear that the government likely would issue an environmental license for the Rio Madeira Project, other construction companies, with government encouragement, began to demonstrate interest in submitting competing bids for the Project. These would-be competitors, however, were at a substantial disadvantage because they had not devoted the time and resources to developing detailed plans for the Project as had CNO.

78.    On information and belief, Camargo Corrêa, a major competitor of CNO in the construction and infrastructure business, is one of the companies that is now interested in bidding for the Project and is actively courting General Electric as a potential member of its EPC Consortium.

79.    In or around May 2007, it became increasingly apparent to CNO that General Electric was interested in working with a competing bidder for the Rio Madeira Project. On information and belief, General Electric intends to participate in a bid to be submitted by Camargo Corrêa, along with IESA and Hitachi as additional members of the EPC Consortium.

80.    Although General Electric had withdrawn from the Project over a year before and the GE Joint Venture had not been involved with the EPC Consortium for almost a year before that, CNO received a letter dated May 15, 2007 from the GE Joint Venture in which it purported to withdraw from the CNO bidding group and returned a

long list of technical documents, including confidential drawings and plans, which it had been provided earlier.

81.    On July 24, 2007, Mr. Pinto received a letter from Eduardo Ribeiro Santos and Dalmon Rogério de Moraes Sapata of the GE Joint Venture. This letter attached a request from the Department of Economic Protection and Defense at the Secretariat for Economic Law ("SDE"), which asked the GE Joint Venture for a copy of any exclusivity agreement it has entered into with CNO. The letter also stated that the GE Joint Venture would be providing the January 11, 2006 Agreement to SDE. Although IESA had no right to the January 11, 2006 Agreement or any of the highly confidential information contained therein, the GE Joint Venture also sent this letter, which referenced the January 11, 2006 Agreement, to IESA. This letter therefore suggested that IESA has unlawful access to the January 11, 2006 Agreement.

82.    In a subsequent exchange of letters between the GE Joint Venture and CNO dated July 25 and 27, 2007, the GE Joint Venture expressly disclaimed that it was a party to the January 11, 2006 Agreement and, therefore, not subject to the exclusivity provisions. In a letter dated July 25, 2007 from Mr. Pinto to Mr. Santos and Mr. Sapata of the GE Joint Venture, Mr. Pinto explained that, as a non-party to the January 11, 2006 Agreement, the GE Joint Venture had no right to possess the agreement or its attachments,. In a reply letter dated July 27, 2007, Mr. Santos and Mr. Sapata specifically acknowledge that the Joint Venture was not a party to the January 11, 2006 Agreement,.

83.    General Electric conveyed its intent to join a competitor by a letter from Mr. Wiener to Mr. Pinto dated June 18, 2007. Mr. Wiener's letter was on "GE Energy"

letterhead, identified him as "Manager – Hydro Sales and Commercial Operations" for "GE Energy," and included a footer identifying an additional affiliation between Mr. Wiener and "General Electric International, Inc."

84.    In the letter, Mr. Wiener specifically acknowledges that General Electric is bound by the exclusivity obligation arising from the Agreement. Mr. Wiener asks, however, for CNO to release General Electric from its exclusivity agreement.

85.    As a result of this letter, representatives of CNO requested a meeting with General Electric representatives in Brazil. The meeting was held on August 9, 2007. Mr. Tamberg and CNO's in-house attorney, Adriano Maia, attended on behalf of CNO. In addition, Alvaro Novis, the CFO of CNO's holding company, Odebrecht S.A., attended the meeting. The CEO of GE Brasil, Mr. Alexandre Silva, attended, as did the company's General Counsel, Ms. Josie Jardim. At the meeting, CNO made clear that it was opposed to General Electric participating with a competing bidder for the Rio Madeira Project and was unwilling to waive General Electric's non-competition obligations. CNO asked Mr. Silva whether General Electric could make assurances that General Electric could set up a "Chinese wall" that would assure CNO that its confidential information could be protected if General Electric participated in the EPC Consortium to be hired by any other bidder. Mr. Silva told CNO and Odebrecht S.A., that it would be very difficult for General Electric to do so. CNO therefore asked Mr. Silva whether General Electric would be willing to make a representation to that effect to the Brazilian government and declare that it therefore would not be able to compete even if released from its exclusivity obligation. Mr. Silva said that he would need to consult with General Electric's compliance department in the United States.

86.    A few days after that meeting, Mr. Silva called Mr. Novis and informed him that the matter was being handled solely by General Electric's U.S. entities, and that GE Brasil would not be able to provide any assurances to CNO.

87.    As a result of the August 9, 2007 meeting and the subsequent telephone conversation between Mr. Silva and Mr. Novis, Mr. Pinto wrote a letter on August 16, 2007 to Mr. Silva, the General Electric Corporate Ombudsman and the individual members of General Electric Co.'s Board of Directors, with a copy of the letter to Mr. Wiener. In that letter, Mr. Pinto explained to General Electric that any cooperation with a competitor of CNO on the Rio Madeira Project would be both illegal and unethical. To date, CNO has not received a response to this letter.

88.    Accordingly, on September 5, 2007, Mr. Pinto further wrote to Mr. Wiener to reiterate CNO's position that it would not release General Electric either from the confidentiality provision or the exclusivity provision of the Agreement. He further explained that because of the nature of the Project, the exclusivity and confidentiality provisions are dependent on each other, and that it would not be possible for General Electric to participate in a competing bid for the Rio Madeira Project without directly or indirectly using information covered by the confidentiality agreement. To date, CNO has received no response to that letter.

89.    Despite CNO's correspondence and meetings, and with the auction date for Santo Antônio pending in less than sixty days, CNO has received reliable information that General Electric is cooperating with a competing bidder and violating its confidentiality and exclusivity obligations.

90.     In a letter dated August 20, 2007, IESA informed the Ministry of Mines and Energy that IESA firmly intends to participate in a consortium with, among others, General Electric to bid on the Rio Madeira Project. On information and belief, this consortium is being led by Camargo Corrêa. IESA further stated that it has been working on the design for over a year with all member companies of its consortium, including General Electric. IESA further emphasized the importance of General Electric's extensive experience with bulb turbine technology. IESA also informed that Ministry that it does not believe it can submit a bid unless General Electric were released from its exclusivity agreement with CNO.

91.     CNO has felt confident that its time, money and effort in developing a unique technical and financial plan for the Rio Madeira Project would pay off in the presentation of a bid far superior to any of its competitors. General Electric, of course, is privy to the very information that makes CNO's plans far superior to those of any other company. Were a competitor to be provided access to CNO's proprietary and confidential information, which is in General Electric's possession, CNO's hard-earned advantages could be lost.

92.     On July 31, 2007, General Electric wrote CNO to say that General Electric and GE Brasil would be turning over the January 11, 2006 Agreement to the Brazilian government. The letter is signed by Stanley Smith on behalf of General Electric. Mr. Smith is an official of GE Energy, a division of the General Electric Company in the United States. This letter was signed separately by two representatives of GE Brasil.

93.     In addition, CNO has learned that just within the last month, two senior technical managers and one technical manager for Alstom (a member of the EPC

Consortium associated with the CNO/Furnas bidding group), each of whom has directly participated in the technical design solutions for the Rio Madeira Project, were recruited by headhunters on behalf of a large multinational company based in the Campinas region, state of São Paulo in Brasil. The primary company that would satisfy that description is the GE Joint Venture. CNO also has learned that three less senior employees of Alstom, who also had confidential information relating to the Rio Madeira Project, were successfully hired by the GE Joint Venture. On August 20, 2007, the law firm of Lobo & Rizzo wrote GE Brasil and the GE Joint Venture warning General Electric of the illegality of their actions.

94.    Given the limited time available before the auction date to potential bidders who only began developing a bid in the last year, the most important thing that General Electric can bring to a competing group is not its technical ability to manufacture turbines – a niche that can be filled by any number of entities throughout the world – but its knowledge of confidential and proprietary information regarding CNO's design and bid. It is this knowledge that could enable a competing bidder to bypass the otherwise necessary process of developing (over the course of a significant period of time) a technical and financially sound proposal for completion of the Rio Madeira Project.

95.    The fact that IESA has informed the Brazilian government that it can only go forward if General Electric participates, confirms this conclusion. If all that IESA needed to present a bid was a manufacturer of turbines and generators of sufficient size and sophistication to meet the technical and financial requirements of the Project, numerous options other than General Electric are available for the Project. Specifically, Ingehyrdo, a Spanish company, CKD Blansko, a Czech company, Skoda Energo, a Czech

company, Toshiba, a Japanese company, Hitachi, a Japanese company, Mitsubishi, a

Japanese company, Litostroj, a Slovenian company, Bharat Heavy Electricals Limited, an

Indian company, Power Machines, a Russian company, Dong Fang, a Chinese company,

Harbin, a Chinese company and Kharkov, a Russian company, all have the ability to

supply turbines for the Rio Madeira Project. Some of these companies – Power

Machines, Hitachi, Toshiba, Dong Fang, Harbin, and Kharkov – actually have more

experience in designing bulb turbines of the size needed for the Rio Madeira Project than

General Electric. What makes General Electric uniquely helpful to any late bidder for the

Rio Madeira Project is its knowledge of CNO's proprietary and confidential information.

## VII.    Absent Injunctive Relief, CNO Will Suffer Significant And Irreparable Harm

96.    General Electric's use of CNO's confidential and proprietary information

is a violation of its contractual commitments as well as its own ethical guidelines. As

General Electric admits on page 48 of "The Spirit and the Letter," its publication on

compliance policies, which is available on General Electric's website at

<http://www.ge.com/files/usa/citizenship/pdf/english.pdf>:

> **[I]t is critical that we respect the valid intellectual
> property rights of others.** Unauthorized use of others'
> intellectual property can expose the Company and even
> individual GE employees to civil law suits and damages,
> including significant fines and criminal penalties.

(emphasis added).

97.    These policies apply to all General Electric employees, as well as all

subsidiaries owned half or more by General Electric.

98.    General Electric has had access to CNO's confidential engineering and

financial information. This information will be disclosed to CNO's competitors if

General Electric is allowed to join a rival bidding group. Further compounding this harm, General Electric has information concerning the prices that CNO will pay other suppliers for turbines and generators. The cost of the turbines and generators is estimated at an approximate set percentage of the overall construction cost. With this information in hand, a sophisticated competitor with experience in the construction industry could approximate CNO's costs and from this reach a reasonable estimate of CNO's ultimate bid. Such unfair competition in the bidding would irreparably harm CNO as well as undermine the integrity of the bidding process.

99.      The Rio Madeira Project is one of the largest energy projects ever undertaken in Brazil. The stakes are enormous for the parties, and the temptation to cut corners is obvious. The winner of this auction will have an inestimable advantage in the bidding for the follow-on Jirau Project. If a competitor were to win the first auction for the initial Santo Antônio Project by using confidential information from CNO, it would surely harm CNO's reputation, as CNO has been the champion of the project from the beginning. The resulting loss of momentum and prestige in the market place could cause serious harm in terms of lost future business.

100.      Unless this Court grants injunctive relief restraining the General Electric Defendants in the United States from violating their obligations under the January 11, 2006 Agreement, General Electric could easily circumvent its contractual obligations by acting indirectly through separate divisions and subsidiaries. The contractual prohibition on any participation by General Electric in the Project other than through CNO was designed to be infallible protection for CNO. It was a bright-line prophylactic measure

32

designed to prevent any conflict of interest or any possible dilution of CNO's competitive edge as a result of its negotiations with General Electric.

101.    CNO has satisfied all conditions precedent to bringing this action.

## CAUSE OF ACTION

### Count I
### (Breach of Contract)

102.    CNO incorporates by reference all of the allegations set forth above as if set forth fully in this Count.

103.    Each of the defendants is the agent, alter ego or instrumentality of the General Electric Company and one another.

104.    Pursuant to the January 11, 2006 Agreement, General Electric contractually committed, in the event General Electric withdrew from the Consortium, not to compete in any manner with CNO for the Rio Madeira Project.

105.    CNO performed all of its obligations under the Agreement. General Electric, however, has breached the covenant not to compete in the Agreement by sharing CNO's proprietary information with third parties and participating in and/or assisting a competing consortium's efforts to bid on the Rio Madeira Project.

106.    General Electric must be required to identify all instances of their cooperation with entities other than CNO intending to bid on the Rio Madeira Project and all confidential documents or information belonging to CNO which Defendants has disclosed to such entities.

107.    General Electric must be required to provide specific performance of its contractual obligations because, if General Electric is allowed to continue to breach its

exclusivity agreement, CNO will suffer irreparable injury including, but not limited to, loss of reputation and goodwill, loss of economic opportunity and loss of trade secrets and proprietary information.

108. In the alternative, General Electric must be enjoined from breaching the non-compete provisions of the January 11, 2006 Agreement or CNO will suffer irreparable injury including, but not limited to, loss of reputation and goodwill, loss of economic opportunity and loss of trade secrets and propriety information. CNO would not be able to recover monetary damages sufficient to address all the harm caused to its business and opportunities.

## PRAYER FOR RELIEF

**WHEREFORE,** CNO prays that after a trial on its claim:

A. A preliminary and permanent injunction be entered enjoining General Electric from breaching the exclusivity obligations under the Agreement and barring General Electric from joining directly or indirectly, participating with other entities in, selling to or assisting any entities to prepare, a bid for the Rio Madeira Project;

B. An order requiring General Electric to specifically perform and abide by its exclusivity obligations by refraining from joining directly or indirectly, participating with other entities in, selling to or assisting any entities to prepare, a bid for the Rio Madeira Project;

C. CNO be awarded from General Electric its attorneys' fees and costs incurred in this litigation; and

D. CNO be awarded such other relief as this Court deems appropriate.

34

## DEMAND FOR JURY TRIAL

Plaintiff Construtora Norberto Odebrecht S.A. hereby demands a jury trial on all issues for which it is so entitled.

Dated: September 12, 2007
      New York, NY

                    Respectfully submitted,

                    BOIES, SCHILLER & FLEXNER LLP

                    By:    Donald L. Flexner
                              George T. Frampton Jr.
                              Howard L. Vickery
                              Amy L. Neuhardt
                    575 Lexington Avenue, 7th Floor
                    New York, NY 10022
                    (212) 446-2300 (phone)
                    (212) 446-2350 (fax)

                    *Attorneys for Plaintiff Construtora Norberto Odebrecht, S.A.*