# EXHIBIT A

MINISTRY OF JUSTICE
SECRETARIAT OF ECONOMIC LAW
ECONOMIC PROTECTION AND DEFENSE DEPARTMENT

**Docketed under number:** 08012.008678/2007-98
**Nature:** Administrative Proceedings
**Complainant:** SDE *ex officio*
**Respondent:** Construtora Norberto Odebrecht S.A.

**Public Version**

Madam Director,

I. **REPORT**

1. This is the Administrative Proceedings filed by SDE *ex officio* aiming to investigate whether the exclusivity / non-compete agreements executed by **Construtora Norberto Odebrecht S.A. ("Odebrecht")** with equipment suppliers may harm or even prevent the participation of other consortiums in the auctions of concession of the hydroelectric plants of Santo Antônio and of Jirau, on the Madeira River, in violation to the provisions in Article Twenty, Items I and II combined with Article Twenty-One, Items V and VI of Act No. 8.884/94.

I.1 **PROJECT OF IMPLEMENTATION OF THE MADEIRA RIVER HYDROELECTRIC SYSTEM**

2. Before reporting the instruction of these proceedings a brief summary of the hydroelectric project at hand is necessary. The Project of Implementation of the Madeira River Hydroelectric System comprises the construction of two hydroelectric plants on the Madeira River, called Santo Antônio and Jirau, in the municipality of Porto Velho (RO). The works integrate the Federal Government Growth Acceleration Program (PAC) and the Department of Mining and Energy 2006-2015 Electric Power Expansion Ten-Year Plan (PDEE).

3. The auctions for the concession of the Santo Antônio and of the Jirau hydroelectric plants are independent and will be held at different moments. It is important to mention that, although both will be located on the Madeira River, the locations of the two plants are characterized by having different distributions of heads and flow rates which will lead to different specifications for the equipment. The Santo Antônio hydroelectric plant will have 3.150 MW of installed power and Jirau will have 3.300 MW.

4. The feasibility studies, approved in separate for each plant by the Power Sector Regulator (ANEEL), concluded for the utilization of bulb type turbines due to the low head and high flow rate of Madeira River which waives the construction of large reservoirs. The utilization of this type of turbine in Brazilian rivers is still small with only three plants currently operating with this technology,

namely, Canoas I and II (Duke Energy) and Igarapava (Cemig). The study provides for the utilization of 44 bulb turbines in each plant, with the respective technical specifications for each plant.

5. The winning companies of each auction should start the power generation within five (05) years after the execution of the Concession Contract. The enterprise's timetable provides for the installation of at least one (01) turbine per month in order to meet the Brazilian market electric power demand, within terms to be set forth in the Concession Contract.

6. The Department of Mining and Energy has set the date of October 30, 2007 for holding the auction of concession of the Santo Antônio hydroelectric plant.[1] The Jirau hydroelectric plant is scheduled to be bid in the first half of next year.

## I.2 RESPONSE PRESENTED BY ODEBRECHT

7. Aiming at duly investigating these proceedings, on June 05, 2007, SDE issued an Official Letter to Odebrecht requesting the list of all companies with which an exclusivity agreement was entered into in relation to the supply of equipment for the Madeira River Hydroelectric Projects (Pages 01/02). In its answer Odebrecht also addressed the agreement entered into with Furnas Centrais Elétricas S.A. ("**Furnas**") for participation in said project.

### I.2.1 AGREEMENT ENTERED INTO BY AND BETWEEN ODEBRECHT AND FURNAS

8. In answer to the SDE Official Letter, Odebrecht informed that it leads the organization of a consortium jointly with Furnas ("**Odebrecht Consortium**") to participate in the bidding for the granting of a concession for the implementation and operation of the Santo Antônio and of the Jirau hydroelectric plants, on the Madeira River.

9. According to Respondent, the studies related to the Santo Antônio and to the Jirau plants started in 2001 when Odebrecht applied to ANEEL for the active registration for the execution of inventory studies of the Madeira River. With such registration in hand, Odebrecht informed having invited Furnas to participate in said studies which were completed and delivered to ANEEL in 2002 having been approved in December of the same year and made publicly available by the regulating agency.

10. Once the potential hydroelectric use was identified, Odebrecht requested and obtained from ANEEL the granting of active registrations for carrying out of feasibility studies of the Santo Antônio and of the Jirau hydroelectric plants. Furnas was once again invited by Odebrecht to participate in the preparation of these studies. The feasibility studies of said plants were approved in separate by ANEEL on March 30, 2007.

---

[1] Under terms of the Department of Mining and Energy Ordinance No. 186 of 08.10.2007, published in the Federal Official Gazette of 08.13.2007, Section 1, Page 52.

11. It should be noted that Furnas and Odebrecht entered into a "Deed of Commitment" on [CONFIDENTIAL] aiming at the joint participation in the future auction of concession of the Santo Antônio hydroelectric plant. On the same date, the companies executed a document with same title referring to the joint participation in the auction of concession of the Jirau hydroelectric plant. [Exhibits 4 and 5 of Odebrecht's Reponse to CGSI/DPDE Official Letter No. 3016]

12. Such Deeds of Commitment contain a clause [CONFIDENTIAL] which sets forth the exclusivity obligation in the participation in auctions of concession of the Santo Antônio and of the Jirau plants, binding not only the parties (Odebrecht and Furnas) but also the companies integrating the parties' same economic group. In the case of Furnas, this implies the prohibition to other companies of the Eletrobrás group (such as Eletronorte) from participating in a consortium competing with Respondent.

[CONFIDENTIAL]

## I.2.2 EXCLUSIVITY / NON-COMPETE AND/OR CONFIDENTIALITY AGREEMENTS ENTERED INTO BY AND BETWEEN ODEBRECHT AND EQUIPMENT SUPPLIERS

13. In response to the SDE Official Letter, Odebrecht informed that, in view of the size of the Santo Antônio and of the Jirau hydroelectric plants, it is necessary to prepare a pre-engineering project prior to the auctions. According to the company:

> *"There is no way to develop in a venture of such nature, the pre-engineering works without the engagement of manufacturers of electromechanical equipment in the EPCista Consortium. Such engagement, made after a thorough screening process, as demonstrated below, requires an exchange of technological and strategic information, many of them legally protected"* (Page 6 of Odebrecht's response to DPDE / CGSI Official letter No. 3016)

14. Respondent informed that the Madeira River entreprise requires its own peculiar and differentiated financing model (Project Finance) as the project size does not allow for the traditional financing, which would heavily burden the investors' balance.[2] According to Odebrecht, the Project Finance is used in infrastructure projects and requires as consideration the appropriate allocation of risks and responsibilities among the involved partners. It would not be possible to either assure a predictability of cash flow to the lenders or to demonstrate that the risk related to the equipment supply will be mitigated by the investor, without previously establishing the conditions of such supply in detail.

---

[2] In the definition used by Odebrecht: *"the Project Finance consists in "provision of resources to finance an economically separable capital investment project where the resource providers see the cash flow from the project as a primary source of funds to meet the service of their loans and supply the return over their invested capital"* (Page 6 of Odebrecht's response to the DPDE/CGSI's Official Letter No. 3016).

15. Odebrecht informed that as of August 2005, after the delivery of the feasibility studies of the Santo Antônio and of the Jirau plants to ANEEL, it started a separate negotiation with certain equipment suppliers aiming at setting up the group of suppliers to be invited to participate in the Odebrecht Consortium.

16. Thus, in its search for potential partners for the hydroelectric development at hand and due to the need to jointly develop with future supplying companies a "pre-engineering" project enabling the formulation of a proposal to the investors, Odebrecht informed having entered into <u>confidentiality agreements</u> with several companies, namely:

    [CONFIDENTIAL]

17. According to Respondent, after reviewing the proposals from the interested suppliers and after extensive negotiations, it elected the following companies as its associates to participate in the Madeira River bidding, with which it entered into <u>exclusivity / non-compete agreements</u>:

    i. **Alstom Hydro Energia Brasil Ltda. (Alstom), VA Tech Hydro Brasil Ltda. (VA Tech) and Voith Siemens Hydro Power Generation Ltda. (Voith Siemens)** for the supply of generators, bulb turbines and associated equipment; and

    ii. [CONFIDENTIAL] for the supply of the remaining electric equipment required for the construction of the plants.

18. The association with such companies was made through the following instruments:

    [CONFIDENTIAL]

19. [CONFIDENTIAL]

20. In this manner, the "Exclusivity and Confidentiality Agreement" not only prevents other equipment suppliers from associating with other consortiums to participate in the auctions of concession of the Santo Antônio and of the Jirau plants, <u>but also prevents them from supplying equipment to any other consortium after the auction is held, even if the Odebrecht Consortium is not the winner</u>. This occurs due to the commitment not to supply equipment for the hydroelectric projects of Santo Antônio and of Jirau to any agent competing with the Odebrecht Consortium for the period of [CONFIDENTIAL] years counting from the execution of the agreement.

21. Furthermore, the clause [CONFIDENTIAL] of said agreements binds not only the signatory companies, but also any company integrating the same economic group of Alstom, VA Tech and Voith Siemens:

    [CONFIDENTIAL]

22. [CONFIDENTIAL]

23. [CONFIDENTIAL]

24. Lastly, Odebrecht claimed that the engagement of more than one supplier of turbines, generators and other equipment would be justified by the necessary sharing of risks among these companies, as:

   > *"not even the concessionaire could conceive the concentration of the supply risk in the hands of one single player, which would put the completion of the development and the Project Finance repayment at risk, and no supplier would ever assume the risk of such huge delivery in an isolated manner and with the almost full commitment of its manufacturing capacity."* (Page 10 of Odebrecht answer to DPDE/CGSI Official letter No. 3016)

25. According to Odebrecht, the exclusivity agreements entered into with equipment suppliers would not be anticompetitive in view of the existence of other apt suppliers in the market. In this aspect, Odebrecht listed thirteen (13) potential equipment suppliers.

## I.3 ADDITIONAL INVESTIGATION CARRIED OUT BY SDE

### I.3.1 SUPPLIERS AVAILABLE IN THE MARKET

26. Concurrently with the first Official letter sent to Odebrecht, other official letters were issued to companies Areva (Page 04/05), Alstom (Page 07/08), Siemens (Page 10/11), ABB (Page 12/13) and Bardella (Page 15/16) requesting information as to the execution of exclusivity agreement with Odebrecht for the supply of equipment for the Santo Antônio and the Jirau hydroelectric plants.

27. In view of Odebrecht's answer, SDE carried out additional measures with the equipment suppliers aiming at finding out whether there are in fact other suppliers of equipment in the market which are not bound to Odebrecht and which may participate in the auctions of concession of the Santo Antônio and of the Jirau plants, associated with other consortiums, in a competitive way.

28. In this sense, SDE sent official letters to the following equipment suppliers: Nuclep (Page 73/74), Dedini (Page 76/77), IESA (Page 79/80, Impsa (Page 83/84), Weg (Page 89/90), Bardella (Page 92/93), Energ Power (Power Machines representative in Brazil (Page 95/96), Mitsubishi Corporation (Page 107/108), Mitsubishi Electric Corporation (Page 110/111), GE Energy (Page 113/114), Hitachi (Page 133/134), Toshiba (Page 306/307) and Usiminas Mecânica (Page 331/332). These companies were questioned in relation to:

   > i. Capacity to supply, in Brazil, the equipment used in large size hydroelectric generation projects (that is, 70 MW bulb turbines, generators, electric, electromechanical and hydromechanical equipment associated with the construction of this type of plant); and

   > ii. Capacity to supply such equipment at short / medium term.

**Turbines and Generators**

29. Among the questioned companies, those which declared having the technology and capacity to manufacture turbines and generators within the established terms were:

    i. **General Electric do Brasil Ltda.** It affirmed having, together with its global affiliates and joint ventures (including **GE Hydro Inepar do Brasil S.A.**) the technology and capacity to manufacture bulb turbines which would be appropriate to the Santo Antônio and the Jirau plants. It stated, however, that it does not have the capacity to manufacture, separately, all 88 units required for the plants and that it would probably associate with one or more suppliers to meet the total manufacturing schedule within the current timetable required by the project. It also stated that it has already executed small size projects of bulb generators in addition to holding the expertise in design of generators. But it affirmed that it does not have the experience base to develop the design of generators in the size required for the project, reason why it would associate to another supplier experienced in larger size bulb generators. (Page 242/243)

    ii. **Hitachi Brasil Representações Ltda.** It informed that it has the technology to produce bulb turbines and generators in the specified power. The company assured having conditions to adequate the terms to the plants' needs through a detailed study of the project timetable, manufacturing and delivery of equipment (Page 256/258). However, Hitachi has no manufacturing unit in Brazil.

    iii. **OJSC Power Machines / Energ Power Ltda.** Russian OJSC Power Machines, in cooperation with Brazil Energ Power Ltda., affirms having capacity to supply turbines and generators of the plants' size. It also affirms being able to supply them at short / medium term (Page 296/305). However, it has no manufacturing unit in Brazil.

    iv. Chinese **Harbin Electric Machinery Co. Ltd.** and **Dong Fang Electrical Machinery Co. Ltd.** could not be directly contacted by SDE. However, company StarCapital Serviços Ltda. which has a commercial agreement with these two companies declared that they have the capacity to supply 70 MW bulb turbines and generators but, however, have no manufacturing unit in Brazil (Page 582).

30. The following companies informed that they have no appropriate technology for the manufacturing of turbines and generators, being limited to the supply of some components thereof: Bardella, Dedini, Nuclep and Usiminas Mecânica.

31. The following companies informed that hey have no capacity to supply 70 MW bulb turbines and generators: Mitsubishi Electric Corporation – Melco (Page 146/147); Impsa (Page 153); Toshiba (Page 350) and Weg (Page 247).

**Electric, Electromechanical and Hydromechanical Equipment**

32. Among the questioned companies, those which informed having conditions to manufacture or supply the electric, electromechanical and/or hydromechanical equipment for large hydroelectric plants within the established term were:

i. **Bardela S.A. Indústrias Mecânicas.** It informed having the capacity to supply electromechanical and hydromechanical equipment [including water gates] with its own engineering. It also informed having the manufacturing capacity to supply such equipment at short / medium term. Depending on the size and complexity of the project, it affirmed that it would associate with other companies in the business to mitigate risks, distribute factory load and assure the execution timetable (Page 163/164);

ii. **General Electric do Brasil Ltda.** It informed having the technology and capacity to produce associated hydromechanical equipment. In case of electromechanical equipment it informed that it would have to associate with another supplier or subcontractor. The company believes it has the short / medium term production capacity in several of its manufacturing plants worldwide (Page 242/243);

iii. **Hitachi Brasil Representações Ltda.** It informed that it has no capacity to supply hydromechanical equipment. As to electric equipment, it affirms having conditions to supply $SF_6$ gas insulated substations (GIS – Gas Insulated Switchgear) and other high-voltage equipment. The company assured having conditions to adjust the terms to the plants' needs by means of a detailed study of the project timetable, manufacture and delivery of equipment (Page 256/258);

iv. **Indústrias Metalúrgicas Pescarmona S.A.I.C. y F – IMPSA.** It assured having wide capacity to supply the electromechanical equipment required for a bulb type hydroelectric plant as well as the capacity of engineering, manufacturing and management to supply them at short / medium term (Page 259);

v. **Usiminas Mecânica S.A.** Affirmed having the capacity to supply hydromechanical equipment, including water gates, at short / medium term. It informed however that it has no capacity to supply switches (Page 428/431);

vi. **OJSC Power Machines / Energ Power Ltda.** Russian OKSC Power Machines, in cooperation with Brazil Energ Power Ltda., informs having capacity to supply electromechanical and hydromechanical equipment associated with the construction of hydroelectric plants. It also informs that it is able to supply them at short / medium term (Page 296/305);

vii. **Dedini S.A. Indústrias de Base.** Informs being able to supply hydromechanical equipment such as gates of different types and models with its own project to meet the Madeira River project demand (Page 406/408);

viii. **Weg Equipamentos Elétricos S.A.** Informs having the capacity to supply 500 kV switches and ancillary electric equipment of power generation,

transmission and distribution. It also informed that within a horizon of 15 to 24 months it could accommodate the supply of a large part of such equipment (Page 247 and 420).

33. **Toshiba do Brasil S.A.** informed that it does not manufacture electromechanical or hydromechanical equipment associated with the construction of the Santo Antônio and of the Jirau plants. As to electric equipment, it informed that it manufactures power switches but not at the technical specifications requested for the Santo Antônio and the Jirau plants.

34. The other contacted companies informed that they do not have the capacity to supply equipment associated with the construction of the Santo Antônio and of the Jirau hydroelectric plants.

**I.3.2 CONFIDENTIALITY AGREEMENTS ENTERED INTO BY ODEBRECHT**

35. SDE sent official letters to the suppliers of equipment which executed confidentiality agreements (but no exclusivity agreements) with the Respondent to find out whether they are contractually free to supply equipment to other consortiums. [CONFIDENTIAL]

36. **Bardella** and **Sojitz** informed that the confidentiality agreement does not restrict their freedom of negotiation and contracting with other consortiums (Page 432 and 543, respectively).

37. **Hitachi** informed that Odebrecht claims that, due to commitments assumed within the scope of the confidentiality agreement, it would be prevented from participating in other consortiums. However Hitachi disagrees and understands that it could participate in another consortium provided that it will not use documents exclusively owned by Odebrecht (Page 437/438).

38. **IMPSA** informed that in view of execution of the "Deed of Termination to the Confidentiality Agreement entered into by and between Construtora Norberto Odebrecht and IMPSA Indústrias Metalúrgicas Pescarmona SAIC y F" on May 30, 2006, there is no obstacle for it to negotiate with other consortiums (Page 584).

39. Russian **Power Machines** only informed that the sole contractual document entered into with Odebrecht was the Confidentiality Agreement (Page 583).

**I.3.3 POTENTIAL COMPETITORS IN THE AUCTION**

40. SDE identified the potential Odebrecht competing consortiums / companies in the Madeira River auctions and conducted contacted them aiming at finding out:

   i. The actual interest by the consortiums / companies to participate in said auctions. In case of positive answer, SDE questioned if they understood that there was some factor placing them in competitive disadvantage for the participation in the auction; and

      ii. Which suppliers of turbines, generators, electric, hydro-mechanical and electromechanical equipment would be available to associate with a consortium competing with Odebrecht Consortium.

41. The **AMEL – Amazônia Madeira Energética Ltda.** consortium headed by Construtora Camargo Corrêa indicated difficulties of supply of the following equipment due to the exclusivity agreements executed by Odebrecht: turbines, generators, sluice gates, 500 kV switches and $SF_6$ gas insulated substations (GIS), with great emphasis on turbines and generators. AMEL concluded that:

> *"it is clear the economic/competitive disadvantage which will be faced in the auctions by other competitors of said Consortium and consequently it is clear and imminent the risk of frustrating the bidding major purpose: to assure by means of competition among the bidders the moderate rates to consumers of electric power to be generated by those UHE's"* (Page 458/459).

42. According to the **AMEL** Consortium, the GE Group would have the capacity to supply the bulb turbines and generators required for the Santo Antônio and the Jirau hydroelectric plants. It affirmed however that the **possibility of having GE as supplier** *"is conditioned to the release of confidentiality agreements / contracts entered into with the Odebrecht / Furnas Consortium."* (Page 453) (Our bold and italics).

43. It also affirmed that imports are economically disadvantageous for the following reasons: (i) high import tax rate (14%), (ii) high cost of opening of foreign exchange hedge and (iii) impossibility of access to BNDES financing resources.

44. Furthermore, the **AMEL** consortium showed its concern in relation to the exclusivity agreements which would have been entered into by Odebrecht and insurance companies, which could hinder the taking of insurance by competitor consortiums (Page 630). It also pointed out the competitive disadvantage arising out of the exclusivity clause signed by Furnas and Odebrecht which prevents the Eletrobrás group companies from associating with competitor consortiums (Page 631).

45. At the end of its answer, the **AMEL** consortium requested the filing of administrative proceedings against the Respondent and the adoption of a provisional remedy determining the annulment and exclusion of the exclusivity and confidentiality clauses contained in the agreements executed with equipment suppliers, insurance companies and Furnas, since they make it impossible to obtain timely information required for the definition of price proposals and, as such, do not allow for the consequent participation by AMEL and other competitors in the auctions of the Madeira River plants (Page 467).

46. At a subsequent moment, the **AMEL** consortium repeated the request for a provisional remedy (Page 624/640).[3] According to the consortium, there is no validity in the argument that the exclusivity clauses would be justified by an

---

[3] The request of provisional remedy was repeated once again in a petition of September 10, 2007 (Page 743/744).

alleged need to maintain confidentiality of the company secrets contained in engineering projects jointly developed by Odebrecht and its exclusive turbine suppliers. This would be because:

> *"there is no joint development or technological partnership in the current preparatory phase to the bidding (pre-project phase), as the latter is characterized by the simple price quotation with suppliers for the production of turbines and other equipment. The data flow is thus represented by information which solely results from suppliers, with no counter-flow of "technological" information from the Consortium to the suppliers. The information provided by suppliers at this phase are nothing but technical data pertinent to the products they intend to supply to the Consortium if the latter is awarded in the construction of the UHE's, being possible to affirm that, if there is no exclusivity, said information could be conveyed, as mere quotation, to other market agents interested in participating in the biddings, as it is the case of AMEL."* (Page 626)

47. **Alusa** expressed its interest in participating in the auctions, although it reasoned that:

> *"if the news in the press are confirmed (…), mentioning the existence of exclusivity agreements or pre-agreements between the few suppliers of equipment for the execution of works with occasional competitors, we fear that there will be serious obstacles, if not total impossibility, to the submission of any bid."* (Page 539)

48. **Light** expressed having interest in participating in the auctions but mentioned that the exclusivity agreements entered into by Odebrecht with equipment suppliers may compromise its participation. It also mentioned that the short term for the construction of the development of the Santo Antônio and Jirau plants (five years) may make impossible the alternative of installation of new equipment factories in the country. Therefore it emphasizes the concern in relation to the entering of exclusivity agreements with the suppliers already installed in Brazil (Page 579/581).

49. **Suez** also expressed its interest in participating in the Santo Antônio and Jirau auctions but argued that the establishment of the exclusivity regime with a considerable share of potential suppliers of equipment existing in the market is a strong reason for concern. According to the company:

> *"To the extent that a large part of potential suppliers, banks, insurers and construction companies, among others, are prevented from supplying these quotations due to exclusivity agreements, it becomes unfeasible to optimize the construction and implementation costs which would allow the formation of a competitive price for the energy to be offered during the auction. In our understanding, this might create inequality in the process possibly benefiting one stakeholder in detriment of the others (and ultimately of end consumers)"* (Page 577).

### 1.3.4 EXCLUSIVITY / NON-COMPETE AGREEMENT EXISTING BETWEEN ODEBRECHT AND GE

50. In view of the response by the AMEL consortium which indicated the existence of an exclusivity / non-compete agreement between Odebrecht and a company of the GE Group related to the Madeira River Hydroelectric Projects, SDE notified the companies GE Brasil, GE Company ("GE"), holding of the GE Group, and Odebrecht to confirm the existence of such agreement and the terms thereof (Page 548/556).

51. It should be mentioned that Odebrecht had already been previously notified to list <u>all companies</u> with which it had entered into exclusivity agreements related to the Madeira River Hydroelectric Projects (Page 01/02). However, at the time, no reference was made to an exclusivity agreement with any company of the GE Group (Page 13 of Odebrecht's response to DPDE/CGSI Official Letter No. 3016).

52. [CONFIDENTIAL]

53. [CONFIDENTIAL]

54. [CONFIDENTIAL]

55. [CONFIDENTIAL]

56. [CONFIDENTIAL]

57. GE informed that Odebrecht has recently released the GE Hydro Inepar facilities for the manufacture of equipment of the Madeira River Project. GE attached a copy of the letter sent by Odebrecht where Respondent states that:

    > "The GE Hydro Inepar do Brasil <u>facilities</u> are cleared for the manufacturing of equipment for the Madeira River Plants provided that the following is preserved (i) the confidentiality agreements; (ii) everything agreed upon in the minutes of the meeting of January 11, 2006; and (iii) the commitment taken by General Electric's own initiative in the letter sent by Mr. Jeffrey Wiener on March 15, 2006". (Our underscoring).

58. According to GE's understanding, the "release" of GE Hydro Inepar facilities for the manufacturing of equipment for the Madeira River Project would only allow that one company could use the manufacturing facilities for the production of equipment in Brazil. There would still remain the difficulty to obtain the technology required to the design of bulb turbines and generators (the companies holding such technology are, for example, GE and Alstom).

59. Thus, according to GE, the prohibition for it to participate in auctions of concession of plants may limit the possibility of GE Hydro Inepar facilities to produce and therefore supply equipment for this project, since it could not use

        the technology developed by the GE Group entities, such as [CONFIDENTIAL].

60. In its response to the SDE Official Letter containing specific questions on GE, Odebrecht confirmed the existence of the "Minutes of the Meeting". <u>Odebrecht admitted that such document contains an exclusivity and non-compete clause</u> (Page 594). Odebrecht justified the existence of such clause due to the need to protect the technical / strategic information of its project which would have been exchanged with GE (Page 614/618):

> "GE had access to (i) the interface matrix, (ii) information on spare parts (iii) equipment delivery timetable, (iv) turbine / generator assembly output (v) turbine setting, among others. More than that, GE also discussed aspects related to its occasional participation in the enterprise's equity" (Page 615).

61. In a subsequent petition, GE clarified that, in relation to the alleged information which would have been exchanged with Odebrecht:

"GE does not believe it has received any confidential information from Odebrecht which is relevant to its participation in another consortium which may participate in the Madeira River Project" (response to the DPDE / CGSI Official Letter No. 5460/2007).

## I.3.5 OFFICIAL LETTERS SENT TO MME

62. On August 31, 2007, September 06, 2007 and September 13, 2007, SDE sent official letters to the Department of Mining and Energy aiming to find out the potential anticompetitive effects resulting from the exclusivity / non-compete agreements entered into by Odebrecht and equipment suppliers to participate in the auctions of concession of the Madeira River hydroelectric plants (Page 738/741).

63. In brief, the Department of Mining and Energy expressed concern in its responses with the conditions under which the auctions of the Santo Antônio and Jirau hydroelectric plants will be conducted, affirming that:

"By defining competitive conditions as the capacity of similar prices to equipment producing similar performance and which can be delivered in the same terms, the indications obtained by the MME from such surveys are that <u>the competitive conditions to a consortium other than the one formed by Odebrecht would be compromised and hindered</u>". (Page 748) (Our underscoring).

64. This is the report.

## II. <u>REVIEW</u>

## II.1 PRACTICE OF MARKET FORECLOSURE

65. The practices initially taken as the object of this review refer to: