>   i. Entering into of exclusivity / non-compete agreements between Odebrecht and Alstom, VA Tech, Voith Siemens and GE for the exclusive supply of generators, bulb turbines and related equipment required for the construction of the Santo Antônio and Jirau plants;
>   ii. Entering into of exclusivity / non-compete agreements between Odebrecht and [CONFIDENTIAL] for the exclusive supply of electric equipment and related equipment required for the construction of the Santo Antônio and Jirau plants.

66. Also, as seen in the report, potential competitors of the Odebrecht Consortium reported their concerns on the following:

>   iii. Entering into of "Deeds of Commitment" by and between Odebrecht and Furnas which prevent the companies forming the Eletrobrás Group from associating with an eventual consortium competitor to the Odebrecht Consortium for the participation in the auctions of concession of the Santo Antônio and Jirau hydroelectric plants; and
>
>   iv. Entering into of exclusivity agreements by and between Odebrecht and private banks and insurers for the exclusive provision of services required to the participation in the auctions of concession of the Santo Antônio and Jirau hydroelectric plants.

67. Each of these practices will be reviewed below. However, some previous considerations should be made on exclusivity and non-compete agreements.

68. In the case at hand, (i) the <u>exclusivity</u> agreement with a product supplier / service provider prevents the latter from supplying the product / service object of the contract to competitors to the Odebrecht Consortium, even if such consortium is not the winning bidder; and (ii) the <u>non-compete</u> agreement prevents the product supplier / service provider not integrating the Odebrecht Consortium (situation in which GE is today) from associating with a competitor consortium to participate in the auctions of concession of the Santo Antônio and Jirau hydroelectric plants.

69. Such agreements are not anticompetitive *per se* and eventual losses to open competition must be weighed with potential efficiencies in light of the public interest.

70. In this review, the greatest competition concern is that such agreements may foreclose a substantial share of the market of products / services to competitors of the Odebrecht Consortium if, after the execution of agreements, <u>there are no competitively feasible contracting alternatives left in the market</u>. It should be mentioned that the entering of one single exclusivity / non-compete agreement may not be harmful to competition and it is necessary to assess the impact of the set of the agreements entered into.

71. The intervention by the competition authorities in relation to the execution of exclusivity / non-compete agreements will take place only in those cases where

the net effect resulting from the whole of agreements entered into is harmful to the competition.

### II.1.1 CONTRACTUAL IMPEDIMENT TO OTHER COMPANIES / CONSORTIUMS TO ASSOCIATE WITH OTHER COMPANIES OF THE ELETROBRÁS GROUP

72. As reported, the [CONFIDENTIAL] clause of the "Deeds of Commitment" executed by Furnas and Odebrecht sets forth the exclusivity obligation in the participation in both auctions of the Madeira River, binding not only the parties (Odebrecht and Furnas) but also the companies integrating the same economic group of the parties. In the case of Furnas, this means the prohibition to the association of other companies of the Eletrobrás Group with a consortium competing with the Respondent in said auctions.

73. It is understood that the review of this point is compromised since an Amendment to the Deed of Commitment between Furnas and Odebrecht was signed [CONFIDENTIAL] allowing the participation of other companies integrating the Eletrobrás Group in consortiums competing with the Odebrecht Consortium to participate in the Madeira River Project auctions.[4]

### II.1.2 ON THE ALLEGED EXCLUSIVITY AGREEMENT ENTERED INTO BY AND BETWEEN ODEBRECHT AND PRIVATE BANKS AND INSURERS

74. For the construction of hydroelectric plants the size of Santo Antônio and Jirau, the access to financing and insurers is essential for the venture feasibility. However, it should be noted that there are no sufficient signs in the records so far to indicate the existence of an anticompetitive practice by Odebrecht aiming at restricting the competing consortiums' access to private banks and insurers.[5]

75. Nevertheless, in view of the allegations presented, we would suggest the filing of administrative proceedings and the carrying out of necessary measures to investigate such alleged practice.

### II.1.3 EXCLUSIVITY / NON-COMPETE CLAUSES EXECUTED BY AND BETWEEN ODEBRECHT AND SUPPLIERS OF ELECTRIC AND HYDRO-MECHANICAL EQUIPMENT

---

[4] It should be observed that Page 372 of the records contains a newspaper excerpt dated August 23, 2007 informing that the Acting Minister of Mining and Energy, at that time, already confirmed the Government's intention to release the other companies of Eletrobrás Group to participate in the auction. According to the news: *"In order to assure the participation of other state companies an amendment will be made to the contract between Furnas and Odebrecht, which prevented the association of Eletrobrás other companies with the construction company's competitors. Irineu Meirelles, Odebrecht Director, informed that the company will not oppose to the amendment. He said that he does not see any problems in Eletrobrás' subsidiaries joining other consortiums. He just does not relinquish the right to go to the auction with Furnas."* (Page 732)

[5] In this sense, we should observe that the AMEL consortium, in the Page 624/640 petition, mentions only the exclusivity agreements which would have been executed by Odebrecht and insurers, and did not complain - at the time - of market foreclosure in relation to private banks.

76. And neither are there, in the records, so far, sufficient signs to indicate the existence of anticompetitive practice by Odebrecht aiming at restricting the competing consortiums' access to companies supplying electric and hydromechanical equipment.

77. The tables below, referring to manufacturers of hydromechanical equipment and, specifically, sluice gates for large size hydroelectric plants, indicate that, in a preliminary analysis, there are no issues of market foreclosure due to the exclusivity / non-compete agreements entered into by Odebrecht.

### Table 1 – Hydromechanical Equipment (except sluice gates)

| Company | Does it have an exclusivity agreement with Odebrecht? | Does it have manufacturing unit in Brazil? |
|---|---|---|
| Alstom | Yes | Yes |
| Bardella | No[6] | Yes |
| IMPSA | No | No |
| GE | GE Company entered into an exclusivity / non-compete agreement with Odebrecht. Odebrecht has recently expressed its agreement in allowing the use of GE Hydro Inepar manufacturing facilities by a competing consortium, but not the use of GE technology of turbine and generator manufacturing. | Yes |
| Dedini | No | Yes |
| Usiminas Mecânica | No | Yes |
| Power Machines | No | No |

### Table 2 – Sluice Gates

| Company | Does it have an exclusivity agreement with Odebrecht? | Does it have manufacturing unit in Brazil? |
|---|---|---|
| Alstom | Yes | Yes |
| Voith Siemens | Yes | Yes |
| Bardella | No | Yes |
| Dedini | No | Yes |
| Usiminas Mecânica | No | Yes |
| IMPSA | No | No |
| GE | GE Company entered into an exclusivity / non-compete agreement with Odebrecht. Odebrecht has recently expressed its agreement in allowing the use of GE Hydro Inepar manufacturing facilities by a competing consortium, but not the use of GE technology of turbine and generator manufacturing. | Yes |
| Power Machines | No | No |

78. Finally, the electric equipment used in large hydroelectric plants are several, such as power switches, insulated substations, voltage and speed regulation systems and protection, control and supervision systems. In communications from SDE to the Department of Mining and Energy, the latter also did not identify any issues of market foreclosure in relation to electric equipment. Thus,

---

[6] Note that the AMEL consortium claims that Bardella would operate in the market jointly with Alstom and, therefore, *"it would be prevented from submitting a firm proposal for the supply of hydromechanical equipment UHE Santo Antônio"*. (Page 458)

we understand for the non-existence of sufficient signs so far to indicate market foreclosure in relation to the access to electric equipment by the Respondent competitors in the auctions of the Santo Antônio and Jirau plants.

79. The situation reoccurs in relation to electromechanical equipment. In this sense, the *Empresa de Pesquisa Energética* (EPE) informed that:

> *"There are in Brazil several suppliers which could meet the requirements of the Madeira River projects considering that such equipment are virtually common in all hydroelectric plants"* (Page 160).

80. Nevertheless, in view of the presented allegations, we would suggest the opening of administrative proceedings and the carrying out of necessary measures to investigate such alleged practice.

## II.1.4 EXCLUSIVITY / NON-COMPETE CLAUSES EXECUTED BY AND BETWEEN ODEBRECHT AND SUPPLIERS OF BULB TURBINES AND GENERATORS

### II.1.4.A   GENERAL CONSIDERATIONS

81. The scope of this review is to assess whether the exclusivity / non-compete agreements entered into by Odebrecht with suppliers of generators and bulb turbines imply market foreclosure so as to prevent competitors from participating, in a competitive manner, in the auctions of the Santo Antônio and Jirau hydroelectric plants. We should emphasize the importance of generators and bulb turbines in the formation of total cost of ventures: for example, in the case of Santo Antônio, such equipment answers for 30% of the cost of the works.[7]

82. If the market foreclosure is confirmed this fact can be extremely detrimental to the competition in auctions, resulting in much higher prices of electric power and decrease of the well-being of Brazilian consumers, in addition to a direct loss to public coffers.

83. We should initially check which companies - suppliers of generators and bulb turbines - remained free to negotiate and supply such equipment in the market after the exclusivity / non-compete agreements entered into by Odebrecht. We should also assess whether the supply by imports appears as a competitively feasible alternative.

84. The tables below show the results of contacts/investigations carried out by SDE with companies supplying generators and bulb turbines:

---

[7] See information from the Department of Mining and Energy, *Nota Informative* No. 001/DPE-DOC/SPE/MME of September 11, 2007 (Page 746). According to information from the Department of Mining and Energy, Official Letter 1811/2007, the costs of generators and bulb turbines to be used in the Jirau plant should be higher than those in Santo Antônio.

**Table 3 – 70 MW Generators and Bulb Turbines**

| Company | Does it have an exclusivity agreement with Odebrecht? | Does it have manufacturing unit in Brazil? |
|---|---|---|
| Voith Siemens | Yes | Yes |
| Alstom | Yes | Yes |
| VA Tech | Yes | No |
| GE | GE Company entered into an exclusivity / non-compete agreement with Odebrecht. Odebrecht has recently expressed its agreement in allowing the use of GE Hydro Inepar manufacturing facilities by a competing consortium, but not the use of GE technology of turbine and generator manufacturing. | Yes |
| Hitachi | No | No |
| Power Machines | No | No |
| Dong Fang | No | No |
| Harbin | No | No |

85. As seen in the Table above, only four (04) companies supplying 70 MW generators and bulb turbines are not contractually bound to Odebrecht. Out of those, none has a manufacturing unit in Brazil. Besides, the Chinese Dong Fang and Harbin could not even be directly contacted by SDE, which was not able to confirm whether such companies would be interested and would have manufacturing availability to supply equipment to the Madeira River Project. The Department of Mining and Energy equally reports that it had no return from the attempts to contact the Chinese manufacturer (Page 747).

86. Furthermore, according to information in the records, each hydroelectric plant of Madeira River will demand a total of forty-four (44) generators and bulb turbines, which could make it difficult for one supplier to serve the entire venture by itself. Besides, this is a major project requiring sharing of risks by more than one supplier.

87. In this aspect, and in aresponse to the SDE Letter, GE informed that it would have to associate with another turbine supplier to meet the project demand (Page 242). Such information is in line with the answers from other competitor consortiums and with the understanding by Odebrecht itself, which justified having formed a consortium with three (03) suppliers of generators and bulb turbines (in addition to the exclusivity agreement with GE) considering the size of the venture and the need of risk mitigation.

88. As to GE Hydro Inepar, we understand that, from a competitive standpoint, the solution presented by Odebrecht to "release" the manufacturing facilities of such company is insufficient. This is because the combination of technology and manufacturing plant in Brazil appeared to be an essential condition for the submission of a competitive bid in the auction. Add to that the above observation on the need of risk sharing by more than one company in a venture this size.

89. On that aspect, in response to the DPDE/CGSI/560/2007 Official Letter, the Department of Mining and Energy emphasized the need to combine technology and manufacturing plant in Brazil to allow for the presence of other competitors

in the auction. The answer from the Department of Mining and Energy is transcribed below *in verbis*:

> "Considering the responses from all turbine manufacturers with whom we discussed the issues (ALSTOM, VA TECH, SIEMENS, GE, IESA, IMPSA, HITACHI, POWER MACHINES), **our perception is that the existence of manufacturing facilities in the Country is not sufficient to enable such supply under competitive conditions.**
>
> All manufacturers informed that they have no conditions to individually offer a bid to the venture. Due to the size and complexity of the supply, there is need for a group of large companies to support the technological warrant of the supply.
>
> By way of illustration, we make reference to the case of Hitachi, which clearly expressed to this Department the need to associate with GE Internacional to be able to effectively participate as a supplier of equipment to the Santo Antonio hydroelectric plant on the Madeira River. The company Director informed that "it will not submit a proposal of supply if they cannot associate with GE Internacional". (Page 744) (Our bold).

90. Finally, it is worth noting that a competitively feasible consortium should necessarily have the participation of at least one company of the size of Alstom / GE / Voith Siemens, which are major economic groups able to face the business risk, in addition to holding the technology required to the design of the equipment.

### II.1.4.B    COMPETITIVE DISADVANTAGE OF IMPORTS

91. The analysis of a potential market foreclosure does not involve the verification of existence of equipment suppliers available in the market only, but also the evaluation of their competitiveness. This is because it would be useless to have supply alternatives that ate not very efficient to the remaining competitors. In a bidding process, such situation would cause the bidders to participate in unfavorable competitive conditions, which undoubtedly would mean a higher price than the one resulting from an actually competitive process.[8]

92. Within such context, the need for a combination of manufacturing plant and technology in Brazil also arises out of the fact that imports are not a competitively feasible alternative to the potential consortiums competing with the Respondent.

93. One of the reasons is that, in order to obtain financing from BNDES (National Bank for Social and Economic Development), there is a requirement that the

---

[8] The illustrious Professor H. Hovenkamp, on discussing the practice of exclusivity agreements, calls our attention to this issue: *"Many of the foreclosure theories of exclusive dealing become more robust if one views them, not as excluding rivals from a market altogether, but as raising rivals' costs by relegating them to inferior distribution channels."* In: Hovenkamp, H. Federal Antitrust Policy: The Law of Competition and Its Practice. West Publishing: St. Paul, Minn, 1999, Page 431.

equipment should be produced or should have aggregation of value in the national territory. In this specific case, the BNDES financing appears even more important, since the project at hand integrates the Growth Acceleration Program (PAC) and, therefore, enjoys highly favorable financing conditions (TJLP interest plus basic spread of 0.5%, long amortization period – 20 years – and minimum grace periods of 06 months). Thus, the supply by means of imports considerably increases the cost of equipment because the eventual competitor consortiums would search for more expensive sources of financing.

94   If the competitors would choose to take loans in foreign currency, they would also have to bear the costs of the foreign exchange hedge, which makes the scenario even more unfavorable in the impossibility to use the BNDES financing.

95.  Besides, the price of imported products would suffer an addition of 14% resulting from the import taxes - an additional competitive disadvantage to the occasional competitors of the Odebrecht Consortium. Add to such disadvantage the costs related to the logistics involved in importation.

96.  It is therefore clear the raising of costs and the consequent competitive disadvantage for the consortiums competing with Odebrecht Consortium, if they are denied the alternative of engaging a local supplier. This would adversely affect the auction result.[9]

97.  With regards to this issue, Odebrecht claims that occasional problems of higher costs related to import of equipment could be solved with the construction of a factory in Brazil. However, such possibility bumps into some difficulties such as the foreign companies' economic interest in building a factory in the country, considering, among other factors, that the Brazilian market already has major suppliers of turbines and generators – which are contractually bound to Odebrecht only with regards to the Santo Antônio and Jirau auctions. Besides, there is a reduced time window for the start of delivery of turbines and generators.

98.  **Light Energia,** although admitting that foreign manufacturers could be interested in building factories in Brazil, affirmed that:

> *"the problem would be the reduced time frame for the construction of the venture (five years), which could make it impossible for new factories to install themselves in Brazil".* (Page 580)

99.  Finally, in relation to the competitive disadvantage of imported products, the Department of Mining and Energy informed that:

---

[9] Naturally, when bidding in an auction, an economic player considers the competitiveness of its rivals. If it concludes that the price to be offered by them will be added of additional costs such as those arising out of import of equipment, it will be bound to offer a higher bid than what it would submit under other competitive conditions, thus increasing the price of the entire auction and causing direct losses to the public coffers and reducing the consumer's well being.

> *"(...) the competitiveness of the bid depends on its association with a local supplier, considering that the supply involves the manufacturing of large parts with no relevant aggregate value, whose transportation would make prices non-competitive.*
>
> *Another aspect to affect the competitiveness is the fact that imported goods are not financed by BNDES, indicated as preferred source for the Santo Antônio plant due to its attractive financing conditions.*
>
> *And last, but not least, we have been informed that the manufacturing capacity of these foreign suppliers is not sufficiently consistent to meet its traditional market concurrently to the Santo Antônio plant. This would represent, if there are no partners for the project to share the manufacturing, their exit from the market for the time required to supply Santo Antônio."* (Page 748/749)

### II.1.4.C NON-SUBSISTENCE OF JUSTIFICATIONS PRESENTED BY ODEBRECHT FOR THE EXCLUSIVITY / NON-COMPETE AGREEMENT

100. Respondent presented two main reasons to justify the execution of exclusivity agreements with many suppliers of generators and bulb turbines[10]:

> (i) <u>Mitigation of financing risk</u>: According to Respondent, within a Project Finance context, the hiring of more than one supplier of turbines and generators is justified by the required sharing of risks among such companies. Thus, the concessionaire could conceive the concentration of the supply risk in the hands of one single player, which would put the completion of the development at risk, and no supplier would assume the risk of such huge delivery in such isolated manner and with the almost full commitment of its manufacturing capacity;
>
> (ii) <u>Exchange of confidential information for the participation in the Madeira River auctions</u>: According to Respondent, in order to participate in a development of the size of Madeira River plants, they have to prepare a pre-engineering project which requires the exchange of technological and strategic information between the company and the equipment suppliers.

101. As to the first reason, the need of mitigation of the investment risk does not justify the execution of the exclusivity clause with equipment suppliers. Such reasoning explains only the need to contract more than one supplier of turbines and generators, considering the size of the Madeira River hydroelectric plants. Besides, aiming to assure the supply and price if it wins the bidding, the requirement of a firm offer by the suppliers would suffice (with no need of a relationship by means of an exclusivity / non-compete clause).

102. On the other hand, this reasoning shows the adverse competitive conditions to be faced by the Respondent's competitors, to the extent that they were left with very few

---

[10] The same justifications were presented in relation to the exclusivity imposed on the suppliers of other equipment required for the construction of plants.

options of supply and that only one supplier of each type of equipment is not sufficient for their engagement in the construction of Santo Antônio and/or Jirau plants.

103. We now analyze the justification of the exchange of strategic information between Odebrecht and the equipment suppliers as a reason for the entering into of an exclusivity / non-compete clause.

104. As seen in the report, Odebrecht entered into an exclusivity / non-compete agreement with four (04) suppliers of turbines and generators: Alstom, VA Tech, Voith Siemens and GE; the first three (03) companies are part of the consortium formed by Odebrecht to participate in the biddings of Madeira River plants. GE remains with the commitment not to compete with the Respondent, although it has decided not to be a part of the Odebrecht Consortium.

105. Respondent claims that it has already shared confidential information with the equipment suppliers so that an occasional breach of the agreed upon exclusivity / non-compete clause would imply substantial losses to its participation in the Madeira River auctions. Its competitors would have at their disposal the company technical and strategic information in an opportunist behavior typical of free riders.

106. So we will review separately the exclusivity / non-compete agreements entered into by and between (i) Odebrecht and GE; and (ii) Odebrecht and Alstom, VA Tech and Voith Siemens.

**Exclusivity / Non-Compete with GE**

107. In the specific case of GE it happens that the "Minutes of the Meeting" containing the obligation of confidentiality and non-compete were signed with Odebrecht on January 11, 2006. On [CONFIDENTIAL] GE informed Odebrecht that it would not participate in the Odebrecht Consortium.

108. It is worth mentioning that **on [CONFIDENTIAL] when GE ceased to exchange information with Odebrecht, the Respondent had not yet entered into the "Confidentiality and Exclusivity Agreement" with the companies manufacturing turbines and generators which currently form its consortium to participate in the Madeira River auctions.** Such agreement was only entered into on June 12, 2006, that is, approximately three months later.

109. In its answer to SDE Odebrecht stated the following regarding the execution of such Agreement:

> *"The consolidation of the relationship involving CNO and the selected partners, combined with the need of a joint development of pre-engineering which would enable the formulation of a proposal to investors and the exchange of confidential information on technical, commercial, financial and strategic data led the parties to enter into a confidentiality and exclusivity agreement on June 12, 2006 (Exhibit 9) and subsequently an amendment on October 26, 2006 (Exhibit 10)."*
> (Page 8 of Odebrecht Answer to DPDE / CGSI Official Letter No. 3016)

110. Thus, as clarified by Odebrecht itself, **GE <u>did not participate in the phase of furthering of discussions</u>** between Odebrecht and the equipment suppliers selected by the company to form the consortium which will participate in the Madeira River auctions, therein included the pre-engineering process phase which is the foundation for the price proposal.

111. On being questioned on the information actually exchanged in the period of dealings with Odebrecht, GE affirmed that:

> *"GE does not believe it has received any confidential information from Odebrecht which would be relevant to its participation in another consortium which might take part in the Madeira River Project."*
> (Answer to DPDE / CGSI Office Letter No. 5460/2007)

112. In fact, the analysis of the type of information which Odebrecht affirms having exchanged with GE[11] shows that an expressive part of the data (such as "turbine / generator assembly output") is currently in the public domain as they appear in the feasibility studies approved by ANEEL on March 30, 2007.

113. Even if we considered that the information exchanged between GE and Odebrecht had some specificity at the time, we understand that such information would already be outdated by one and half year after the end of the communications. Additionally, the flow of information at the pre-project stage chiefly occurs from the equipment suppliers to the construction company and not the opposite, and therefore if there were any information to be protected, it would be owned by GE (See Items 115 to 122).

114. In view of the above, it is understood that the reasoning presented by Odebrecht for the maintenance of the exclusivity / non-compete agreement with GE is ungrounded because:

> i. The negotiations period lasted from January 11, 2006 to [CONFIDENTIAL], being that GE ceased to exchange information with Odebrecht before the furthering of discussions on the Madeira River project; and

> ii. Even if we considered that the information exchanged were relevant at the time, (a) the flow of confidential information would have been mainly from GE to Odebrecht (b) large part of the exchanged information relates to information now publicly available in the feasibility studies; and (c) other occasional information would be outdated today by one and half year after the end of the communications.

## Exclusivity / Non-Compete Imposed on other Suppliers of Turbines and Generators

---

[11] According to Odebrecht, *"GE had access (i) to the interface matrix, (ii) information on spare parts, (iii) equipment delivery schedule, (iv) the turbine/ generator assembly outputs, (v) setting of turbine, among others. If this were not sufficient, GE also discussed some aspects related to the occasional participation in the enterprise's equity."* (Page 615)

115.  The analysis on the degree of confidentiality of information exchanged between Odebrecht and Alstom, VA Tech and Voith Siemens goes through the understanding of what is the process of pre-project of hydroelectric developments of the size of the Santo Antônio and the Jirau plants. The main purpose of such process is to enable the formulation of price bid to be submitted in the auction. In order to do so, it is necessary to obtain the quotation of prices with equipment suppliers.

116.  During the pre-project phase, commercially sensitive information may have been exchanged which deserve confidential treatment. However, in such phase, occasional specific studies required by the exceptional size of turbines are based on data owned by the supplier, which holds the technology / know-how to optimize the design and output of the equipment. In this aspect, the Department of Mining and Energy informed that:

> *"The Santo Antônio Plant requires a hydro-generator[10] that has never been manufactured, which requires a more refined criterion in the selection of suppliers, <u>The suppliers</u>, on their turn, should produce specific studies already in the budgeting phase, providing data exclusive to the project and, naturally, the price."* (Page 746) (Our underscoring)

117   On the information flow, the Department of Mining and Energy further clarified that:

> *"For the major equipment of a hydroelectric plant, if that is actually the purpose thereof, the equipment suppliers should, by means of the project technical requirements, select an alternative of equipment to use in the plant and supply its technical specifications to the engineering company.*
>
> *Such technical specifications are used by engineering companies to compose, together with other requirements, the sizing of civil works and to carry out the integration of such equipment with others supplied by third parties so as to obtain the general design of the work."* (Page 745/746)

118.  Thus, as a rule, <u>equipment suppliers are the ones conveying confidential information to the civil construction company,</u> and according to the Department of Mining and Energy, the inverse does not occur:

> *"Note that the confidentiality on the civil works is not under discussion, since the groups interested in the Santo Antônio plant are predominantly led by contractors <u>whose costs naturally will not be disclosed</u> (...)"* (Page 746) (Our underscoring)

119.  In its response, the Department of Mining and Energy clarifies that the discussions between the construction company and the turbine and generator suppliers on the best technical solution for the Madeira River ventures are

---

[10] Hydro-generator is used as synonym for turbine.

limited, bearing in mind that this issue has already been settled by the selection of the bulb type turbine after the feasibility studies of a public nature.

120. Therefore, it is unfounded the Respondent's claim that it carried out several technical studies with its suppliers which cannot be disclosed now under penalty of frustrating all its investment. The answer by the Department of Mining and Energy is transcribed *in verbis*:

> "*The hydro-generators in the specific case of the Santo Antônio plant alreadyhave their type (Bulb) determined as a result of the feasibility study available to all interested parties, which reduces the developers' margin of choice, and consequently, reduces the possibility of selection of suppliers.*
>
> *Considering the percentage share of costs of this equipment in the total of works, the requirement of confidentiality to the suppliers thereof, in our opinion, is not a relevant factor for the preservation of secrecy of the bid.*" (Page 746) (Our underscoring)

121. The actual understanding of how the process of pre-project occurs in hydroelectric ventures the size of Santo Antônio and Jirau undermines Odebrecht's claims that an occasional breach of exclusivity / non-compete agreed upon with the equipment suppliers would be very detrimental thereto because it would disclose to its competitors such information of high commercial value to the Respondent, in an unfair and opportunistic manner.

122. On the contrary, a more detailed review of this process shows that:

> i. The technical feasibility studies of the Santo Antônio and of the Jirau hydroelectric plants, publicly available, already set forth the technical specifications of turbines and generators to be used;[11]
>
> ii. Occasional adaptations to publicly available general specifications are prepared by suppliers, who hold the equipment technology and know-how. Thus, the flow of confidential information is chiefly from the equipment suppliers to the construction company and not the opposite.

### II.1.4.D   CONCLUSION AND NEED OF PROVISIONAL REMEDY

123. In brief:

> i. Respondent entered into an exclusivity/non-compete agreement with all suppliers of generators and bulb turbines with manufacturing units in Brazil (that is, Alstom, GE, Voith Siemens), in addition to an agreement entered into with VA Tech:

---

[11] Note that Odebrecht, which carried out the feasibility studies in partnership with Furnas, will be reimbursed for the expenses incurred for the development of the studies, such being the model of concession of hydroelectric ventures adopted in the country.

ii. Considering the companies with no manufacturing unit in Brazil, only four (04) suppliers of large size generators and bulb turbines are not contractually connected to Odebrecht (Dong Fang, Harbin, Hitachi and Power Machines). It is worth mentioning that Chinese companies Dong Fang and Harbin could not even be directly contacted by SDE and by the Department of Mining and Energy, with no confirmation of those companies' interest in participating in the auctions;

iii. A competitively feasible consortium shall necessarily have the participation of at least one economic agent the size of Alstom /GE/Voith Siemens which are major business groups able to face the business risk, besides holding the technology required for the design of equipment;

iv. The "release" by Odebrecht of GE Hydro Inepar <u>manufacturing unit</u> is not sufficient in itself to enable the formation of other consortiums which would bid in the auction in equal competitive conditions with Odebrecht, being essential the combination of technology and manufacturing unit in Brazil; and

v. The importation of equipment does not appear to be a competitive alternative due to the high costs associated thereto (impossibility of access to BNDES financing, high import taxes and logistics).

124. The analysis carried out so far enables the conclusion for the existence of strong signs of violation to the economic order, consisting in the existence of exclusivity / non-compete agreements entered into by Odebrecht with turbine and generator suppliers which, as everything indicates, are able to result in market foreclosure. We would therefore suggest the filing of administrative proceedings aiming at investigating such practice.

125. We would further suggest, based on Article Fifty-Two of Law No. 8.884/94[14] the adoption of a provisional remedy to ensure that the auctions of concession of Santo Antônio and Jirau occur under competitive conditions. In fact, without the adoption of a provisional remedy, Respondent would maintain the artificially obtained large competitive advantage over its other competitors, which would reflect on the value of its bid in the auctions to secure the concession of the plants.[15]

126. It should be emphasized that the granting of a provisional remedy does not aim at the direct protection of a competitor but rather at the collective well-being, that is, the public interest. We will now demonstrate the existence of requirements for the granting of a provisional remedy: appearance of law (*fumus boni iuris*) and danger of irreparable injury or of damages of difficult redress to the market (*periculum in mora*).

---

[14] *"Article Fifty-Two – In any phase of the administrative proceedings the SDE Secretary or the Reporting Commissioner may, at his own initiative or through incitement by the CADE Attorney General, adopt such provisional remedy <u>when there are signs or grounded fear that the respondent, directly or indirectly, causes or may cause to the market irreparable damages or damages of difficult redress or render ineffective the proceeding final result.</u>"*

[15] This because on offering a bid in an auction, a company considers the level of rivalry offered by its competitors, in an economic rationality logic. If it understands that the price to be offered by competitors will be added of costs such as those arising out of importation of equipment, it will offer a higher bid than it would present in other competitive conditions.

### (i) Presence of *Fumus boni iuris*

127. The *Fumus boni iuris* applicable within the antitrust scope in conducts addressed by Law No. 8.884/94 is understood as the appearance of good law which indicates the need of intervention, *in limine,* of the competition defense authorities, due to the presence of sufficient signs that a certain conduct is causing or may cause anti-competitive effects provided for in said Law.[16]

128. That is, from the assertion that certain conducts in the market reveal a possible limitation, distortion or any other form of damage to the open competition and free initiative (Article Twenty, Item I), domination of the relevant market of goods or services (Article Twenty, Item II), arbitrary increase of profits (Article Twenty, Item III), or abusive exercise of dominant position (Article Twenty, Item IV), there arises the *fumus boni iuris,* consisting in the collectivity's right to state intervention to protect it from such practices in the market.

129. Items 81 to 123 above indicate the existence of strong signs of market foreclosure in the market of bulb turbines and generators due to the exclusivity / non-compete agreements executed by Odebrecht and supplying companies. The existence of the *fumus boni iuris* requirement to authorize the granting of a provisional remedy is therefore justified.

### (ii) Presence of *Periculum in Mora*

130. The requirement of *periculum in mora* consists of the imminence of production of irreparable injury or damages of difficult redress to the market due to a possible identified violation so as to require an immediate state action.

131. In the present case, the *periculum in mora* is clear, since the auction of Santo Antônio plant is scheduled to take place soon (October 30, 2007).[17] The time aspect is of great importance in this case since this is a major project requiring a minimum time of negotiation before reaching the value of the bid.

132. Having the requirements authorizing the granting of a provisional remedy been deemed present, it is important to assess which remedy would better restore the market competition conditions in order to re-balance the public and private interests.

### (iii) Scope of Provisional Remedy

**Annulment of GE's Obligation Not to Compete**

---

[16] According to HUMBERTO THEODORO JR, the *fumus boni iuris* is a perfunctory assertion of the *plausibility of the material law* at risk and, at first, definitive proof of its existence is not required.. THEODORO JR., Humberto. *Curso de Direito Processual Civil,* 26th edition, Rio de Janeiro: Forense, 1999, page 371.

[17] Under terms of the Department of Mining and Energy Ordinance No. 186 of August 10, 2007 published in the Federal Official Gazette of August 13, 2007, Section 1, No. 52. It is worth mentioning that the auction of the Jirau plant should take place in the first half of 2008.

133. In view of the above discussion, we understand for the relevance and need to adopt a provisional remedy to annul the non-compete clause agreed upon by Respondent and GE by means of the "Minutes of the Meeting – MOM" on January 11, 2006.

134. We understand that the annulment of the GE / Odebrecht non-compete clause will not imply losses to Respondent, since:

> i. GE ceased to exchange information with Odebrecht before the furthering of discussions on the Madeira River project;

> ii. Even if we considered that the information exchanged were relevant at the time, (a) the flow of confidential information would have been mainly from GE to Odebrecht (b) large part of the exchanged information relates to information now publicly available in the feasibility studies; and (c) other occasional information would be outdated today by one and half year after the end of the communications. (See items 107 to 114)

135. The annulment of the GE / Odebrecht non-compete clause will represent an essential option of supply of generators, bulb turbines and related equipment to potential competitors in biddings of plants. This is a "release" of a major financial economic group (GE Group) with technology and manufacturing unit in Brazil which will be able to associate with other equipment suppliers such as Hitachi and Power Machines by providing the formation of consortiums to participate in biddings under more favorable conditions from a competitive standpoint.

136. In order to meet such purpose and ensure a pro-competitive net effect we would suggest that it is required of GE not to bind itself exclusively with any other consortium to participate in said concession biddings. In this manner, different companies / consortiums may consult GE to quote the price of equipment for the formulation of bid which will be presented in the auctions.

137. It cannot be said that the requirement that GE will not be bound under exclusivity to one single consortium will make the preparation of a competing bid in the pre-auction phase unfeasible. This is because in several manifestations by companies interested in participating in the auctions (AMEL, Suez, Alusa), and according to the Department of Mining and Energy, there is no requirement to enter into an exclusivity agreement at that stage, being sufficient the receipt of a firm bid of prices for the calculation of the precise amount of the auction bid.

## Annulment of the Exclusivity Provision in the Post-Auction by Alstom, VA Tech and Voith Siemens

138. In addition to the above action, we understand for the pertinence and need to adopt a provisional remedy to annul the exclusivity clause agreed upon by Respondent with Alstom, VA Tech and Voith Siemens by means of the "Confidentiality and Exclusivity Agreement" entered into on June 12, 2006 and amended on October 26, 2006, in relation to the prohibition of Alstom, VA Tech and Voith Siemens Groups from supplying equipment to other consortiums if the Odebrecht Consortium is not the winning bidder in the auction (the non-compete obligation is contained in

[CONFIDENTIAL] clause of said agreement[18]). Under the agreement terms, the economic groups Alstom, VA Tech and Voith Siemens are exclusively bound to Odebrecht for any activity related to the Madeira River Hydroelectric Projects until [CONFIDENTIAL].

139. In view of all of the above, we realize that the "release" of the GE Group represents a solution which, although reducing the competitive disadvantage the other players face in relation to the Odebrecht Consortium, does not ensure the required conditions so that the participation in the auctions will occur in a competitive manner.

140. We should recognize that Odebrecht is in a competitively favorable position due to the fact that it took such actions, before its competitors, to form a consortium having the participation of all economic players required for the development of the venture. We do not intend here to punish Odebrecht's entrepreneurism, but rather to <u>correct excess which may result in competitive distortions</u>.

141. Odebrecht justified the need for the exclusivity clause to protect technical and strategic information owned by it which would have been exchanged between Odebrecht and Alstom, VA Tech and Voith Siemens during the pre-project phase. It is known that, during such phase, there was a furthering of information exchanged by such companies, although, as seen, the flow of confidential information is predominantly from the equipment suppliers to the construction company and not the opposite.

142. What we attempt is to analyze which is the best solution to balance the public interest to increase the competition level in auctions with Odebrecht's private interest to enter into exclusivity agreements to meet its business interests.

143. Considering a solution which will best meet the public interest and will intervene in the market in the appropriate degree to prevent competitive conditions from being distorted, we understand:

> i. That the exclusivity agreements entered into by Odebrecht with equipment suppliers integrating its consortium should be maintained until the holding of the respective auctions of the Santo Antônio and Jirau plants; and
>
> ii. That the exclusivity obligation by Alstom, VA Tech and Voith Siemens should be annulled, so as to allow the companies integrating the economic groups of Alstom, VA Tech and Voith Siemens to be able to, <u>after the occurrence of each of the auctions of Santo Antônio and Jirau</u>, negotiate with the winning consortium of each auction, aiming at supplying equipment and related services, if the consortium led by the Odebrecht Group is not the winning bidder in each auction.

144. The permission to the Alstom, VA Tech and Voith Siemens Groups to supply generators and turbines to the winning consortium <u>if Odebrecht is not the winning bidder</u>, opens up the possibility that potential consortiums will participate in the bidding and form their own prices by foreseeing the possibility also to have the production

---

[18] [CONFIDENTIAL]

capacity of Groups such as Alstom or Voith Siemens to meet the project demands. Such action will therefore result in the formation of a greater number of consortiums and/or submission of bids with lower prices.

145. In fact, in a newspaper report of July 12, 2007, there is reference to the fact that this solution would have been considered by the Suez Group as an alternative that would allow it to participate in the auctions:

> "*Potentially interested in national equipment, the Suez Director assesses that any exclusivity can be valid only prior to the auction. "It is this way in any country in the world", he emphasized. After that, if Odebrecht does not win, the Suez executive does not see "economic logic" in maintaining an agreement (...)*". (Page 510)

146. Considering that the auctions will take place on different dates, the provisional remedy herein suggested allows that:

> i. The Alstom, VA Tech and Voith Siemens groups will supply generators, bulb turbines and related equipment to the winning consortium of the concession auction of the <u>Santo Antônio plant</u>, if the winning of such auction is not the Odebrecht Group;

> ii. The exclusivity by the Alstom, VA Tech and Voith Siemens Groups for the supply of generators, bulb turbines and related equipment to the Odebrecht Consortium for the <u>Jirau plant</u> will be maintained until the holding of such auction; if the Odebrecht Consortium is not the winning bidder in this auction, said suppliers may equally supply generators, bulb turbines and related equipment to the winning consortium.

147. It cannot be said that the partial annulment of the exclusivity clause agreed upon by Odebrecht with Alstom, VA Tech and Voith Siemens in relation to the Santo Antônio plant concession auction may distort the competitive conditions in the second auction (Jirau).

148. This is because the locations of the two plants are characterized by distribution of different heads and flow rates, which causes different specifications for equipment (generators and turbines) and, consequently, different price quotations. In this aspect, the Department of Mining and Energy, in response to the DPDE/CGSI Official Letter No. 5733/2007 sent by SDE, informed that:

> "*a) (I) Are the technical specifications of generators and bulb turbines to be used in the Santo Antônio and in the Jirau plants different?*
>
> *Yes. Although the equipment is similar and follow the same project design, there are differences, since the locations of the two plants are characterized by different distributions of heads and flow rates. I would also emphasize that the turbine-generator assembly rated power is 71.5 MW and 75 MW, respectively, for Santo Antônio and Jirau plants.*

> *a) (II) Could such differences in specifications influence the product final price?*
>
> *Yes. Considering that the equipment is associated with the respective sizes of the units, those referring to Jirau plant would require investments higher than those referring to Santo Antônio plant."* (Page 753)

149. The differences between generators and bulb turbines to be used in the Santo Antônio and in the Jirau plants also become clear from the review of the relevant feasibility studies approved by ANEEL. The tables below show in summary some of the differences pointed out:

### Table 4 – Differences between Bulb Turbines

| Specification | Santo Antônio | Jirau |
|---|---|---|
| Rated unit power (kW) | 73.000 | 75.000 |
| Synchronous rotation (rpm) | 81.8 | 85.7 |
| Reference head (m) | 13.9 | 15.1 |
| Rated unit flow rate ($m^3$/s) | 561 | 542 |
| Total weigh per unit (kN) | 8.820 | 8.400 |

### Table 5 – Differences between Generators

| Specification | Santo Antônio | Jirau |
|---|---|---|
| Rated unit power (kW) | 80.000 | 84.000 |
| Rotor weight (kN) | 2.300 | 2.100 |

150. Thus, we cannot speak of any loss to Odebrecht with the breach of exclusivity in the post-auction of the first bidding if the company is not the winner, as potential consortiums participating in the Jirau auction will not have had access to commercially relevant information of Alstom / VA Tech / Voith Siemens which would affect the equipment price bid to be submitted in the Jirau hydroelectric plan concession auction.

### III.   CONCLUSION

151. Therefore, in view of the strong signs of violation to the economic order configured in the potential foreclosure of the market to the auctions of concession of the Santo Antônio and of the Jirau plants, we would recommend the opening of administrative proceedings against the Respondent under terms of Article Twenty, Items I and II, combined with Article Twenty-One, items V and VI[19] of Law No. 8.884/94.

---

[19] Article Twenty-One of Law No. 8.884/94, Items V and VI, provides the following:
"Article Twenty-One – The following conducts, in addition to others, to the extent that they will configure the hypothesis provided for in Article Twenty and items thereof, characterize violation to the economic order:
(...) V – Create difficulties to the organization, operation or development of a competitor or supplier, purchaser or financer of goods or services;
VI – Prevent the competitor's access to sources of inputs, raw materials, equipment or technology, as well as to distribution channels."

152. Additionally, under terms of Article Fifty-Two of Law No. 8.884/94, the analysis carried out demonstrated the possibility and imminence of irreparable damages or damages of difficult redress to the competition in relation to access of suppliers of generators, bulb turbines and related equipment. In view of this, we recommend the granting of a provisional remedy aiming at reestablishing the competitive conditions of the biddings of concession of the Santo Antônio and of the Jirau plants. We thus recommend that the following be determined: (i) immediate annulment of the clause contained in the Minutes of the Meeting signed on January 11, 2006 by and between Construtora Norberto Odebrecht S.A. and General Electric Company relating to the latter's obligation not to compete with the consortium headed by Respondent in the biddings of concession of the hydroelectric plants of Santo Antônio and Jirau, by requiring that General Electric Company does not exclusively bind itself to any other consortium to participate in such concession biddings; and (ii) immediate partial annulment of the exclusivity clause appearing in the Exclusivity and Confidentiality Agreement executed on June 12, 2006 and amended on October 26, 2006 by and between Construtora Norberto Odebrecht S.A. and Alstom Hydro Energia Brasil Ltda., VA Tech Hydro Brasil Ltda. and Voith Siemens Hydro Power Generation Ltda. in order to enable the companies integrating the economic groups Alstom, VA Tech and Voith Siemens to be able to, after the occurrence of each of the auctions, negotiate with the winning consortium of each auction aiming at supplying related equipment and services if the consortium led by the Odebrecht Group is not the winning bidder in each of said auctions. Bearing in mind the gravity of the facts verified and the Respondent's economic situation, we would further suggest the setting of a daily fine, in case of violation to the provisional remedy, in the amount of One hundred thousand Reais (R$ 100,000.00) until the final decision of the present administrative proceedings.

To higher consideration

Brasilia, September     2007.

FLAVIO DANIEL BARAN
Governmental Manager

MARCIA SUAIDEN
CGSI Substitute General Coordinator

Agreed
To the consideration of the Secretary of Economic Law
Brasilia, September     2007

ANA PAULA MARTINEZ
DPDE Director