# EXHIBIT B

## Quotes Demonstrating That Confidentiality Is The Principal Harm Alleged

### Brief

- **"Not only would General Electric bring its technical resources and expertise to the consortium, it would also inevitably make use (if it has not done so already) of the highly confidential and proprietary information developed by CNO at great effort and expense, including information that is crucial to the turbine design, the technical centerpiece of the entire Project." (p. 3).**

- "In the course of negotiating the January 11, 2006 Agreement, General Electric was provided with a vast amount of confidential information regarding the technical engineering strategy and design for the Rio Madeira Project." (p. 15-16) (listing information that was provided).

- "The plan developed by CNO, Furnas, and the EPC Consortium draws extensively from the confidential and proprietary information developed by CNO and Furnas through their independent studies of the Rio Madeira Project and the confidential and proprietary information shared among the potential EPC Consortium members prior to General Electric's withdrawal from the project." (p. 17).

- **"Access to the confidential and proprietary information developed by CNO, Furnas and their EPC Consortium would give competing bidders an unfair advantage by permitting them to free-ride on the six years and $75 million CNO invested in the Project and to use CNO's pricing and cost information to structure their own bids." (p. 18).**

- **"General Electric, however, is privy to the very information that makes CNO's plans far superior to those of any company. Thus, were General Electric to directly or indirectly assist a competitor of CNO, CNO's hard-earned advantages could be lost." (p. 18).**

- **"CNO further explained that because of the nature of the Project, the exclusivity and confidentiality provisions are dependent on each other, and that it would not be possible for General Electric to participate in a competing bid for the Rio Madeira Project without directly or indirectly using information covered by the confidentiality agreement." (p. 21).**

    - This argument is inconsistent with CNO's argument that the CA and MOM are separate documents.

    - It is also inconsistent with Muriel's claim that "[A Brazilian] court would construe the Confidentiality Agreement to apply only to disputes arising

from the disclosure of the document or the information contained therein." Muriel Aff. ¶8, second sentence

- "Because multiple other manufacturers of turbines and generators are available to IESA for the production of equipment, some of which have even more experience than General Electric with the type of bulb turbine needed for the Project, *IESA's insistence on General Electric to support its bid is a clear indication that it is General Electric's intimate knowledge of CNO's confidential and proprietary information that is necessary – not General Electric's ability to make turbines.*" (p. 22).

- **"CNO will suffer irreparable harm if General Electric is free to aid a competitor using proprietary technical and price information developed by CNO and the EPC Consortium." (p. 23).**

- **"Indeed, because General Electric is privy to the pricing structure for the turbines in the CNO/Furnas bid, and is aware of the percentage of the total cost allocated to turbines, General Electric has in its hands the very information needed to allow a competitor to anticipate CNO's bid and price its own bid based on the cost and pricing information gained from CNO. It is precisely because of situations such as this that exclusivity obligations are necessary." (p. 23).**

- "The avoidance of improper disclosure of confidential information is one of the purposes of exclusivity agreements." (p. 27).

- "There also can be no serious question that General Electric's participation in the Rio Madeira Project with a competitor of CNO would result in the improper use of this [confidential] information." (p. 28).

- "Without such clauses [exclusivity], private enterprises would never be able to participate in large-scale construction contracts of this type, because of the danger that a supplier would share its partner's proprietary information with competitors, who would free-ride on the partners efforts." (p. 30).

- "This clause [exclusivity] was expressly negotiated by two sophisticated business entities, is necessary to protect CNO's legitimate interests in protecting its confidential, proprietary information and in preventing unfair competition, and is reasonable in time and scope." (p. 30).

- **"All of these individuals directly participated in the technical design solutions for the Rio Madeira Project and are in possession of confidential information relating to the Rio Madeira Project. This knowledge makes them particularly valuable acquisitions for any entity attempting to compete on the Rio Madeira Project." (p. 33-34).**

- "Were General Electric to assist, directly or indirectly, a competitor for the Rio Madeira Project – inevitably making use of CNO's proprietary and confidential information in the process – CNO's hard-earned position as the leading bidder on the Jirau and Santo Antonio sites of the Rio Madeira Project would be seriously compromised, as would CNO's goodwill and sterling reputation as a developer of large civil infrastructure projects." (p. 35).

### Pinto Affidavit

- "To protect CNO's competitive advantage from having developed such data and information, CNO demanded and General Electric agreed that General Electric would not compete against CNO in connection with the Rio Madeira Project." (p. 3).

- "Because of the highly confidential nature of information provided to General Electric, CNO insisted that General Electric agree to work exclusively with CNO on the Rio Madeira Project." (p. 16).

- "Were General Electric to give a competitor to CNO access to CNO's proprietary and confidential information, either directly or indirectly, CNO's hard-earned competitive advantage could be lost." (p. 22).

- *"I further explained that because of the nature of the Project, the exclusivity and confidentiality provisions are dependent on one another, and that it would not be possible for General Electric to participate in a competing bid for the Rio Madeira Project without directly or indirectly using confidential information." (p. 27).*

- "General Electric, of course, is privy to the very information that makes CNO's plans far superior to those of any other company. Were a competitor to be provided access to CNO's proprietary and confidential information, which is in General Electric's possession, CNO's hard-earned advantages could be lost." (p. 28).

- *Given the limited time available before the auction date to potential bidders bidders who only began developing a bid in the last year, the most important thing that General Electric can bring to a competiting group is not its technical ability to manufacture turbines – a niche that can be filled by any number of*

> *entities throughout the world – but its knowledge of confidential and proprietary information regarding CNO's design and bid."* (p. 29).

- "If all that IESA needed to present a bid was a manufacturer of turbines and generators of sufficient size and sophistication to meet the technical and financial requirements of the Project, numerous options other than General Electric are available for the Project. . . .**What makes General Electric uniquely helpful to any late bidder for the Rio Madeira Project is its knowledge of CNO's proprietary and confidential information."** (p. 30).

- "General Electric has had access to CNO's confidential engineering and financial information. This information will be disclosed to CNO's competitors if General Electric is allowed to join a rival bidding group." (p. 30).