1  there simply is none. And aside from the fact that the bids
2  aren't even due until October 30, the pre-bidding, that won't
3  take place until September 30, so they have no risk of
4  irreparable harm. There is no urgency.
5         THE COURT: Well, September 30 is not that far away.
6         I question in my mind why, since they have known about
7  this for months, they waited until Rosh Hashanah to do
8  something about it, but it is a well known trick.
9         MR. ROTHMAN: Exactly. And, your Honor, the only
10 statement that they rely on in this letter is pure hearsay
11 about how the parties have supposedly been working together,
12 and it doesn't establish anything.
13        So let me turn now briefly to forum non conveniens,
14 because I think that the facts which support dismissal on forum
15 non conveniens grounds are so glaring that the Court should, if
16 it needs to, dismiss this sua sponte.
17        As the Court may be aware, the leading case in the
18 Second Circuit is Iragorri v. United Technologies. It was an
19 en banc decision and the cite was 274 F.3d, 65. A recent
20 application and interpretation of that decision was set forth
21 in Judge Castel's opinion last summer of 2006 in Gilstrap v.
22 Radiance, 443 F.Supp.2d 474. That has been affirmed by the
23 Second Circuit. We were involved in that case, which is the
24 only reason why the law is fresh in my mind, your Honor. This
25 is not my usual --

79DUCONC

1          THE COURT:  You were not showing off?  Come on.
2          MR. ROTHMAN:  Here is the situation as to forum non
3  conveniens because I think that it is very clear.
4          In the Second Circuit there is a three-step analysis.
5  The court looks first to what the level of deference should be
6  to which the plaintiff's choice of forum should be afforded.
7  It then considers whether there is an adequate alternative
8  forum.  And then it needs to proceed to weigh the relevant
9  private and public interest factors.
10         Whereas in this case you have a foreign plaintiff, it
11 is entitled to very little, if any, deference, particularly
12 because the indicia of forum shopping here are enormous.
13         Turning to the second prong, there is clearly an
14 adequate forum in Brazil, indeed that's what the parties
15 selected.
16         Turning next to the private factors, virtually all of
17 them weigh overwhelmingly, indeed, entirely in favor of Brazil.
18 They are a major Brazilian company.  As the Pinto affidavit
19 reflects, CNO is a Brazilian company domiciled in Brazil.  It
20 is the largest construction company in Brazil, and the
21 Odebrecht loop is also a Brazilian business.  The project is in
22 Brazil.  Virtually all of the key witnesses are in Brazil.
23 They point to one witness in New York who was involved in the
24 original negotiations, but virtually all of the witnesses
25 involved in the alleged breaches and all of the events relating

1    to the alleged breaches are in Brazil. Key third parties are
2    in Brazil.
3            I see nothing in their papers, but if you look at the
4    Pinto affidavit, he talks about how they believe that a
5    Brazilian company named Conagra Korea is behind this. They are
6    in Brazil. Nonparty Brazilian witnesses are not subject to
7    subpoena. The agreements are governed by Brazilian law. Key
8    documents regarding the project are in Brazil. You could go on
9    and on. Every private factor weighs overwhelmingly in favor of
10   Brazil.
11           When you come to the public interest factors, it is
12   even more lop-sided. What do they say? Again, I am just
13   basing it on their papers. They say, first of all, it is clear
14   this is not a private project. It is a purely Brazilian
15   project that, according to them, will have a significant impact
16   on the citizens of Brazil. The Brazilian government has been
17   and will remain intimately involved in this project which they
18   say was part of the government plan. So paragraph 4 of the
19   Pinto affidavit, he says that the project was part of the
20   economic growth acceleration plan proposed by the Brazilian
21   government to address Brazil's suspected infrastructure needs
22   over the next decade.
23           Paragraph 9, he says that the project uses public
24   lands and waterways and requires a government concession to
25   operate the resulting power facility. The Brazilian government

required three preliminary studies to be conducted and accepted by the government before an auction date would be set.

As I said before, the Brazilian government is investigating this.

And, finally, when you look at their brief, the entire public interest argument they make in support of their request for an injunction is based on the public interest of Brazil and the people of Brazil whose interests are a matter for the government of Brazil to protect and, indeed, that's exactly what the SDE is investigating.

And, finally, New York has absolutely no interest in this thing. So it is hard to imagine a more compelling case for a forum non conveniens dismissal over and above the forum selection clause.

The bottom line is, your Honor, based on their papers alone, we believe that they have failed completely to satisfy any prong, any aspect of the test to obtain a TRO in the Second Circuit. There is no reason why a New York court should involve itself in this Brazilian dispute, let alone grant the kind of extraordinary relief which they seek which could very well be interfering with an ongoing investigation in Brazil. We believe that this was a clear misuse of this Court. They have no risk of irreparable harm. There is no urgency. They have an adequate remedy of law. There is no probability of success on the merits because we have made clear, among other

```
 1    things, that we intend to honor the exclusivity clause.  There
 2    is no basis for a TRO here and there is certainly no basis to
 3    allow them to launch into discovery.
 4            We believe and we respectfully request that the Court
 5    should deny the application for a TRO and that, either pursuant
 6    to the exclusive forum selection clause or the doctrine of
 7    forum non conveniens, they should dismiss this case and tell
 8    them, if they want to bring a case, they should do so in Brazil
 9    where they have agreed to do so.
10            Thank you, your Honor.
11            THE COURT:  All right.  Thank you, Mr. Rothman.
12            On the briefs, I know that I will find the real issues
13    if I look in the itty-bitty footnotes, so I make an exception
14    to my usual rule that I will not read footnotes that are in
15    typeface smaller than the typeface of the main brief, though
16    you are all now on notice that I do not like footnotes and I
17    will not read itty-bitty footnotes.  So I did read the
18    itty-bitty footnotes, so I think I was able to tease out all of
19    the issues that Mr. Rothman has called to my attention this
20    morning, and I would be interested in what you have to say
21    about those issues, which is not much.
22            MR. VICKERY:  Your Honor, you didn't want me to
23    anticipate all of their arguments, did you?
24            THE COURT:  Sure.
25            MR. VICKERY:  I would have a hard time with a 50-page
```

79DUCONC

1  or 100-page brief if I did that.
2      But let me talk about this dispute for a second, which
3  is basically very narrow. Do they have an enforceable
4  exclusionary obligation or not? We are not talking about
5  damages or actions for damages arising out of pursuing other
6  remedies. We just want to know whether this isolated clause in
7  that MOM agreement, exclusionary agreement is enforceable.
8      THE COURT: They admit it is enforceable, unless and
9  until such time -- their lawyer has stood up here and said, it
10 is enforceable and we intend to abide by it unless and until
11 such time as the government of Brazil tells us it is not
12 enforceable. So what do I have to do with any of this?
13     MR. VICKERY: Well, so far so good. And we have asked
14 them for assurances. What is a breach? Have GE officials been
15 meeting in Brazil with IESA and Hitachi and planning, if they
16 have not formally joined the consortium --
17     THE COURT: Why should I care about any of that if
18 they have said, if a representation has been made to me by an
19 officer of the court and if letters from General Electric
20 officials have been sent to your client saying, you know, our
21 hands are tied, we cannot participate in any other bid unless
22 and until we get released, and if CNO won't release us and the
23 Brazilian government doesn't conclude that this is anti-
24 competitive, we are stuck. Can't do anything.
25     MR. VICKERY: Fine. Make this real.

1   The bidding process is between the contractor, the
2   prime contractor. Suppliers are not the main parties of this
3   bid. Does it mean that they won't support the bid and not give
4   information and comfort to this other group?
5   THE COURT: Information, go to Sao Paulo to talk about
6   the information.
7   MR. VICKERY: I agree. The limited disclosure
8   agreement talks about Sao Paulo and has a damage limitation
9   but that is strictly non-disclosure. I don't think that they
10  maintain that the contractual terms, the price for the turbine
11  would be governed in Sao Paulo unless there is a new --
12  THE COURT: Are you suggesting that the gravamen of
13  your lawsuit is that they have breached a contract from which
14  they have withdrawn and withdrew in accordance with its terms,
15  or maybe you are saying they didn't withdraw in accordance with
16  the terms? It looks to me like they withdrew in accordance
17  with its terms, two months after they signed it.
18  MR. VICKERY: That is for example.
19  THE COURT: Let's just deal with reality here instead
20  of hypotheticals.
21  MR. VICKERY: One is confidentiality. The other is
22  exclusivity.
23  THE COURT: I absolutely agree. Confidentiality is
24  none of my business and exclusivity may or may not be my
25  business.

| | |
|---|---|
| 1 | MR. VICKERY: This is a commonplace. You share with |
| 2 | your competitors, you enter into non-completes -- |
| 3 | THE COURT: Happens all the time. |
| 4 | MR. VICKERY: The disclosure part of the original |
| 5 | agreement says Sao Paulo. That's what it says. This is a |
| 6 | different agreement. This is like, I think, going to a lawyer |
| 7 | giving him secret and he is disqualified from going across the |
| 8 | street. You have to go piecemeal -- |
| 9 | THE COURT: This is what I need to know, what the MOM |
| 10 | being subject to the exclusivity agreement means because my |
| 11 | instinct as an American lawyer is to say that that imports the |
| 12 | terms of the non-disclosure agreement into the MOM, and it |
| 13 | means that the scribe who was scribbling down this agreement |
| 14 | didn't have to rewrite all of those terms, they just |
| 15 | incorporate them by reference. |
| 16 | That, it seems to me, is the most logical reading of |
| 17 | the English words which are the only ones that I can read |
| 18 | because, although I read Spanish, I don't read it well enough |
| 19 | even to read a Spanish contract and Portuguese is enough |
| 20 | different from Spanish that it makes me dizzy. |
| 21 | So I appreciate that you have submitted an affidavit |
| 22 | from a Brazilian lawyer which, in my mind raises more questions |
| 23 | than it answers, but right now, you haven't convinced me, and |
| 24 | that as to anything relating to non-disclosure, anything |
| 25 | relating to non-disclosure, the proper forum here is in Sao |

1   Paulo.
2          MR. VICKERY:  I want to focus on the other half of
3   exclusivity.  Regardless of secrets, and that I don't think is
4   subject to any forum selection clause.
5          THE COURT:  I tend to agree with you on that.
6          MR. VICKERY:  And the reason that we are here is the
7   intellectual process is centered in this state.  You just don't
8   buy generators off the shelf; you design them for the sort
9   of --
10         THE COURT:  It is centered in the Northern District of
11  New York.  It is not centered here.  They are not making
12  turbines in New York City.  General Electric is barely in New
13  York City.  They are on Exit 46 off of Merrick Parkway in
14  Fairfield, Connecticut, and have been for 20 years and they
15  have a big plant upstate in Schenectady.
16         MR. VICKERY:  They do have an office in New York, so
17  for purposes of venue, that's enough.  It may be a more
18  convenient place.  You can do a 1404 transfer to Schenectady,
19  but the lawyers are here --
20         THE COURT:  Or I can do a FNC to Brazil.
21         MR. VICKERY:  That's true.
22         THE COURT:  And I am really concerned and I have been
23  concerned since I started reading papers about some sort of
24  investigation about what that investigation is.  And your
25  papers don't really tell me what it is or what is going on in

79DUCONC

Brazil and how this relates to that Brazilian investigation.

MR. VICKERY: I think what is going on in Brazil, to the extent that I know, is that competitors probably said we need more time and are objecting to this tying up of this area due to the consortium, so you go to the government and you lodge a complaint. The government has written letters.

As far as I know, that's all that happened. If there is a decree that GE is free, despite this enforceable contract, fine, that's the game. You have an appeal in Brazil. But our focus here, until the Brazilian government acts, then this is an enforceable contract and they should stand clear.

THE COURT: And they have said that they are standing clear until somebody releases them, be it your client or the Brazilian government. They know they can't play. That's what they said.

MR. VICKERY: They have said that, and yet there is a letter to a pile of ministers saying that we have been working with them for a year. What does that mean? That is not standing clear. That is doing everything but put your name on the contract. Just waiting for the government to possibly release them.

If you look at the declaration, there were scads of manufacturers of turbines out there. There is Hitachi. There are Russians. There is Westinghouse. There is Toshiba. There is not a shortage of turbine manufacturers. One of the

79DUCONC

1   competitors said, we don't care about these things.  We have
2   our own suppliers.  So this is people agitating.
3           Of course, GE wants to be in the action now.  They
4   chose to get out and now they want to get back in, and the
5   government of Brazil wants everybody to play because it will
6   lower the price.  But we have agreement with them which was
7   negotiated back and forth and they were given a choice, do you
8   want to play and be a part of our team?  Sign this.  They
9   signed it.  So it should be enforceable until the government of
10  Brazil says this violates public policy.
11          And I wouldn't expect you to focus on Brazilian public
12  policy whether it is antitrust or not.  This is exclusivity.
13  You cannot play with other people, which they acknowledge is
14  enforceable.  And that means that you don't meet with them.
15  You don't do everything but sign a contract.
16          If they make a representation that they will stand
17  clear until released by the Brazilian government, I'm sure our
18  client would accept that and it might make the problem go away.
19          We have sent letters.  There were meetings in Brazil
20  and saying, are you going to honor this, and we have gotten
21  ambiguous answers, and by filing here you get their attention.
22  It is quite common that this Court can very quickly look at
23  this and say, is it enforceable or not.  They do it every day.
24          But perhaps if counsel would elaborate a little bit
25  more about what they will not do -- not meet with competitors,

79DUCONC

1   they will stand clear until released by the action of Brazil
2   that otherwise they will honor it.
3           THE COURT:  Mr. Rothman, I know that you have not had
4   a lot of opportunity to talk to your client.
5           MR. ROTHMAN:  Your Honor, I don't want to make a
6   representation to the Court that I don't really have enough
7   facts to make.  What I do know is that I am authorized to say,
8   since this was the question that I asked, that we will not bid
9   or participate in any bid unless and until the SDE were to
10  invalidate the agreement.  And even in that event, the client
11  has not made a determination as to what it will do.
12          I should also note that, while Mr. Vickery is making
13  statements about what the agreement prohibits, that's not
14  contained in the agreement.  The only reference to the
15  exclusivity is in paragraph 5A which, after saying that it is
16  subject to the confidentiality agreement says at the end -- I
17  had better read the whole thing:  "This MOM is subject to the
18  confidentiality agreement signed by the parties and currently
19  in force.  If GE does not enter into the construction
20  consortium or exit the construction consortium under any
21  provision of this MOM, then GE shall maintain the
22  confidentiality agreement until its expiry and further agrees
23  not to pursue this project with any other party."
24          That's all it says.
25          The prebidding, as we say, is due on September 30.  I

1   gather that the bids are due on October 30. And what I am in a
2   position to say is that we won't either bid or participate in
3   any bid for so long as this contract remains in place, your
4   Honor.
5           THE COURT: Well, of course, "pursue" is a little
6   broader word than "bid" as you know and I know.
7           MR. ROTHMAN: I am not purporting to say what it
8   includes or it doesn't include. Is it ambiguous, is it not
9   ambiguous. But what I am saying is, that's the representation
10  that we can make.
11          By the way, I think if you look at their papers, they
12  did not ask us the question, will you honor the exclusivity
13  provision. If you look at the letter that they refuse to grant
14  us the waiver that was requested. They refuse to release us.
15  Why? Because they were concerned about the confidentiality
16  agreement and the confidential information, but they never
17  asked us the simple question. Had they asked us the simple
18  question, we probably wouldn't be here.
19          THE COURT: I am not going to grant the TRO because I
20  think there are enough open questions, including whether I have
21  jurisdiction over what appears to be significant portions, if
22  not all of this lawsuit. And to the extent that I have
23  jurisdiction, whether it is appropriate in all of the
24  circumstances, all of which are not before me, then I exercise
25  that jurisdiction.

           Also, to the extent that on the present record I
believe I might have jurisdiction, it is exclusively over the
exclusivity portion of the agreement.  And at the present time
on the present record, it does not appear to me that there is
enough of a risk of irreparable harm, since GE has represented
that it is not going to be participating in any bidding.

           I realize that the words "not pursuing the project
with other parties" isn't limited to bidding and for all I
know -- and I don't know enough yet -- GE may have participated
or pursued the project with another party and that may have
involved breaching of the confidentiality agreement which is,
of course as I read the contract today, the province of the
court in Sao Paulo.  But there, frankly, are enough questions
about whether this Court is going to go forward with this case
that it would be inappropriate for me to enter a TRO at this
time.

           So the question is, how we are going to proceed, and
we are obviously going to proceed very quickly.  I am not, Mr.
Rothman, going to dismiss the case on forum non conveniens
grounds sua sponte.  I am prepared to entertain an immediate
motion followed by an immediate response, and I am talking 48
hours.  You apparently have some advantages since you just
briefed this issue.

           The disadvantage that you have is that you really need
to get some information from your client and from the Brazilian

1  government pretty quickly about what this investigation
2  involves and what it is all about and what it could result in.
3      I don't know how much the Brazilian government is
4  willing to share with an American court, but I am not
5  interested in stepping on the toes of the Brazilian government
6  and would certainly be interested to know what they are about
7  and how quickly they are likely to resolve this matter.
8      So I know that there is going to be a motion to
9  dismiss. As much as I would like to, I am not going to send
10 the case to Schenectady. They are busy enough up there, and
11 they don't have judges and we have plenty of judges, and I am
12 here. And I don't deny that there is venue over General
13 Electric, at least some General Electrics in this district.
14 There may not be venue over all of the General Electrics in
15 this district.
16     I would think, Mr. Vickery, you have a pretty tough
17 row to hoe to try to pierce the corporate veil of the great GE
18 infrastructure. They have a pretty fine legal department that
19 I am sure spends an awful lot of time making sure that they
20 observe corporate formalities so that that corporate veil can't
21 be pierced.
22     I don't know who all of these people are. I notice
23 that General Electric Brazil, there appears to be a company
24 called General Electric Brazil. The fellow besides
25 Mr. Weinstein who was involved in these negotiations, Luis

79DUCONC

1    somebody or other, was a representative of the GE Brazil and I
2    know they are not named as a party and the joint venture
3    company is not named as a defendant.  That is a Brazilian
4    enterprise.
5         And as I said, I have some question about exactly who
6    the parties to the MOM are.  And in that regard there is
7    actually an interesting phrase used in the MOM, which I don't
8    know how literally to take, and it is in paragraph 5A.  And it
9    talks about the MOM being subject to the confidentiality
10   agreement signed by "the parties" and currently in force, which
11   could be read to suggest that the parties to the MOM are the
12   parties to the exclusivity agreement.  And if that's true, then
13   they have the wrong people here.
14        So aside from the underlying merits of whether there
15   is an enforceable exclusivity agreement, which doesn't seem to
16   be disputed, we have a lot of issues here to get out of the way
17   about whether this Court should be handling this case.
18        So, Mr. Rothman, tell me what is realistic.  Can you
19   get your motion made by Monday?
20        MR. ROTHMAN:  Close of the day on Monday?
21        THE COURT:  Close of the day on Monday.
22        MR. ROTHMAN:  Let me make sure I understand what we
23   should be briefing.  Should I just brief the 409 motion?
24        THE COURT:  Anything that is going to get rid of the
25   case for me.

```
 1            MR. ROTHMAN:  In other words, just so that I
 2   understand, don't worry about the injunction issues now, worry
 3   about the issues that go to whether this Court should handle
 4   this case?
 5            THE COURT:  Right.
 6            Close of business, Wednesday, Mr. Vickery?
 7            MR. VICKERY:  Your Honor, I am not quite the same
 8   expert on forum non conveniens that Mr. Rothman is and other
 9   issues --
10            THE COURT:  But you can start to research now.
11            MR. ROTHMAN:  I was settling in for the holiday last
12   night, and not that I am very observant but I was settling in.
13   If you would like to do this on a slightly relaxed schedule I
14   am certainly amenable.
15            MR. VICKERY:  I am amenable.  They have to figure out
16   what the Brazilian government is doing.  They are slow --
17            THE COURT:  If you want to work out a schedule that
18   would be fine with me, but I am setting two of my three law
19   clerks, one of whom is home for the holidays to work
20   immediately so that I can turn this around in 24 to 48 hours on
21   those issues, real fast.  Real fast.  But I really think that I
22   have to decide first and foremost whether this case belongs in
23   front of me.
24            MR. ROTHMAN:  I agree.
25            MR. VICKERY:  I would ask, if I can, for a little more
```

1   time because getting information from Brazil --
2          THE COURT:  In that case, you and Mr. Rothman work out
3   a schedule in time for him to get home for Rosh Hashanah.
4          MR. ROTHMAN:  We will do it.
5          THE COURT:  If you would communicate with Mr. O'Neill.
6          THE DEPUTY CLERK:  805-6329.
7          THE COURT:  We still have a 212 number here.
8          MR. VICKERY:  There is one issue about sealing of the
9   declaration and this MOM agreement which has details of theirs
10  and ours.  Could we agree on having that exhibit and the
11  declaration filed under seal?
12         MR. ROTHMAN:  Sure.  I have no problem with that.  We
13  have given it to our client.
14         THE COURT:  They have to give it to their clients.
15         Knowing that you have made that recommendation, that
16  is one of the reason that I made sure that I went through all
17  of the exhibits with a fine tooth comb, and I would have to
18  say, except for the MOM itself, I don't really see anything in
19  there that contains what would arguably be called
20  confidentiality information.
21         For the time being, I am prepared to seal Mr. Pinto's
22  affidavit, but that is subject to my reading it again because I
23  am an anti-sealer and I really don't think that there is much,
24  except in the MOM.  I agree with you that in the MOM there is
25  some stuff that ought not to be made public.  But other than

79DUCONC

```
 1    that, these letters in Pinto's affidavit he says that the
 2    various proposals that your client has been making and the
 3    studies have been public in Brazil for years.  The letters that
 4    have gone back and forth between your clients to the ministry
 5    doesn't contain the confidential information.  They contain the
 6    various provisions on who is subject to what.
 7            So I will enter an interim order sealing the Pinto
 8    affidavit and its exhibits, but that may very quickly be
 9    modified to just sealing Exhibit C.
10            MR. VICKERY:  Thank you, your Honor.
11            MR. ROTHMAN:  Thank you, your Honor.
12            THE COURT:  So we will get a call.
13
14                          o   0   o
```