UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| CONSTRUTORA NORBERTO ODEBRECHT S.A., | : | |
| Plaintiff, | : | Civil Action No. |
| v. | : | |
| GENERAL ELECTRIC COMPANY, GENERAL ELECTRIC INTERNATIONAL, INC., GE INFRASTRUCTURE, INC., GE POWER SYSTEMS, INC., GE ENERGY LLC and GE HYDRO POWER, INC., | : | |
| Defendants. | : | |

---

**DECLARATION OF JOSÉ BONIFÁCIO PINTO JÚNIOR IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

JOSÉ BONIFÁCIO PINTO JÚNIOR, pursuant to 28 U.S.C. § 1746, declares as follows:

1.  I am a Project Director of Construtora Norberto Odebrecht S.A. ("CNO"), the

plaintiff in this action and the largest construction company in Brazil.  I supervise

both the development and later implementation of projects.  I submit this

declaration in support of CNO's application to enjoin General Electric from

breaching a contract that, among other things, provided that General Electric

would not compete against CNO in connection with its direct or indirect

participation in the bidding on the first of two concessions (to be located at a site

called Santo Antônio) to construct and operate hydroelectric plants on the Rio

Madeira (the "Rio Madeira Project").  Bidding on this project is currently

scheduled to happen on October 30, 2007, with pre-qualification of potential

bidders normally required 30 days before the auction, or on September 30, 2007.

Based on discussion within the industry, my own experience in the industry, as well as press reports, Camargo Corrêa, which is likely to submit a competing bid, is making efforts to dismantle the exclusivity agreements that CNO has with its current consortium partners and also with General Electric. Because General Electric is the only supplier that executed an exclusivity agreement with CNO and later withdrew from our initial consortium, I can infer that General Electric and Camargo Corrêa are jointly forming a competitive group. Unless otherwise specified, I have personal knowledge of the facts set forth in this Declaration.

2. CNO is a corporation organized under Brazilian law and domiciled in Brazil. It is wholly owned by Odebrecht S.A., the holding company for the Odebrecht Group. CNO is the largest construction company in Brazil and is involved in building projects in nineteen countries, including the United States. In 2006, Global Finance Magazine named CNO the best Brazilian construction company.

3. The Odebrecht Group is a Brazilian business conglomerate with operations in South America, Central America and the Caribbean, North America, Africa, Europe and the Middle East. It is the Latin American leader in the engineering and construction and chemicals and petrochemical businesses, and also has business in the infrastructure, public services, mining and energy sectors.

4. CNO is the lead company responsible for the necessary studies for the development of a project in Brazil known as the "Rio Madeira Project." The Rio Madeira Project is for the construction of two hydroelectric power plants to be built at two locations on the Madeira River, Santo Antônio and Jirau, both of which are near the City of Porto Velho, State of Rondônia, Brazil. The Project is

part of the Economic Growth Acceleration Plan proposed by the Brazilian Government to address the country's expected infrastructure needs over the next decade.

5.  The contract to build each of the Rio Madeira hydroelectric facilities is a lump sum, turnkey contract known as an Engineering, Procurement and Construction ("EPC") contract. Bidders are given detailed bidding packages outlining the specifications for the project and providing detailed information concerning the hydrological, geological, and environmental conditions at the site. Based on these packages, the bidders are required to develop the engineering designs and financial solutions for the construction and operation of the facility.

6.  The specifications for the Rio Madeira Project require forty-four groups of turbines and generators at each of the two sites. These turbines and generators are huge pieces of machinery which are not off-the-shelf items; rather they must be tailored to the unique hydrologic characteristics of the particular sites on the particular river where a project will be located. In negotiating with General Electric as a possible supplier to the Rio Madeira Project, it therefore was necessary for CNO to share certain highly valuable confidential and proprietary information, as described in Paragraph 55 below, including hydrologic data. To protect CNO's competitive advantage from having developed such data and information, CNO demanded and General Electric agreed that General Electric would not compete against CNO in connection with the Rio Madeira Project.

7.  If General Electric were to compete or assist another competitor on a bid against CNO for the Rio Madeira Project, the harm that would result to CNO's

3

competitive advantage, trade secrets and other confidential and proprietary information, and corporate good will and reputation cannot be calculated in monetary terms.

I. **CNO AND ITS PARTNER, FURNAS, CONCEIVE OF AND DEVELOP THE RIO MADEIRA PROJECT FROM INCEPTION**

8. In 2001, CNO first conceived the concept of developing a hydroelectric project on the Madeira River, located between the city of Abunã and downtown Porto Velho, in the Amazon region of Brazil. Until recently, it was commonly believed in Brazil that it was very difficult to build hydroelectric plants in the Amazon in a cost-efficient and environmentally friendly way. CNO believed otherwise, and, starting in 2001, promoted and developed the Rio Madeira Project, spending tens of millions of dollars of its own money in the process. I was involved in the development of the Rio Madeira Project from its inception.

9. A project such as the Rio Madeira Project, which will use public lands and waterways, and which will require a government concession to operate the resulting power facility, demands that three separate preliminary studies be conducted and accepted by the Brazilian Government before the government will set a date to auction the concession. The three required studies are:

   a. An "inventory study," which analyzes the river, or a part of it, and surrounding area to identify the existing hydroelectric potentials in the river and to estimate the energy capacity of each site identified by the study.

   b. A "feasibility study," which develops for each potential hydroelectric site a preliminary engineering design, including identification of the type of

4

turbines to be used, and further collects the hydrological, pluviometric, geological and other data for each site.

    c. An "environmental and social impact study," which analyzes the impact of the project on the physical environment, flora and fauna, and any surrounding populations.

10. Accordingly, as the first official step towards development of the Rio Madeira Project, in June 2001, CNO requested permission from the Agência Nacional de Energia Elétrica ("ANEEL"), Brazil's national electric power agency, to conduct an "inventory study" on the Madeira River between the city of Abunã and downtown Porto Velho, at CNO's own expense and risk.

11. Upon obtaining permission to conduct the inventory study, CNO invited Furnas Centrais Elétricas, S.A. ("Furnas") to participate in the development of studies related to the Rio Madeira Project, and Furnas accepted. Furnas is a corporation formed under the laws of Brazil and controlled by the Brazilian government. It is one of the largest generators of electrical power in Brazil, and one of the largest generators of power in Latin America. Furnas is one of the most experienced companies in successfully developing hydroelectric projects in Brazil.

12. The inventory study took roughly eighteen months to complete, and demanded that CNO and Furnas hire outside engineers and conduct analyses of potential sites between the city of Abunã and downtown Porto Velho on the Madeira River in Brazil. CNO and Furnas filed the completed inventory study with ANEEL in November 2002, and received approval of that study in December 2002.

13. The inventory study was made available to the public at that time.

5

14. In January 2003, CNO requested and obtained permission from ANEEL to conduct feasibility studies for two of the sites identified in the inventory study, Santo Antônio and Jirau. Furnas again participated in these studies.

15. To complete the feasibility studies, CNO and Furnas hired outside engineering experts (in particular, PCE Ltda) to analyze the Madeira River and its surrounding lands to determine whether the Santo Antônio and Jirau sites had the potential to provide economic and reliable hydroelectric power to meet Brazil's growing energy needs. The results of the feasibility studies contained an accurate analysis of the economic potential of the Rio Madeira Project and laid the groundwork for the development of the detailed design for the hydroelectric plants by the winner of the bid competition. The feasibility studies for the two sites took two years and four months to complete: CNO and Furnas filed the completed feasibility study for Jirau in December 2004 and for Santo Antônio in April 2005. CNO and Furnas received approval of the studies on March 30, 2007.

16. The feasibility studies have been available to the public since the dates they were filed. Any other entity that wished to develop this Project could have been developing its own feasibility studies.

17. In August 2003, CNO and Furnas sent a request to Brazil's environmental regulatory agency, Instituto Brasileiro do Meio Ambiente e dos Recursos Naturais Renováveis ("IBAMA"), for the agency to issue a formal "term of reference" to conduct an environmental impact study. The term of reference is essentially a list of all the environmental aspects, both general and specific, that must be analyzed as a part of the study. IBAMA conducted a public hearing and visited the future

6

project sites, then issued the document in September 2004. CNO and Furnas officially began the environmental study immediately thereafter, although they already had been conducting environmental analyses of the expected issues since August 2003.

18. The environmental study again required CNO and Furnas to hire outside experts – including recognized research entities and universities – and to devote significant time and resources to developing a plan that would minimize the environmental impact of the Rio Madeira Project on the surrounding region and the environment generally.

19. CNO and Furnas filed the completed environmental study in May 2005. After IBAMA requested various clarifications, public hearings were held on the study in November 2006. IBAMA issued environmental approval of the Rio Madeira Project in July 2007. Based on the CNO environmental study, IBAMA imposed approximately thirty-three conditions that had to be satisfied by the winning bidder.

20. The environmental study has been available to the public since its time of filing and is an exhaustive report on the environmental conditions at the Santo Antônio and Jirau sites. The winning contractor is required to develop a detailed plan to address the environmental concerns and impacts identified during the development of the studies.

## II. THE CONCESSION CONTRACT WILL BE AWARDED BY AN AUCTION CONDUCTED IN ACCORDANCE WITH THE BRAZILIAN PUBLIC BIDDING LAW (LAW 8.666/1993)

21. In mid-August, ANEEL published for public comment the official notice of the public auction for the award of the concession to construct and operate the

hydroelectric plant at the Santo Antônio site.  Bidding on this project is currently
scheduled to commence on October 30, 2007, with pre-qualification of potential
bidders normally required 30 days before the auction, or on September 30, 2007,
when interested parties are required to submit detailed information, including
technical qualifications and financial strength.

22. ANEEL provided detailed technical studies and other requirements for the
construction of the Santo Antônio hydroelectric plant.  The winning bidder is
responsible for creating an acceptable basic engineering design ("projéto basico")
which will meet ANEEL's basic design specifications and other requirements.

23. ANEEL currently has scheduled October 30, 2007 as the auction date for the
concession to construct and operate the hydroelectric plant at the Santo Antônio
site.  Before the auction date, ANEEL will set a ceiling price for the tariff to be
charged for hydroelectrical power during the thirty year period for which the
winner of the concession will be authorized to operate the plant pursuant to a set
of Power Purchase Agreements ("PPAs") to be entered into with energy
distributors throughout the country.  Bidders are required to submit a price below
that tariff.   The price reflects the price per megawatt hour to be charged for the
term of the PPA.  The successful bidder must post performance bonds to
guarantee that the projects will be completed as required by the contract.

24. ANEEL will sign a concession contract with the winning bidder shortly after the
winning bid is selected.  The contract will require that the Santo Antônio
hydroelectric plant commence operation in 2012.

8

25. The auction for the construction and operation of the hydroelectric plant at the Jirau site has not yet been scheduled. Governmental authorities recently have suggested that the auction for the Jirau site will take place in 2008.

26. Although CNO's efforts have resulted in ANEEL's decision to auction concessions for the Rio Madeira Project, it was not at all clear that the Project would go forward. Indeed, until the time of the public hearings on CNO's environmental studies, in November 2006, it generally was believed by CNO's competitors in the industry that the Project would not be approved due to its environmental aspects. Moreover, there were no public indications that any entities other than CNO and Furnas were interested in the Project or had taken any steps towards developing their own design and strategy for constructing and operating plants at the Santo Antônio and Jirau sites, despite the fact that many capable companies are and were available to develop a competing bid.

27. CNO's conduct and completion of the inventory, feasibility and environmental studies that enabled the Project to go forward cost CNO and Furnas in excess of 150 million Brazilian reals, or approximately US $75 million. Had the Brazilian government turned down the Project, CNO would have had to absorb the costs of these studies. Now, even with the Project being presented for auction, CNO and Furnas will only be able to recover approximately half of their expenses (from the Santo Antônio site) from the eventual winner of the auction. The other half shall be reimbursed if and when Jirau is auctioned.

28. Along with the expense and risk, however, CNO developed substantial proprietary and confidential information regarding the Rio Madeira Project, which

9

CNO has been using to develop its submission for the auction on October 30, 2007. The value of this proprietary and confidential information to CNO's development of final plans to be used for the public auction process cannot be calculated.

### III.    CNO AND FURNAS HAVE DEVELOPED A PROJECT OF PROFOUND SOCIAL BENEFIT TO THE PEOPLE OF BRAZIL, THAT WILL HAVE MINIMAL ENVIRONMENTAL IMPACT TO THE AMAZON AND THE WORLD GENERALLY

29. As a result of CNO's and Furnas's efforts, the Brazilian public will be provided with state-of-the-art hydroelectric power plants that will help in the growth of the Brazilian economy.

  a.  Brazil's gross domestic product is expected to grow approximately 4% per annum over the next ten years, while Brazil's energy demand is expected to increase an average of 5% per year for the next ten years.

  b.  By 2015, the two plants that comprise the Rio Madeira Project will together represent 7% of the country's power generation.

30. Moreover, because of the efforts of CNO and Furnas, these plants will have minimal environmental impact in the ecologically sensitive Amazon region. Indeed, were it not for CNO's engineering and environmental solutions, the Rio Madeira Project likely would not have been presented for public auction. Examples of the contributions made by CNO and Furnas include:

  a.  In order to limit the footprint of the accompanying reservoir to the size of the existing riverbed during the rainy season, the plants will use "bulb" turbine technology. This represents a "low head" concept, which

10

minimizes the drop in the water level of the river downstream from the plants.

b. The plants will require flooding of only very limited areas, unlike the flooding required for other types of hydroelectric plants. The Project will have one of the lowest ratios (.09) between the reservoir area and the total installed generation capacity. By way of comparison, the Balbina hydroelectric plant in Brazil has a ratio of reservoir area to total installed generation capacity of 9.44.

c. Only approximately 1,058 families reside in the relevant areas of the river, only 610 of which will have to be relocated as a result of the Project. By way of comparison, another hydroelectric plant built at the Itaipu site in Brazil relocated over 40,000 inhabitants.

d. The Santo Antônio site is near a Brazilian highway, built in the 1970s, which already had an environmental impact on the region.

e. The Madeira River Project will use areas already designated as eminent domain by the Brazilian government to transport the energy to other areas of the country, thereby reducing the degradation of flora and fauna that would result from building transport lines on untouched land.

## IV.    CNO AND FURNAS DEVELOPED A PROPRIETARY, STRATEGIC PLAN FOR IMPLEMENTING THE RIO MADEIRA PROJECT.

31. While conducting the studies for the Rio Madeira Project, CNO and Furnas began to put together teams to develop a confidential and proprietary technical design and financial strategy for purposes of bidding for the concession to construct and

11

operate hydroelectric plants at the Santo Antônio and Jirau sites of the Madeira River.

32. Undertaking a huge infrastructure project of this type requires huge capital investments, meticulous planning, technological expertise in numerous areas, and the assumption of a high level of risk. For these reasons, construction companies customarily seek technology and financial partners with which to combine forces to tackle the challenge of designing and building an enormous public works project, as well as to finance the costs and spread the risk.

33. To develop these plans, CNO sought engineering firms and electromechanical equipment manufacturers that could meet the high demand for services and supplies required by the Project and who could be a part of an "EPC Consortium" responsible for the construction of the hydropower plants should CNO and Furnas win the government concessions for the Project. At the same time, CNO and Furnas also assembled a pool of banks and other financial institutions to develop a financial deal structure and fund the Project.

34. Both groups – the construction consortium and the group of banks and financial institutions – were necessary to make the Rio Madeira Project financially viable. In view of the five year deadline to commence operations, design and planning had to commence well in advance of the bidding deadline. To properly create financial and technical solutions for a project of the magnitude of the Rio Madeira Project, a potential bidder must devote substantial time and resources to develop solutions to challenges at the construction site, detailed plans and drawings, and the construction strategy itself.

35. The participation of the turbine and generator manufacturers in the design and planning process is critical to the Project. This work cannot be developed in a project of the magnitude of the Rio Madeira Project without the participation of electromechanical equipment manufacturers in the EPC Consortium. Moreover, the Rio Madeira Project is of such size that it is critical that the consortium include more than one supplier of the turbines and generators in order to meet the strict schedule for start-up implementation of the Project. Each of the two Rio Madeira hydroelectric plants will have forty-four turbines. These are long lead-time items. In view of the ambitious construction schedule set by the government, the prudent course is to have more than one turbine and generator vendor participate in a construction consortium in order to ensure that the Project can be completed on schedule and perform as designed

36. Thus, CNO's objective in putting together an EPC Consortium was not simply to hire equipment vendors, but to attract potential partners to a future EPC consortium that could bring resources and expertise to the Project that were beyond the capability of CNO acting alone.

37. To this end, in mid-2005, CNO reached out to leading suppliers of electromechanical turbines and generators. CNO told each such supplier that CNO was seeking participants in the EPC Consortium that CNO would organize and lead to support CNO's and Furnas' bid for the Rio Madeira Project, and would like to invite that supplier to negotiate with CNO. Each such supplier was informed, however, that before negotiations could begin, CNO would require the

13

supplier to execute a confidentiality agreement, so that CNO could provide the supplier with certain proprietary technical information about the Project.

38. Among those who signed confidentiality agreements are VA Tech Hydro Brasil Ltda. ("VA Tech"), Alstom Hydro Energia Brasil Ltda. ("Alstom"), Voith Siemens Hydro Power Generation Ltda. ("Voith-Siemens"), Siemens, Areva Transmissão e Distribuição de Energia, Ltda. ("Areva"), ABB Ltda ("ABB"), Energ Power Ltda., OSJC "Power Machines", IESA Equipamentos e Montagens, S.A., GE Hydro Inepar do Brasil S.A, Sojitz do Brasil, SA, Bardella S/A Indústrias Mecânicas, Industrias Metalúrgicas Pescarmona SAIC y F, and Hitachi, Ltd., among others.

39. One of the entities to whom CNO sent an invitation letter, and with whom CNO chose to conduct initial discussions and enter into a non-disclosure agreement, was GE Hydro Inepar do Brasil S.A. (the "GE Joint Venture"), a joint venture between General Electric do Brasil Ltda., a Brazilian corporation that is a subsidiary of General Electric Co., and Inepar S.A. Indústria e Construções ("Inepar"), a Brazilian corporation. Inepar is itself partially owned by IESA Equipamentos e Montagens, S.A. ("IESA"), which also was a party to the non-disclosure agreement.

40. Attached as Exhibit A is a true and correct copy of a non-disclosure agreement dated May 16, 2005 between CNO, the GE Joint Venture, and IESA, along with an English translation of this agreement and certification of the translation.

41. Shortly after the confidentiality agreement was signed, CNO provided the GE Joint Venture and the other entities who signed confidentiality agreements with

14

detailed engineering documents so that they could adapt their bulb turbines' generation capacity to the demands of the Rio Madeira plants. Exhibit B to this Declaration is a true and correct copy of an email from me to Mr. Ricardo Woitowicz dated May 28, 2005 which forwards such documents to the GE Joint Venture. Mr. Woitowicz has represented himself as Director of Marketing and Business Development-Hydro, GE Energy, Power Generation, located at the address of the GE Joint Venture.

42. The GE Joint Venture has as its primary asset a lease with IESA allowing the GE Joint Venture to use a certain amount of the manufacturing capacity (measured in hours) of a factory owned by IESA. Only those certain companies that have high level technological capabilities are able to supply the design of the generators and turbines. In the case of General Electric, the engineering staff with the technical expertise is located outside of Brazil.

43. Although CNO sent the initial invitation to bid to the GE Joint Venture, it always was understood that the GE Joint Venture was capable only of fabricating turbines for the EPC Consortium once a design and strategy was developed. It also always was understood that the technical and engineering expertise, as well as financial support for the Project, would come from General Electric entities located within the United States.

## V.    THE EXCLUSIVITY PROVISIONS WERE THE PRODUCT OF ARMS LENGTH NEGOTIATIONS BETWEEN SOPHISTICATED PARTIES

44. After the initial round of negotiations, CNO chose to further negotiate with a smaller subset of suppliers. This group included Alstom Hydro Energia Brasil

15

Ltda, Voith Siemens Hydro Power Generation Ltda., VA Tech Hydro Brasil Ltda, and General Electric.

45. With regards to General Electric, the chief representative of the company, with whom CNO exchanged information and negotiated, was Jeffrey R. Wiener, who works at General Electric's offices in Schenectady, New York in the United States. Over the course of the negotiations, Mr. Wiener represented himself as a representative of GE Hydro, GE Energy, General Electric International, Inc., and "General Electric" generally, all of which are corporate entities based in the United States. CNO understood that it was necessary to negotiate with the U.S. entities rather than the GE Joint Venture because the GE Joint Venture did not have the engineering, strategic, or financial capability to participate in the Project. Indeed, General Electric formed a Rio Madeira "team" which included engineers and other key personnel, many of which were from outside Brazil. Exhibit C to this Declaration is a true and correct copy of an email from L. Kuster to me dated December 22, 2005 that shows the formation of this team, along with an English translation of this document and certification of the translation.

46. At this stage of the negotiations, CNO provided additional confidential proprietary information to General Electric and to the other three suppliers with which CNO was still negotiating.

47. Because of the highly confidential nature of information provided to General Electric, CNO insisted that General Electric agree to work exclusively with CNO on the Rio Madeira Project. To that end, CNO executed a new agreement with General Electric on January 11, 2006 (the "January 11, 2006 Agreement"), which

required exclusivity. A true and correct copy of the January 11, 2006 Agreement, which has been redacted, is attached as Exhibit D. In this agreement, General Electric agreed that it would not pursue the Rio Madeira Project with any other party.

48. Although the January 11, 2006 Agreement suggests that its terms were developed solely at a meeting held on that same date, the terms of the agreement were in fact heavily negotiated ahead of time by myself and Mr. Wiener in 2005 and early 2006. The January 11, 2006 Agreement was a wholly separate contract from the original confidentiality agreement signed with the General Electric Joint Venture. It provided not just for exclusivity, but also the outline of the commercial and financial deal between CNO and General Electric – including such matters as the number of turbines and generators to be supplied, the price, the timing for delivery, and the penalties for late delivery. This was an entirely new contract of broad scope.

49. In negotiating this binding contract with General Electric, Mr. Wiener engaged in multiple discussions with me and others at CNO, both in person and over the telephone. We exchanged drafts of what would come to be the January 11, 2006 Agreement, signed by myself on behalf of CNO and Mr. Wiener and Mr. Luiz Kuster on behalf of "General Electric." Moreover, Mr. Wiener informed me during these negotiations that he was consulting with GE's legal department regarding the content of the January 11, 2006 Agreement.

50. Exhibit E is a true and correct copy of an early draft of the January 11, 2006 Agreement that I provided to Mr. Wiener, along with an English translation of

17

this document and certification of the translation. The provisions requiring that General Electric not pursue the Project with any other party were not in this draft.

51. After reviewing the draft, Mr. Wiener asked me to add a provision that would specifically allow General Electric to pursue the Project with another entity if it chose not to enter, or to later leave, the Consortium. I not only declined Mr. Wiener's proposal, but informed him that, in light of his request, CNO would have to insist that General Electric specifically agree not to pursue the Project with any other party if it wished to continue to pursue a position within the EPC Consortium.

52. The result of these negotiations was formalized in Section 5(a) of the January 11, 2006 Agreement, which provides:

> ... If GE does not enter the Construction Consortium or exits the Construction Consortium under any provision of this MOM [Minutes of Meeting], then GE shall maintain the Confidentiality Agreement until its expiry **and further agrees not to pursue this Project with any other party.**

53. Also of particular import is Section 5(o) of the January 11, 2006 Agreement, which provides:

> ... If no equipment supply contract is executed by the expiry of the Confidentiality Agreement, then this MOM shall expire **and GE agrees not to pursue this project with any other parties.**

54. Had Mr. Wiener not agreed to these exclusivity provisions, CNO would have terminated negotiations with General Electric. General Electric was not forced to enter into the January 11, 2006 Agreement. They did so of their own free will for their own commercial advantage.

## VI.   AS A RESULT OF ENTERING NEGOTIATIONS WITH CNO, GENERAL ELECTRIC WAS GIVEN ACCESS TO SUBSTANTIAL PROPRIETARY

**AND TRADE SECRET INFORMATION OF CNO AND THE OTHER CONSORTIUM MEMBERS**

55. In the course of negotiating the Agreement, General Electric was provided with significant confidential information regarding the technical engineering strategy and design for the Rio Madeira Project. General Electric also was provided with substantial confidential information regarding the financial, commercial and logistical strategies for making the Project economically successful. This information included, but was not limited to:

- An advanced stage version of the detailed engineering design prepared by PCE for CNO;

- The "general arrangement" for the Project, which consists of detailed drawings of the technical plans;

- The hydrologic data for each of the two sites, including the behavior of the river at different times of the year (during the rainy season and the dry season), which are essential for the appropriate sizing of the turbines and to define how such equipment will adequately perform;

- The final pricing of the turbines and generators, which were estimated to represent approximately 35% of total investment in the Project;

- The payment conditions within the EPC consortium;

- The anticipated annual escalations of prices;

- The definition of the full scope of the suppliers;

- The technical performance required for the turbines and generators;

- The proprietary schedule for the delivery of the turbines/generators and the anticipated date for the delivery of the first set of machines at the project site;

- The Project's transportation and logistic strategies;

- The financial structures dealing with limitations of liability between and among the EPC Consortium, CNO and Furnas;

19

- The provisions for liquidated damages in the event of delay or failure to perform;

- The structure and content of the guarantees to be given by the EPC Consortium to the project company;

- The structure and content of the cross-guarantees to be provided between CNO, the EPC Consortium members and vice-versa;

- The anticipated discounts to be provided in the event that General Electric could provide improvements to the project;

- The amount and terms of the down payment the EPC Consortium would be entitled to receive before the start-up of the project.

- The cost of the spare parts to be delivered by the suppliers;

- The amount and terms of the leadership and development fee to be paid to CNO;

- The amount of reduction of the civil works side of the project anticipated from the technical elevation of the machine's setting;

- The interface matrix attached to the Agreement, which defines the scope of the civil works side of the project and the matters to be handled by the EPC Consortium;

- The strategy for the retention of equity by the suppliers, including both the amount of such participation and the innovative legal format relating to convertible debentures;

- The structure of the EPC Consortium; and

- The obligation to reimburse the suppliers to CNO to compensate for the studies performed by CNO and Furnas.

56. In addition, after signing the January 11, 2006 Agreement, General Electric participated in at least two strategic meetings with CNO and the other anticipated members of the EPC Consortium (at that time, Alstom, VA Tech and Voith-Siemens). Exhibit F is a true and correct copy of minutes of those meetings,

along with an English translation of these documents and certifications of the translation.

57. At these meetings, not only did the proposed members of the consortium learn additional valuable confidential information from CNO, but Alstom, VA Tech and Voith-Siemens further revealed their own confidential information to the group – confidential information that became incorporated within the collective knowledge developed for the Rio Madeira Project. Those companies would not have revealed their own sensitive information in the presence of General Electric had they not known that General Electric had agreed to keep such information confidential.

## VII.   AFTER HAVING RECEIVED AND INTERNALIZED CNO'S CONFIDENTIAL AND PROPRIETARY INFORMATION, GENERAL ELECTRIC VOLUNTARILY WITHDREW FROM THE PROJECT BUT REMAINED SUBJECT TO THE EXCLUSIVITY AGREEMENT

58. In March 2006, Mr. Wiener called my colleague, Mr. Edwaldo Tamberg, one of CNO's Senior Managers, to ask for an in-person meeting. After the meeting, which took place on March 15, 2006, Mr. Tamberg informed me that Mr. Wiener had provided him with a letter in which General Electric officially withdrew from the Project.

59. Mr. Tamberg informed me that Mr. Wiener told him that General Electric was withdrawing from the Project for two purported reasons: 1) General Electric was not comfortable with revealing its confidential information to other members of the EPC Consortium, despite the fact that all of these entities had executed non-disclosure agreements; and 2) General Electric did not want to be jointly and severally liable with the other members of the EPC Consortium.

21

60. A true and correct copy of the letter Mr. Wiener provided to Mr. Tamberg on March 15, 2006 is attached as Exhibit G. Mr. Tamberg provided a copy of this letter to me. Notably, in Mr. Wiener's letter to Mr. Tamberg, Mr. Wiener specifically reaffirmed that General Electric would abide by the exclusivity commitments it made to CNO in the Agreement.

## VIII.   CNO HAS LEARNED THAT GENERAL ELECTRIC IS ASSISTING A COMPETING CONSORTIUM

61. After General Electric withdrew from the Project, CNO continued to negotiate with Alstom, VA Tech, Voith-Siemens and other suppliers to form a final EPC Consortium. That group has worked diligently towards developing a strategic plan that hopefully will result in a successful bid at the auction scheduled for October 30, 2007. The plan developed by CNO, Furnas and the EPC Consortium draws extensively from the confidential and proprietary information developed by CNO and Furnas through their independent studies of the Rio Madeira Project and the confidential and proprietary information shared among the potential EPC Consortium members prior to General Electric's withdrawal from the Project.

62. Despite the fact that the information concerning the Rio Madeira Project had been publicly available for years, and despite CNO's early efforts to have other companies join CNO and Furnas in the development of the Project, the CNO/Furnas group was the only publicly interested developer of the Rio Madeira Project until late 2006.

63. Were General Electric to give a competitor to CNO access to CNO's proprietary and confidential information, either directly or indirectly, CNO's hard-earned competitive advantages could be lost.

64. Once it became clear that the government likely would issue an environmental license for the Rio Madeira Project, certain other developers have expressed an interest in submitting competing bids for the Rio Madeira Project. One such entity is Camargo Corrêa, a major competitor of CNO in the construction and infrastructure business.

65. It has become increasingly apparent to CNO that General Electric was interested in working with a competing bidder for the Rio Madeira Project.

66. Although General Electric had withdrawn from the Project over a year before, on May 15, 2007, CNO received a letter from the GE Joint Venture in which the GE Joint Venture purported to withdraw from the CNO bidding group and conspicuously returned a long list of technical documents, including confidential drawings and plans, which it had been provided earlier. A true and correct copy of this letter is attached as Exhibit H.

67. On July 24, 2007, I received a letter from Eduardo Ribeiro Santos and Dalmon Rogério de Moraes Sapata of the GE Joint Venture. This letter attached a request from the Department of Economic Protection and Defense at the Secretariat for Economic Law ("SDE"), which asked the GE Joint Venture for a copy of any exclusivity agreement it has entered into with CNO. The letter also stated that the GE Joint Venture would be providing the January 11, 2006 Agreement to SDE. Although IESA had no right to the January 11, 2006 Agreement or any of the highly confidential information contained therein, the GE Joint Venture also sent this letter, which referenced the January 11, 2006 Agreement, to IESA, which is what led us to believe that IESA has unlawful access to the January 11, 2006

Agreement.    Exhibit I to this Declaration is a true and correct copy of the letter

dated July 24, 2007 from Eduardo Ribeiro Santos and Dalmon Rogério de Moraes

Sapata of the GE Joint Venture, with its attachment, and an English translation of

this document and certification of the translations.

68. In a subsequent exchange of letters between the GE Joint Venture and CNO dated

July 25 and 27, 2007, the GE Joint Venture expressly disclaimed that it was a

party to the January 11, 2006 Agreement and, therefore, not subject to the

exclusivity provisions.    Exhibit J to this Declaration is a true and correct copy of a

letter dated July 25, 2007 from me to Mr. Santos and Mr. Sapata of the GE Joint

Venture explaining that, as a non-party to the January 11, 2006 Agreement, the

GE Joint Venture had no right to possess the agreement or its attachments, along

with an English translation of this document and certification of the translation.

Exhibit K to this Declaration is a true and correct copy of a letter dated July 27,

2007 from Eduardo Ribeiro Santos and Dalmon Rogério de Moraes Sapata of the

GE Joint Venture to Edwaldo Tamberg and me, in which Mr. Santos and Mr.

Sapata specifically acknowledge that they are not parties to the January 11, 2006

Agreement, along with an English translation of this document, along with

certification of the translation.

69. General Electric conveyed to CNO its intent to join a competitor in a letter from

Mr. Wiener to me dated June 18, 2007.    Mr. Wiener's letter was on "GE Energy"

letterhead, identified him as "Manager – Hydro Sales and Commercial

Operations" for "GE Energy", and included a footer identifying an additional

affiliation between Mr. Wiener and "General Electric International, Inc." A true and correct copy of that letter is attached as Exhibit L.

70. In the letter, Mr. Wiener specifically acknowledges that General Electric is bound by the exclusivity and non-disclosure obligations arising from the Agreement. Mr. Wiener asks, however, for CNO to release General Electric from its exclusivity agreement, expressing the theory that General Electric could nonetheless continue to satisfy its non-disclosure obligations. Specifically, Mr. Wiener states:

> ...[W]e now consider it in the best interests of both parties to formally terminate the non-compete agreement that was signed as part of the Meeting of Minutes on January 11, 2006, while retaining the non-disclosure commitment.

71. As a result of this letter, representatives of CNO requested a meeting with General Electric representatives in Brazil. The meeting was held on August 9, 2007. Although I did not attend, Mr. Tamberg attended on behalf of CNO, as did CNO's in-house attorney, Adriano Maia. In addition, Alvaro Novis, the CFO of CNO's holding company, Odebrecht S.A., attended the meeting. I understand from discussions with Mr. Tamberg that the CEO of General Electric do Brasil Ltda., Mr. Alexandre Silva, attended, and that he was accompanied by the company's General Counsel, Josie Jardim.

72. I was informed by Mr. Tamberg that, at the meeting, CNO informed Mr. Silva that it was opposed to General Electric participating with a competing bidder for the Rio Madeira Project and would not waive General Electric's exclusivity obligation. During this discussion, CNO also asked Mr. Silva whether General Electric could make assurances that, if it were released from its exclusivity

obligations, it would be capable of preventing the use of confidential information, by use of a "Chinese wall." I was informed that Mr. Silva told CNO that he agreed that it would be very difficult for General Electric to do so.   CNO therefore asked Mr. Silva whether it would be willing to make a representation to that effect to the Brazilian government and declare that it therefore would not be able to compete even if released from its exclusivity obligation. Mr. Silva said that he would need to consult with General Electric's compliance department in the United States.

73. I later learned that a few days after that meeting, Mr. Silva called Mr. Novis and informed him that the matter was being handled solely by General Electric's U.S. entities, and that General Electric do Brasil Ltda would not be able to provide any assurances to CNO.

74. As a result of the August 9, 2007 meeting and the subsequent telephone conversation between Mr. Silva and Mr. Novis, I wrote a letter on August 16, 2007 to Mr. Silva, the General Electric Corporate ombudsman and the individual members of General Electric Co's Board of Directors, with a copy of the letter to Mr. Wiener. In that letter, I explained to General Electric that any cooperation with a competitor of CNO on the Rio Madeira Project would be both illegal and unethical. To date, I have received no response to that letter. A true and correct copy of that letter is attached as Exhibit M.

75. Accordingly, on September 5, 2007, I further wrote to Mr. Wiener to reiterate CNO's position that it would not release General Electric either from the confidentiality provision or the exclusivity provision of the Agreement. I further

explained that because of the nature of the Project, the exclusivity and confidentiality provisions are dependent on each other, and that it would not be possible for General Electric to participate in a competing bid for the Rio Madeira Project without directly or indirectly using confidential information. A true and correct copy of that letter is attached as Exhibit N. To date, I have received no response to that letter.

76. Despite CNO's correspondence and meetings, and with the auction date for Santo Antônio pending in less than sixty days, we have received indications that General Electric is cooperating with a competing bidder and violating its exclusivity obligations.

77. In a letter dated August 20, 2007, IESA informed the Ministry of Mines and Energy that IESA firmly intends to participate in a consortium with, among others, General Electric to bid on the Rio Madeira Project. Discussion within the industry, my own experience within the industry, as well as press reports, led me to believe this consortium is being led by Camargo Corrêa. IESA further stated that it has been working on the design for over a year with all member companies of its consortium, including General Electric. IESA further emphasizes the importance of General Electric's extensive experience with bulb turbine technology. IESA also informed that Ministry that it does not believe it can submit a bid unless General Electric is released from its exclusivity agreement with CNO. I understand that if IESA's statements are true, General Electric is now in breach of its obligations under the January 11, 2006 Agreement. Exhibit O to this Declaration is a true and correct copy of the letter dated August 20, 2007

27

from Atilano de Oms, President of IESA, to Márcio P. Zimmermann, H.E.
Secretary of Energy Planning and Development, Ministry of Mines and Energy,
along with an English translation of this document and a certification of the
translation.

78. CNO has felt confident that its time, money and effort in developing a unique
technical and financial plan for the Rio Madeira Project would pay off in the
presentation of a bid far superior to any of its competitors. General Electric, of
course, is privy to the very information that makes CNO's plans far superior to
those of any other company. Were a competitor to be provided access to CNO's
proprietary and confidential information, which is in General Electric's
possession, CNO's hard-earned advantages could be lost.

79. On July 31, 2007, General Electric wrote CNO to say that General Electric and
General Electric do Brasil Ltda. would be turning over the January 11, 2006
Agreement to the Brazilian government. The letter is signed by Stanley Smith on
behalf of General Electric. I believe that Mr. Smith is an official of GE Energy, a
division of the General Electric Company in the United States. This letter was
signed separately by two representatives of General Electric do Brasil Ltda.

80. In addition, we have learned that just within the last month, two senior technical
managers and one technical manager for Alstom (a member of the EPC
Consortium associated with the CNO/Furnas bidding group), each of whom
directly participated in the technical design solutions for the Rio Madeira Project,
were recruited by headhunters on behalf of a "large Multinational Energy
Company based in the Campinas region, state of Sao Paulo in Brazil." The

28

primary company that would satisfy that description is GE Joint Venture. Exhibit
P to this Declaration is a true and correct copy of three declarations dated
September 10, 2007 from those employees who were recruited by the headhunter.
We also have learned that three less senior employees of Alstom, who also had
confidential information relating to the Rio Madeira Project, were successfully
hired by the GE Joint Venture. Exhibit Q to this Declaration is a true and correct
copy of a letter dated August 20, 2007 from the law firm of Lobo & Rizzo to
General Electric do Brasil Ltda. and the GE Joint Venture dated August 20, 2007
warning General Electric of the illegality of their actions.

81. Given the limited time available before the auction date to potential bidders who
only began developing a bid in the last year, the most important thing that General
Electric can bring to a competing group is not its technical ability to manufacture
turbines – a niche that can be filled by any number of entities throughout the
world – but its knowledge of confidential and proprietary information regarding
CNO's design and bid. It is this knowledge that could enable a competing bidder
to bypass the otherwise necessary process of developing (over the course of a
significant period of time) a technical and financially sound proposal for
completion of the Rio Madeira Project.

82. The fact that IESA has informed the Brazilian government that it can only go
forward if General Electric participates, confirms this conclusion for CNO. IESA,
of course, is an owner of Inepar, a participant in the GE Joint Venture. If all that
IESA needed to present a bid was a manufacturer of turbines and generators of
sufficient size and sophistication to meet the technical and financial requirements

of the Project, numerous options other than General Electric are available for the Project. Specifically, Ingehydro, a Spanish company, CKD Blansko, a Czech company, Skoda Energo, a Czech company, Toshiba, a Japanese company, Hitachi, a Japanese company, Mitsubishi, a Japanese company, Litostroj, a Slovenian company, Bharat Heavy Electricals Limited, an Indian company, Power Machines, a Russian company, Dong Fang, a Chinese company, Harbin, a Chinese company, and Kharkov, a Russian company, among others, have the ability to supply turbines for the Rio Madeira Project. I learned from research developed by a consultant that some of these companies – Power Machines, Hitachi, Toshiba, Dong Fang, Harbin, and Kharkov – have more experience in designing bulb turbines of the size needed for the Rio Madeira Project than does General Electric. In fact, Suez Energy Brasil, a large power company that also plans to bid on the Project, has stated publicly that if it wins the concession to build the Santo Antônio site, but remains barred from working with turbine suppliers already bound by exclusivity agreements, it will have no problem finding an uncommitted Chinese or Russian turbine supplier to complete the work on the Project. What makes General Electric uniquely helpful to any late bidder for the Rio Madeira Project is its knowledge of CNO's proprietary and confidential information.

IX.   **CNO WILL BE IRREPARABLY HARMED IF GENERAL ELECTRIC VIOLATES THE CONFIDENTIALITY AND EXCLUSIVITY PROVISIONS OF THE JANUARY 11, 2006 AGREEMENT**

83. General Electric has had access to CNO's confidential engineering and financial information. This information will be disclosed to CNO's competitors if General Electric is allowed to join a rival bidding group. Further compounding this harm,

30

General Electric has information concerning the prices that CNO will pay other suppliers for turbines and generators. The cost of the turbines and generators is estimated to constitute approximately 35% of the overall construction cost. With this information in hand, a sophisticated competitor with experience in the construction industry could approximate CNO's costs and from this reach a reasonable estimate of CNO's ultimate bid. Not only would this constitute unfair competition, such conduct raises serious anti-trust concerns.

84. The contractual prohibition on any participation by General Electric in the Project was designed to be infallible protection for CNO. It was a bright-line prophylactic measure designed to prevent any conflict of interest or any possible dilution of CNO's competitive edge as a result of its negotiations with General Electric.

85. The Rio Madeira Project is one of the largest energy projects ever undertaken in Brazil. The contract will be awarded to the group that submits the lowest bid and the winner takes all. The stakes are enormous for the parties, and the temptation to cut corners is obvious. The winner of this auction will have an inestimable advantage in the bidding for the follow-on Jirau Project. If a competitor were to win the first auction for the initial Santo Antônio Project by using confidential information from CNO, it would seriously harm CNO's reputation, since CNO has been the champion of the Project from the beginning. The resulting loss of momentum and prestige in the market place could cause serious harm in terms of lost future business.

31

86. Unless this court grants injunctive relief restraining General Electric in the United States from violating the exclusivity provisions of the January 11, 2006 Agreement, General Electric could easily circumvent its contractual obligations by acting indirectly through separate divisions and subsidiaries.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____, 2007

[signature on original]
JOSÉ BONIFÁCIO PINTO JÚNIOR

# TRANSLATORS' CERTIFICATE

I, Timothy Yuan, hereby certify that I speak and write both the Portuguese and English languages; that I have translated the foregoing 9/12/2007 José Bonifácio Pinto Júnior Declaration to the best of my ability; and that it is a true and correct translation to the best of my knowledge, information, and belief.

_____                    9/12/07
Signature                                                   Date

Kavitha Reddy 9/12/2007

KAVITHA REDDY
NOTARY PUBLIC-STATE OF NEW YORK
No. 02RE6154611
Qualified in New York County
My Commission Expires October 23, 2010

TRIBUNAL FEDERAL DOS ESTADOS UNIDOS
DISTRITO SUL DE NOVA YORK

| | |
|---|---|
| CONSTRUTORA NORBERTO ODEBRECHT S.A., | : |
| Autora, | : |
| | : Ação Civil Nº |
| v. | : |
| | : |
| GENERAL ELECTRIC COMPANY, GENERAL ELECTRIC INTERNATIONAL, INC., GE INFRASTRUCTURE, INC., GE POWER SYSTEMS, INC., GE ENERGY LLC e GE HYDRO POWER, INC., | : |
| Rés. | : |

## DECLARAÇÃO DE JOSÉ BONIFÁCIO PINTO JÚNIOR EM APOIO À MOÇÃO DA AUTORA PARA A EMISSÃO DE UMA MEDIDA CAUTELAR TEMPORÁRIA E UMA MEDIDA LIMINAR

JOSÉ BONIFÁCIO PINTO JÚNIOR, nos termos do 28 U.S.C. § 1746, faz as seguintes declarações:

1. Sou um Diretor de Projetos da Construtora Norberto Odebrecht S.A. ("CNO"), a autora desta ação e maior empresa de construção civil no Brasil. Supervisiono tanto o desenvolvimento como a posterior implementação dos projetos. Apresento esta declaração em apoio ao pedido impetrado pela CNO para proibir a General Electric de violar um contrato que estipulou, entre outros aspectos, que a General Electric não concorreria contra a CNO em conexão com sua participação direta ou indireta na licitação da primeira concessão (que se localizará em um local denominado Santo Antônio) de duas concessões de construção e operação de usinas hidrelétricas no Rio Madeira (o "Projeto Rio Madeira"). A licitação desse projeto atualmente está prevista para 30 de outubro de 2007, normalmente exigindo-se que a pré-qualificação das potenciais proponentes seja realizada 30

dias antes do leilão, em 30 de setembro de 2007. Com base nas discussões em andamento no setor, minha própria experiência no setor, bem como matérias jornalísticas, a Camargo Corrêa, uma das maiores concorrentes da CNO, que deverá apresentar uma proposta rival, tem envidado esforços para desfazer os acordos de exclusividade que a CNO tem com seus atuais parceiros no consórcio e também com a General Electric. Como a General Electric é a única empresa fornecedora que celebrou um acordo de exclusividade com a CNO e posteriormente abandonou o consórcio inicialmente formado, tem-se a impressão de que a General Electric e a Camargo Corrêa estão conjuntamente formando um grupo concorrente. Salvo indicação em contrário, tenho conhecimento pessoal dos fatos dispostos na presente Declaração.

2.  A CNO é uma sociedade constituída nos termos da legislação brasileira e domiciliada no Brasil. É uma subsidiária integral da Odebrecht S.A., a empresa *holding* do Grupo Odebrecht. A CNO é a maior empresa de construção civil do Brasil, participando de projetos de construção em dezenove países, inclusive nos Estados Unidos. Em 2006, a Revista Global Finance apontou a CNO como melhor empresa de construção civil do Brasil.

3.  O Grupo Odebrecht é um conglomerado comercial brasileiro com operações na América do Sul, América Central e Caribe, América do Norte, África, Europa e Oriente Médio. É líder na América Latina nas áreas de engenharia e construção civil e de produtos químicos e petroquímicos, atuando também nos setores de infra-estrutura, serviços públicos, mineração e energia.

4. A CNO é a empresa líder responsável pelos estudos necessários para a elaboração de um projeto no Brasil denominado "Projeto Rio Madeira". Trata-se de um projeto de construção de duas usinas hidrelétricas em dois pontos do Rio Madeira, denominadas Santo Antônio e Jirau, ambos próximos ao município de Porto Velho, Estado de Rondônia, Brasil. O Projeto faz parte do Plano de Aceleração do Crescimento Econômico proposto pelo governo brasileiro para atender às necessidades nacionais de infra-estrutura previstas para a próxima década.

5. O contrato de construção de cada uma das instalações hidrelétricas no Rio Madeira é um contrato *turnkey*, de preço fixo, denominado contrato de Engenharia, Aquisição e Construção ("EPC"). As proponentes recebem pacotes detalhados sobre a licitação, com as especificações do projeto e informações detalhadas acerca das condições hidrológicas, geológicas e ambientais do local. Fundamentadas nesses pacotes, as proponentes têm de elaborar os projetos de engenharia e as soluções financeiras para a construção e operação da instalação.

6. As especificações do Projeto Rio Madeira exigem quarenta e quatro grupos turbina/gerador em cada um dos dois locais. As turbinas e os geradores são máquinas enormes e não são equipamentos de série; eles têm de ser adaptados às características hidrológicas particulares de locais específicos em um determinado rio onde um projeto será localizado. Portanto, ao negociar com a General Electric para ser um possível fornecedor do Projeto Rio Madeira, a CNO teve de disponibilizar certas informações confidenciais e exclusivas de grande valor, conforme descritas no Parágrafo 55 abaixo, inclusive dados hidrológicos. Para resguardar a vantagem competitiva da CNO, alcançada no desenvolvimento de

3

tais dados e informações, a CNO exigiu e a General Electric concordou que a General Electric não concorreria contra a CNO em conexão com o Projeto Rio Madeira.

7. Se a General Electric competisse ou auxiliasse alguma concorrente em uma proposta contra a CNO no Projeto Rio Madeira, os danos que resultariam para a vantagem competitiva, os segredos comerciais e outras informações confidenciais e exclusivas da CNO, assim como sua boa fé e reputação, seriam incalculáveis em termos monetários.

I. **A CNO E SUA PARCEIRA, FURNAS, SÃO RESPONSÁVEIS PELA CONCEPÇÃO E O DESENVOLVIMENTO DO PROJETO RIO MADEIRA DESDE O INÍCIO**

8. Em 2001, a CNO começou a elaborar a idéia de empreender um projeto hidrelétrico no Rio Madeira, situado entre o município de Abunã e o centro de Porto Velho, na região amazônica do Brasil. Até recentemente, havia uma convicção geral no Brasil de que era muito difícil construir usinas hidrelétricas na Amazônia de forma economicamente eficiente e não prejudicial ao meio ambiente. A CNO discordava e, a partir de 2001, promoveu e desenvolveu o Projeto Rio Madeira, gastando dezenas de milhões de dólares em fundos próprios nesse processo. Minha participação no desenvolvimento do Projeto Rio Madeira data dessa época.

9. Um empreendimento como o do Projeto Rio Madeira, que aproveitará terras e hidrovias públicas e que precisará de uma concessão pública para a operação da usina resultante, requer a realização de três estudos preliminares distintos e a respectiva aceitação pelo governo brasileiro antes que este defina uma data para o leilão da concessão. Os três estudos necessários são:

4

a. Um "estudo de inventário", que analisa o rio, ou um trecho deste, e a área circunvizinha para identificar os potenciais hidrelétricos existentes no rio e estimar a capacidade energética de cada local identificado no estudo.

b. Um "estudo de viabilidade", que desenvolve um projeto preliminar de engenharia para cada local com potencial hidrelétrico, inclusive identificando o tipo de turbinas a ser usado, e coleta mais dados hidrológicos, pluviométricos, geológicos e de outra natureza referentes a cada local.

c. Um "estudo de impacto ambiental e social", que analisa o impacto do projeto sobre o ambiente físico, a flora e a fauna e eventuais populações circunvizinhas.

10. Assim, como primeiro passo oficial no desenvolvimento do Projeto Rio Madeira, em junho de 2001 a CNO solicitou autorização da Agência Nacional de Energia Elétrica ("ANEEL") para realizar um "estudo de inventário" do Rio Madeira no trecho entre a localidade de Abunã e o centro de Porto Velho, por conta e risco da própria CNO.

11. Após obter a autorização para realizar o estudo de inventário, a CNO convidou Furnas Centrais Elétricas, S.A. ("Furnas") para participar da elaboração dos estudos relacionados ao Projeto Rio Madeira e Furnas aceitou o convite. Furnas é uma sociedade constituída nos termos da legislação brasileira, sob o controle do governo brasileiro. É uma das maiores geradoras de energia elétrica no Brasil e uma das maiores da América Latina. Furnas é uma das empresas com maior experiência no desenvolvimento exitoso de projetos hidrelétricos no Brasil.

12. A execução do estudo de inventário durou cerca de dezoito meses, exigindo que a CNO e Furnas contratassem engenheiros externos e realizassem análises de possíveis locais no Rio Madeira, no Brasil, no trecho entre o município de Abunã e o centro de Porto Velho. A CNO e Furnas apresentaram o estudo de inventário concluído à ANEEL em novembro de 2002 e receberam a aprovação do estudo em dezembro de 2002.

13. O estudo de inventário foi disponibilizado ao público nessa altura.

14. Em janeiro de 2003, a CNO solicitou e obteve autorização da ANEEL para realizar estudos de viabilidade de dois dos locais identificados no estudo de inventário: Santo Antônio e Jirau. Furnas novamente participou desses estudos.

15. Para realizar os estudos de viabilidade, a CNO e Furnas contrataram peritos externos de engenharia (em particular a PCE Ltda) para analisar o Rio Madeira e as terras circunvizinhas e verificar se Santo Antônio e Jirau tinham o potencial de fornecer energia hidrelétrica de forma econômica e confiável para atender à expansão das necessidades energéticas do Brasil. Os resultados dos estudos de viabilidade apresentavam uma análise precisa e completa do potencial econômico do Projeto Rio Madeira e lançou as bases para o vencedor do leilão desenvolver o projeto detalhado das usinas hidrelétricas. Foram necessários dois anos e quatro meses para realizar os estudos de viabilidade dos dois locais: A CNO e Furnas apresentaram o estudo de viabilidade concluído para Jirau em dezembro de 2004 e para Santo Antônio em abril de 2005. A CNO e Furnas receberam a aprovação dos estudos em 30 de março de 2007.

6

16. Os estudos de viabilidade estão disponíveis ao público desde as datas de sua apresentação. Qualquer outra entidade que quisesse desenvolver este Projeto podia estar desenvolvendo seus próprios estudos de viabilidade.

17. Em agosto de 2003, a CNO e Furnas enviaram solicitação à agência regulatória do meio ambiente no Brasil, o Instituto Brasileiro do Meio Ambiente e dos Recursos Naturais Renováveis ("IBAMA"), para que este emitisse um "termo de referência" formal para a realização de um estudo de impacto ambiental. O termo de referência é essencialmente uma lista de todos os aspectos ambientais, tanto os de natureza geral como os específicos, a serem analisados como parte do estudo. O IBAMA promoveu uma audiência pública e visitou os futuros locais do empreendimento, emitindo, em seguida, o documento em setembro de 2004. A CNO e Furnas deram início oficialmente ao estudo ambiental logo depois, embora já estivessem realizando análises ambientais das questões esperadas desde agosto de 2003.

18. O estudo ambiental novamente exigiu que a CNO e Furnas contratassem peritos externos – inclusive institutos de pesquisa e universidades de renome – e dedicassem um nível considerável de tempo e recursos para elaborar um plano que minimizasse o impacto ambiental do Projeto Rio Madeira sobre a região circunvizinha e o meio ambiente em geral.

19. A CNO e Furnas apresentaram o estudo ambiental concluído em maio de 2005. Após o IBAMA solicitar vários esclarecimentos, foram realizadas audiências públicas sobre o estudo em novembro de 2006. O IBAMA emitiu a licença ambiental do Projeto Rio Madeira em julho de 2007. Com base no estudo

ambiental realizado pela CNO, o IBAMA impões cerca de trinta e três condições
a serem satisfeitas pela proponente vencedora.

20. O estudo ambiental, que é um relatório exaustivo sobre as condições ambientais
em Santo Antônio e Jirau, está disponível ao público desde sua apresentação.  A
proponente vencedora terá de elaborar um plano detalhado para tratar das
questões e dos impactos ambientais identificados durante a execução dos estudos.

## II.    O CONTRATO DA CONCESSÃO SERÁ OUTORGADO EM LEILÃO REALIZADO EM CONFORMIDADE COM A LEI DE LICITAÇÕES DO BRASIL (LEI 8.666/1993)

21. Em meados de agosto de 2007, para obter comentários do público, a ANEEL
publicou o edital oficial do leilão público para a outorga da concessão de
construção e operação da usina hidrelétrica de Santo Antônio.  O início da
licitação desse projeto atualmente está previsto para 30 de outubro de 2007,
normalmente exigindo-se que a pré-qualificação das potenciais proponentes seja
realizada 30 dias antes do leilão, em 30 de setembro de 2007, quando as partes
interessadas deverão apresentar informações detalhadas, inclusive suas
qualificações técnicas e solidez financeira.

22. A ANEEL divulgou estudos técnicos detalhados e outros requisitos para a
construção da usina hidrelétrica de Santo Antônio.  A proponente vencedora é
responsável pela elaboração de um projeto básico de engenharia aceitável, que
atenda às especificações para o projeto básico e outros requisitos da ANEEL.

23. A ANEEL atualmente tem definida a data de 30 de outubro de 2007 para o leilão
da concessão de construção e operação da usina hidrelétrica de Santo Antônio.
Antes da data do leilão, a ANEEL definirá um preço máximo para a tarifa a ser
cobrada pela energia hidrelétrica durante o período de trinta anos da autorização

concedida à vencedora da concessão de operação da usina nos termos de um conjunto de Contratos de Compra de Energia ("CCEARs") a serem celebrados com empresas distribuidoras de energia no país inteiro. As proponentes terão de propor um preço inferior a essa tarifa. O preço refere-se ao preço por megawatt/hora a ser cobrado durante o termo do CCEAR. A proponente exitosa deverá recolher garantias de fiel cumprimento para assegurar a conclusão dos projetos em conformidade com as exigências do contrato.

24. A ANEEL celebrará um contrato de concessão com a proponente vencedora logo após a seleção da proposta vencedora. O contrato exigirá o início da operação da usina hidrelétrica de Santo Antônio em 2012.

25. O leilão para a construção e operação da usina hidrelétrica de Jirau ainda não foi programado. As autoridades governamentais recentemente mencionaram que o leilão de Jirau ocorrerá em 2008.

26. Embora os esforços da CNO tenham levado a ANEEL a decidir-se por licitar concessões para o Projeto Rio Madeira, não foi sempre certo que o Projeto iria adiante. Na realidade, até a época das audiências públicas referentes aos estudos ambientais realizados pela CNO, convocadas em novembro de 2006, as concorrentes da CNO no setor de modo geral acreditavam que o Projeto não seria aprovado em decorrência de seus aspectos ambientais. Além disso, não houve demonstrações públicas de interesse no Projeto por parte de nenhuma entidade, salvo a CNO e Furnas, nem indicações de medidas tomadas para elaborar projeto e estratégia próprios para construir e operar usinas em Santo Antônio e Jirau, não

9

obstânte o fato de que muitas empresas capazes estão e estavam disponíveis para elaborar uma proposta concorrente.

27. Os estudos de inventário, viabilidade e impacto ambiental realizados e concluídos pela CNO, que viabilizaram o avanço do Projeto, custaram à CNO e Furnas mais de R$ 150 milhões, ou cerca de US$ 75 milhões. Se o governo brasileiro tivesse recusado o Projeto, a CNO teria sido obrigada a absorver os custos desses estudos. Agora, mesmo com a oferta do Projeto em leilão, a CNO e Furnas conseguirão recuperar da eventual proponente vencedora apenas cerca de metade de suas despesas (do local de Santo Antônio). A outra metade será reembolsada se e quando Jirau for licitada.

28. Contudo, ao incorrer nos custos e riscos, a CNO desenvolveu um volume significativo de informações exclusivas e confidenciais acerca do Projeto Rio Madeira, as quais a CNO tem usado para elaborar sua proposta para o leilão de 30 de outubro de 2007. O valor dessas informações exclusivas e confidenciais é incalculável para a CNO definir os planos finais a serem usados no processo de leilão público.

III. **A CNO E FURNAS DESENVOLVERAM UM PROJETO COM PROFUNDOS BENEFÍCIOS PARA O POVO BRASILEIRO E UM MÍNIMO DE IMPACTO AMBIENTAL SOBRE A AMAZÔNIA E O MUNDO EM GERAL**

29. Como resultado dos esforços envidados pela CNO e Furnas, o público brasileiro terá usinas hidrelétricas modernas que promoverão o crescimento da economia brasileira.

   a. Projeta-se que o produto interno bruto do Brasil cresça cerca de 4% por ano e que a demanda energética nacional aumente uma média anual de 5% nos próximos dez anos.

   b. Até 2015, as duas usinas que compõem o Projeto Rio Madeira representarão, em conjunto, 7% da geração de eletricidade do país.

30. Ademais, em decorrência dos esforços da CNO e Furnas, essas usinas terão um impacto ambiental mínimo sobre a ecologia sensível da região amazônica. De fato, se não fossem as soluções ambientais e de engenharia da CNO, o Projeto Rio Madeira provavelmente não teria sido oferecido em leilão público. Entre os exemplos de contribuições feitas pela CNO e Furnas destacam-se:

   a. Para limitar a área do respectivo reservatório às dimensões da calha atual do rio durante a estação chuvosa, as usinas utilizarão a tecnologia de turbina bulbo. Esse é um conceito de "baixa queda", o qual minimiza a queda do nível d'água do rio a jusante das usinas;

   b. As usinas implicarão a inundação apenas de áreas muito limitadas, em contraste a outros tipos de usinas hidrelétricas; O Projeto terá uma das menores relações (0,09) entre área de reservatório e capacidade total instalada de geração de energia. Em comparação, a usina hidrelétrica de Balbina, no Brasil, tem uma relação de 9,44 entre área de reservatório e capacidade total instalada de geração de energia;

   c. Residem nas áreas relevantes do rio apenas cerca de 1.058 famílias, sendo que apenas 610 delas terão de ser reassentadas em decorrência do Projeto.

Em comparação, outra usina hidrelétrica construída no local de Itaipu, no Brasil, reassentou mais de 40.000 habitantes;

d.  O local de Santo Antônio é próximo a uma rodovia brasileira construída na década de 1970, que já exerceu um impacto ambiental sobre a região.

e.  O Projeto Rio Madeira utilizará áreas já designadas pelo governo brasileiro como faixa de domínio para transportar a energia para outras áreas do país por essa mesma área já afetada, assim reduzindo a degradação de flora e fauna que resultaria caso fosse necessário construir linhas de transporte em terras virgens.

IV.  **A CNO E FURNAS ELABORARAM UM PLANO ESTRATÉGICO EXCLUSIVO PARA A IMPLEMENTAÇÃO DO PROJETO RIO MADEIRA.**

31. Ao realizar os estudos para o Projeto Rio Madeira, a CNO e Furnas começaram a compor equipes para desenvolver um projeto técnico confidencial e exclusivo e uma estratégia financeira com o intuito de participar do leilão da concessão de construção e operação das usinas hidrelétricas de Santo Antônio e Jirau no Rio Madeira.

32. O empreendimento de um projeto de infra-estrutura dessa magnitude requer enormes investimentos de capital, planejamento meticuloso, conhecimentos tecnológicos em várias áreas e a assunção de um alto nível de risco.  Por esses motivos, as empresas de construção civil normalmente buscam parceiros tecnológicos e financeiros para combinar suas forças e enfrentar o desafio de projetar e construir um projeto enorme de obra pública, e para financiar os custos e dividir o risco.

12

33. Para elaborar esses planos, a CNO buscou empresas de engenharia e fabricantes de equipamentos eletromecânicos que pudessem atender à grande demanda de serviços e fornecimentos exigidos pelo Projeto e fazer parte de um "Consórcio EPCista" responsável pela construção das usinas hidrelétricas caso a CNO e Furnas vencessem a licitação das concessões públicas para o Projeto. Ao mesmo tempo, a CNO e Furnas também reuniram um grupo de bancos e outras instituições financeiras para desenvolver uma estrutura de financiamento para o Projeto.

34. Ambos os grupos – o consórcio de construção e o grupo de bancos e instituições financeiras – foram necessários para a viabilização financeira do Projeto Rio Madeira. Em vista do prazo de cinco anos para iniciar as operações, foi necessário iniciar o projeto e planejamento com muita antecedência à data do leilão. Para criar as devidas soluções financeiras e técnicas para um projeto da magnitude do Projeto Rio Madeira, uma potencial proponente tem de dedicar um período significativo de tempo e recursos para elaborar soluções para os desafios no local da construção, planos e desenhos detalhados e a estratégia de construção em si.

35. A participação dos fabricantes de turbinas e geradores no processo de projeto e planejamento é de importância crítica para o Projeto. Esse trabalho não pode ser realizado em um projeto com as dimensões do Projeto Rio Madeira sem a participação de fabricantes de equipamentos eletromecânicos no Consórcio EPCista. Além disso, o Projeto Rio Madeira é de tal dimensão que se torna essencial o consórcio incluir mais de um fornecedor de turbinas e geradores, para

13

atender ao cronograma rigoroso para a entrada do Projeto em operação. Cada uma das duas usinas hidrelétricas do Rio Madeira terá quarenta e quatro turbinas. Esses equipamentos têm de ser encomendados com muita antecedência. Em vista do ambicioso cronograma de construção definido pelo governo, o procedimento mais prudente é ter mais de um fornecedor de turbinas e geradores como participante de um consórcio de construção para assegurar a execução do Projeto dentro do prazo e seu desempenho de projeto.

36. Portanto, o objetivo da CNO ao reunir um Consórcio EPCista não foi apenas o de contratar simples fornecedores de equipamentos, mas de angariar eventuais parceiros que pudessem integrar o futuro Consórcio EPCista e contribuir recursos e conhecimentos ao Projeto, que não estariam ao alcance da CNO se atuasse por si só.

37. Para esse fim, em meados de 2005, a CNO buscou fornecedores líderes de turbinas e geradores eletromecânicos. A CNO informou a cada fornecedor que a CNO procurava participantes para o Consórcio EPCista a ser organizado e liderado pela CNO em apoio à elaboração da proposta da CNO e Furnas no Projeto Rio Madeira, e que gostaria de convidar o fornecedor para realizar negociações com a CNO. Contudo, cada fornecedor foi informado de que, antes do início das negociações, a CNO exigiria a assinatura de um acordo de confidencialidade por cada fornecedor, para que a CNO pudesse disponibilizar ao fornecedor certas informações técnicas exclusivas acerca do Projeto.

38. Entre os fornecedores que assinaram os acordos de confidencialidade figuram a VA Tech Hydro Brasil Ltda. ("VA Tech"), Alstom Hydro Energia Brasil Ltda.

("Alstom"), Voith Siemens Hydro Power Generation Ltda. ("Voith-Siemens"),

Siemens, Areva Transmissão e Distribuição de Energia, Ltda. ("Areva"), ABB

Ltda ("ABB"), Energ Power Ltda., OSJC "Power Machines", IESA

Equipamentos e Montagens, S.A., GE Hydro Inepar do Brasil S.A, Sojitz do

Brasil, SA, Bardella S/A Indústrias Mecânicas, Industrias Metalúrgicas

Pescarmona SAIC y F e Hitachi, Ltd., entre outros.

39. Uma das entidades às quais a CNO enviou uma carta convite, e que a CNO

selecionou para realizar discussões iniciais e celebrar um acordo de

confidencialidade, foi a GE Hydro Inepar do Brasil S.A. (a "*Joint Venture* da

GE"), uma *joint venture* entre a General Electric do Brasil Ltda., uma subsidiária

da General Electric Co., e a Inepar S.A. Indústria e Construções ("Inepar"), uma

sociedade brasileira. A Inepar, por sua vez, é uma subsidiária não integral da

IESA Equipamentos e Montagens, S.A. ("IESA"), que também foi uma das partes

do acordo de confidencialidade.

40. Em anexo como Documento A encontra-se uma cópia fidedigna e correta de um

acordo de confidencialidade datado em 16 de maio de 2005 entre a CNO, a *Joint*

*Venture* da GE e a IESA, juntamente com uma tradução desse acordo, em inglês,

e a certificação da tradução.

41. Logo após a assinatura do acordo de confidencialidade, a CNO disponibilizou, à

*Joint Venture* da GE e a outras entidades que assinaram os acordos de

confidencialidade, documentos detalhados de engenharia para que pudessem

adaptar a capacidade de geração de suas turbinas bulbo às necessidades das usinas

do Rio Madeira. O Documento B em anexo à presente Declaração é uma cópia

15

fidedigna e correta de um e-mail que enviei ao Sr. Ricardo Woitowicz em 28 de maio de 2005, encaminhando tais documentos à *Joint Venture* da GE. O Sr. Woitowicz apresentou-se como Diretor de Marketing e Desenvolvimento Comercial - Hidro, GE Energy, Power Generation, localizado no endereço da *Joint Venture* da GE.

42. A *Joint Venture* da GE tem, como sua principal vantagem, um arrendamento com a IESA, o qual permite à *Joint Venture* da GE utilizar um certo volume da capacidade fabril (medido em horas) da fábrica de propriedade da IESA. Apenas essas empresas específicas com alto nível de capacidade tecnológica podem fornecer o projeto dos geradores e turbinas. No caso da General Electric, a equipe de engenharia com conhecimentos técnicos está localizada fora do Brasil.

43. Embora a CNO tenha enviado o convite inicial de participação à *Joint Venture* da GE, sempre se compreendeu que a *Joint Venture* da GE tinha capacidade de fabricação das turbinas para o Consórcio EPCista apenas após o desenvolvimento de um projeto e uma estratégia. Também foi sempre compreendido que a especialização técnica e de engenharia, bem como o apoio financeiro para o Projeto, viriam das entidades da General Electric localizadas nos Estados Unidos.

## V.  AS DISPOSIÇÕES DE EXCLUSIVIDADE RESULTARAM DE NEGOCIAÇÕES REALIZADAS EM CONDIÇÕES ESTRITAMENTE COMUTATIVAS ENTRE PARTES SOFISTICADAS

44. Após a rodada inicial de negociações, a CNO optou por avançar as negociações com um subgrupo menor de fornecedores. Esse grupo incluía a Alstom Hydro Energia Brasil Ltda, a Voith Siemens Hydro Power Generation Ltda., a VA Tech Hydro Brasil Ltda e a General Electric.

16

45. No que toca à General Electric, o representante principal da empresa, com quem a CNO trocou informações e negociou, era Jeffrey R. Wiener, que trabalha nos escritórios da General Electric em Schenectady, Nova York, nos Estados Unidos. No decorrer das negociações, o Sr. Wiener apresentou-se como representante da GE Hydro, GE Energy, General Electric International, Inc. e "General Electric" em geral, sendo todas sociedades com sede nos Estados Unidos. A CNO compreendeu que era necessário negociar com as entidades norte-americanas, em vez da *Joint Venture* da GE, pois esta não contava com a capacidade estratégica, financeira e de engenharia para participar do Projeto. Na realidade, a General Electric formou uma "equipe" do Rio Madeira, com engenheiros e outros funcionários chave, muitos dos quais localizados fora do Brasil. O Documento C em anexo à presente Declaração é uma cópia fidedigna e correta de um e-mail que recebi de L. Kuster em 22 de dezembro de 2005, o qual mostra a composição dessa equipe, juntamente com uma tradução desse documento, em inglês, e a certificação da tradução.

46. Nesse estágio das negociações, a CNO disponibilizou outras informações confidenciais e exclusivas à General Electric e aos outros três fornecedores com os quais a CNO ainda negociava.

47. Em vista da natureza altamente confidencial das informações disponibilizadas à General Electric, a CNO insistiu para que a General Electric concordasse em trabalhar exclusivamente com a CNO no Projeto Rio Madeira. Para esse fim, a CNO assinou um novo acordo com a General Electric em 11 de janeiro de 2006 (o "Acordo de 11 de Janeiro de 2006"), que estabeleceu a exclusividade. Uma

17

cópia fidedigna e correta do Acordo de 11 de Janeiro de 2006, que foi editada,
encontra-se em anexo como Documento D. Nesse acordo, a General Electric
comprometeu-se a não participar do Projeto Rio Madeira com nenhuma outra
parte.

48. Embora o Acordo de 11 de Janeiro de 2006 sugira que seus termos tenham sido
formulados exclusivamente em uma reunião realizada na mesma data, na
realidade os termos do acordo foram objeto de intensas negociações prévias entre
o Sr. Wiener e eu em 2005 e início de 2006. O Acordo de 11 de Janeiro de 2006
foi um contrato inteiramente distinto do acordo original de confidencialidade
celebrado com a *Joint Venture* da General Electric. Estabeleceu não só a
exclusividade, como também os contornos do acordo comercial e financeiro entre
a CNO e a General Electric – inclusive questões como o número de turbinas e
geradores a serem fornecidos, preço, cronograma de entrega e multas por atraso
na entrega. Esse foi um contrato inteiramente de escopo amplo.

49. Ao negociar esse contrato vinculante com a General Electric, o Sr. Wiener
participou de várias discussões comigo e com outros indivíduos da CNO, tanto
em pessoa como por telefone. Trocamos minutas do que viria a ser o Acordo de
11 de Janeiro de 2006, assinado por mim, em nome da CNO, e pelo Sr. Wiener e
o Sr. Luiz Kuster em nome da "General Electric". Além disso, o Sr. Wiener
informou-me durante essas negociações que estava realizando consultas ao
departamento jurídico da GE acerca do teor do Acordo de 11 de Janeiro de 2006.

50. O Documento E é uma cópia fidedigna e correta de uma versão inicial do Acordo
de 11 de Janeiro de 2006, que disponibilizei ao Sr. Wiener, juntamente com uma

18

tradução desse documento, em inglês, e a certificação da tradução. As disposições que obrigam a General Electric a não participar do Projeto com nenhuma outra parte não constaram dessa versão.

51. Após analisar a minuta, o Sr. Wiener pediu-me que acrescentasse uma disposição que especificamente permitisse à General Electric participar do Projeto com outra entidade se optasse por não entrar ou se posteriormente saísse do Consórcio. Não só recusei a proposta do Sr. Wiener, como também informei-o de que, em vista de sua solicitação, a CNO teria de insistir que a General Electric especificamente se comprometesse a não participar do Projeto com nenhuma outra parte caso quisesse continuar a explorar uma posição no âmbito do Consórcio EPCista.

52. O resultado dessas negociações foi formalizado na Seção 5(a) do Acordo de 11 de Janeiro de 2006, que prevê:

> ... Caso a GE não entre no Consórcio Construtor, ou saia do Consórcio Construtor, sob quaisquer dos casos neste MOM [Atas de Reunião], então a GE deverá manter o Acordo de Confidencialidade até seu prazo de validade, bem como a GE concorda em não buscar este Projeto com qualquer outra Parte.

53. A Seção 5(o) do Acordo de 11 de Janeiro de 2006 também é de particular importância, dispondo que:

> ... Caso nenhum contrato de fornecimento de equipamentos seja firmado até a data de término do Acordo de Confidencialidade, esta ata perderá efeito **e a GE se compromete a não participar deste projeto em qualquer época com outras partes.**

54. Se o Sr. Wiener não tivesse concordado com essas disposições de exclusividade, a CNO teria encerrado as negociações com a General Electric. A General Electric não foi forçada a celebrar o Acordo de 11 de Janeiro de 2006. Fizeram-no de livre e espontânea vontade para seu próprio benefício comercial.

19

**VI.** **COMO RESULTADO DO INÍCIO DAS NEGOCIAÇÕES COM A CNO, A GENERAL ELECTRIC OBTEVE ACESSO A UM VOLUME CONSIDERÁVEL DE INFORMAÇÕES EXCLUSIVAS E SEGREDOS COMERCIAIS DA CNO E DE OUTROS MEMBROS DO CONSÓRCIO**

55. No decorrer das negociações do Acordo, a General Electric recebeu informações confidenciais significativas acerca da estratégia técnica de engenharia e projeto para o Projeto Rio Madeira. Também foi fornecida à General Electric um volume considerável de informações confidenciais acerca das estratégias financeiras, comerciais e logísticas para o êxito econômico do Projeto. Essas informações incluíram, sem limitação:

- Uma versão em estágio avançado do projeto detalhado de engenharia elaborado pela PCE para a CNO;

- A "disposição geral" do Projeto, que consiste em desenhos detalhados dos planos técnicos;

- Os dados hidrológicos referentes a cada um dos dois locais, inclusive o comportamento do rio em diferentes épocas do ano (durante a estação chuvosa e a seca), que são essenciais para o correto dimensionamento das turbinas e para definir o desempenho adequado de tais equipamentos;

- O preço final das turbinas e geradores, que se estimava representar cerca de 35% do investimento total no Projeto;

- As condições de pagamento no âmbito do Consórcio EPCista;

- As previsões de aumentos anuais dos preços;

- A definição do escopo total dos fornecedores;

- O desempenho técnico exigido para as turbinas e geradores;

- O cronograma interno para a entrega das turbinas/geradores e a data prevista para a entrega do primeiro conjunto de máquinas no local do projeto;

- As estratégias de transporte e logística do Projeto;

- As estruturas financeiras que tratam das limitações de responsabilidade civil entre o Consórcio EPCista, a CNO e Furnas;

- As disposições de multa contratual em caso de atraso ou descumprimento;

- A estrutura e o teor das garantias a serem dadas pelo Consórcio EPCista à empresa do projeto;

- A estrutura e o teor das garantias mútuas a serem dadas entre a CNO, os membros do Consórcio EPCista e vice-versa;

- Os descontos previstos caso a General Electric faça aperfeiçoamentos ao projeto;

- O valor e os termos da entrada que o Consórcio EPCista teria o direito de receber antes do início do projeto.

- O custo das peças sobressalentes a serem entregues pelos fornecedores;

- O valor e os termos da taxa de liderança e desenvolvimento a ser paga à CNO;

- O valor da redução do aspecto das obras civis previstas para o projeto com base na elevação técnica do local de instalação da máquina;

- A matriz de interface em anexo ao Acordo, que define o escopo do aspecto das obras civis do projeto e as questões a serem tratadas pelo Consórcio EPCista;

- A estratégia para a retenção de participação no capital pelos fornecedores, inclusive o valor da participação e o formato jurídico inovador dos debêntures conversíveis;

- A estrutura do Consórcio EPCista; e

- A obrigação de reembolsar os fornecedores à CNO como remuneração pelos estudos realizados pela CNO e Furnas.

56. Além disso, após assinar o Acordo de 11 de Janeiro de 2006, a General Electric participou de pelo menos duas reuniões estratégicas com a CNO e os demais membros previstos do Consórcio EPCista (na altura eram Alstom, VA Tech e Voith-Siemens). O Documento F é uma cópia fidedigna e correta das atas dessas

21

reuniões, juntamente com uma tradução desses documentos, em inglês, e as

certificações da tradução.

57. Nessas reuniões, os membros propostos do consórcio não só obtiveram outras

informações confidenciais de grande valor da CNO, como também a Alstom, VA

Tech e Voith-Siemens revelaram suas próprias informações confidenciais ao

grupo – informações confidenciais que foram integradas ao conhecimento

coletivo desenvolvido para o Projeto Rio Madeira.  Essas empresas não teriam

revelado suas próprias informações sensíveis na presença da General Electric se

não soubessem que a General Electric havia concordado em preservar a

confidencialidade das informações.

VII.   **APÓS RECEBER E INTERNALIZAR AS INFORMAÇÕES
CONFIDENCIAIS E EXCLUSIVAS DA CNO, A GENERAL ELECTRIC
SAIU VOLUNTARIAMENTE DO PROJETO MAS CONTINUOU
SUJEITA AO ACORDO DE EXCLUSIVIDADE**

58. Em março de 2006, o Sr. Wiener telefonou para meu colega, o Sr. Edwaldo

Tamberg, um dos gerentes sêniores da CNO, para pedir uma reunião em pessoa.

Após a reunião, que ocorreu em 15 de março de 2006, o Sr. Tamberg informou-

me que o Sr. Wiener lhe havia passado uma carta em que a General Electric

oficialmente saia do Projeto.

59. O Sr. Tamberg informou-me que o Sr. Wiener lhe havia dito que a General

Electric saia do Projeto por dois motivos alegados:  1) A General Electric não

estava à vontade para revelar suas informações confidenciais a outros membros

do Consórcio EPCista, não obstante o fato de todas as entidades terem celebrado

acordos de confidencialidade; e 2) a General Electric não queria assumir nenhuma

responsabilidade conjunta e solidária com os demais membros do Consórcio EPCista.

60. Uma cópia fidedigna e correta da carta entregue pelo Sr. Wiener ao Sr. Tamberg em 15 de março de 2006 encontra-se em anexo como Documento G. O Sr. Tamberg entregou-me uma cópia dessa carta. É importante observar que, na carta do Sr. Wiener ao Sr. Tamberg, o Sr. Wiener especificamente reafirmou que a General Electric honraria os compromissos de exclusividade assumidos perante a CNO no Acordo.

## VIII.    A CNO FOI INFORMADA DE QUE A GENERAL ELECTRIC ESTÁ AUXILIANDO UM CONSÓRCIO CONCORRENTE

61. Após a General Electric deixar o Projeto, a CNO continuou a negociar com a Alstom, VA Tech, Voith-Siemens e outros fornecedores para finalizar a formação de um Consórcio EPCista. Esse grupo trabalhou com afinco para elaborar um plano estratégico que se espera resultar em uma participação exitosa no leilão marcado para o dia 30 de outubro de 2007. O plano elaborado pela CNO, Furnas e o Consórcio EPCista fundamenta-se largamente nas informações confidenciais e exclusivas desenvolvidas pela CNO e Furnas em seus estudos independentes do Projeto Rio Madeira e nas informações confidenciais e exclusivas partilhadas entre os potenciais membros do Consórcio EPCista antes de a General Electric sair do Projeto.

62. Não obstante o fato de que as informações referentes ao Projeto Rio Madeira haviam sido disponibilizadas ao público há anos e a despeito dos esforços inicialmente enviados pela CNO para envolver outras empresas no desenvolvimento do Projeto, juntamente com a CNO e Furnas, o grupo

23

CNO/Furnas foi o único investidor com interesse público no Projeto Rio Madeira até fins de 2006.

63. Caso a General Electric dê a uma concorrente da CNO acesso a informações exclusivas e confidenciais da CNO, quer direta quer indiretamente, as vantagens competitivas conquistadas a duras penas pela CNO poderiam desaparecer.

64. Quando ficou claro que o governo provavelmente emitiria uma licença ambiental para o Projeto Rio Madeira, alguns outros investidores expressaram interesse em apresentar propostas concorrentes para o Projeto Rio Madeira. Uma dessas entidades é a Camargo Corrêa, uma importante concorrente da CNO no ramo de construção e infra-estrutura.

65. Tem-se tornado cada vez mais claro para a CNO que a General Electric tinha interesse em trabalhar com uma proponente concorrente no Projeto Rio Madeira.

66. Embora a General Electric tivesse saído do Projeto há mais de um ano, em 15 de maio de 2007, a CNO recebeu uma carta da *Joint Venture* da GE, na qual a *Joint Venture* da GE alegou sair do grupo da CNO e de forma conspícua devolveu uma longa lista de documentos técnicos, inclusive desenhos e planos confidenciais, que lhe haviam sido transmitidos anteriormente. Uma cópia fidedigna e correta dessa carta encontra-se em anexo como Documento H.

67. Em 24 de julho de 2007, recebi uma carta de Eduardo Ribeiro Santos e Dalmon Rogério de Moraes Sapata da *Joint Venture* da GE. Essa carta continha em anexo uma solicitação do Departamento de Proteção e Defesa Econômica da Secretaria de Direito Econômico ("SDE"), na qual se pedia que a *Joint Venture* da GE fornecesse uma cópia de qualquer acordo de exclusividade celebrado com a CNO. A carta também declarava que a *Joint Venture* da GE enviaria o Acordo de 11 de Janeiro de 2006 à SDE. Embora a IESA não tivesse direito ao Acordo de 11 de Janeiro de 2006 ou a quaisquer das informações altamente confidenciais dele constantes, a *Joint Venture* da GE também enviou essa carta, que faz referência ao Acordo de 11 de Janeiro de 2006, à IESA, que foi o evento que nos levou a

acreditar que a IESA tem um acesso ilícito ao Acordo de 11 de Janeiro de 2006.
O Documento I em anexo à presente Declaração é uma cópia fidedigna e correta
da carta datada em 24 de julho de 2007, enviada por Eduardo Ribeiro Santos e
Dalmon Rogério de Moraes Sapata da *Joint Venture* da GE, com o respectivo
anexo, e uma tradução desse documento, em inglês, e a certificação das traduções.

68. Em uma troca posterior de correspondências entre a *Joint Venture* da GE e a

CNO, datadas em 25 e 27 de julho de 2007, a *Joint Venture* da GE expressamente

negou ter sido uma parte do Acordo de 11 de Janeiro de 2006 e que, portanto, não

estava sujeita às disposições de exclusividade. O Documento J em anexo à

presente Declaração é uma cópia fidedigna e correta de uma carta datada em 25

de julho de 2007, que enviei ao Sr. Santos e ao Sr. Sapata da *Joint Venture* da GE,

explicando que, não sendo uma parte do Acordo de 11 de Janeiro de 2006, a *Joint*

*Venture* da GE não tinha nenhum direito de possuir o acordo ou respectivos

anexos, juntamente com uma tradução desse documento, em inglês, e a

certificação da tradução. O Documento K em anexo à presente Declaração é uma

cópia fidedigna e correta de uma carta datada em 27 de julho de 2007, de Eduardo

Ribeiro Santos e Dalmon Rogério de Moraes Sapata da *Joint Venture* da GE para

Edwaldo Tamberg e eu, na qual o Sr. Santos e o Sr. Sapata especificamente

reconhecem que não são partes do Acordo de 11 de Janeiro de 2006, juntamente

com uma tradução desse documento, em inglês, e a certificação da tradução.

69. A General Electric comunicou à CNO, em uma carta do Sr. Wiener para mim,

datada em 18 de junho de 2007, que pretende unir-se a uma concorrente. A carta

do Sr. Wiener foi escrita em papel timbrado da "GE Energy", identificou-o como

"Gerente – Vendas Hidro e Operações Comerciais" da "GE Energy" e incluía um

rodapé identificando uma afiliação adicional entre o Sr. Wiener e a "General

Electric International, Inc." Uma cópia fidedigna e correta dessa carta encontra-se

em anexo como Documento L.

70. Na carta, o Sr. Wiener especificamente reconhece que a General Electric está

comprometida pelas obrigações de exclusividade e confidencialidade decorrentes

do Acordo. No entanto, o Sr. Wiener solicita que a CNO libere a General Electric

de seu acordo de exclusividade, expressando a teoria de que a General Electric

poderia, de qualquer forma, continuar a cumprir suas obrigações de

confidencialidade.  Especificamente, o Sr. Wiener afirma:

> ...[A]gora consideramos ser do melhor interesse de ambas as partes
> extinguir formalmente o acordo de exclusividade celebrado como parte
> das Atas de Reunião de 11 de janeiro de 2006, mantendo o compromisso
> de confidencialidade.

71. Como resultado dessa carta, representantes da CNO solicitaram uma reunião com

os representantes da General Electric no Brasil.  A reunião foi realizada no dia 9

de agosto de 2007. Embora não tenha participado, o Sr. Tamberg participou em

nome da CNO, assim como Adriano Maia, advogado sênior da CNO.  Além

disso, Alvaro Novis, o diretor financeiro da Odebrecht S.A., a empresa *holding* da

CNO, participou da reunião.  Com base em discussões que tive com o Sr.

Tamberg, entendo que esteve presente o Sr. Alexandre Silva, CEO da General

Electric do Brasil Ltda., e que estava acompanhado de Josie Jardim, diretor

jurídico da empresa.

72. Fui informado pelo Sr. Tamberg de que, na reunião, a CNO havia informado ao

Mr. Silva sobre sua oposição à participação da General Electric no Projeto Rio

Madeira com uma proponente concorrente e que não liberaria a General Electric

de sua obrigação de exclusividade.  Durante essa discussão, a CNO também

26

perguntou ao Sr. Silva se a General Electric poderia oferecer garantias de que, caso fosse liberada de suas obrigações de exclusividade, teria condições de estabelecer um "Chinese Wall" para impedir o uso de informações confidenciais. Fui informado de que o Sr. Silva mencionou à CNO que concordava que seria muito difícil para a General Electric fazê-lo.    Assim, a CNO perguntou ao Sr. Silva se estaria disposto a fazer uma declaração nesse sentido ao governo brasileiro e declarar que, conseqüentemente, não teria condições de concorrer, mesmo se liberada de sua obrigação de exclusividade. O Sr. Silva disse que precisaria consultar o departamento de "compliance" da General Electric nos Estados Unidos.

73. Posteriormente fui informado de que, alguns dias após a reunião, o Sr. Silva telefonou para o Sr. Novis e informou-o de que a questão estava sendo tratada exclusivamente pelas entidades da General Electric nos EUA e que a General Electric do Brasil Ltda. não poderia oferecer nenhuma garantia à CNO.

74. Como resultado da reunião de 9 de agosto de 2007 e a posterior conversa telefônica entre o Sr. Silva e o Sr. Novis, escrevi uma carta em 16 de agosto de 2007 ao Sr. Silva, ao ombudsman corporativo da General Electric e aos membros individuais do Conselho de Administração da General Electric Co., com cópia para o Sr. Wiener. Nessa carta, expliquei à General Electric que qualquer cooperação com uma concorrente da CNO no Projeto Rio Madeira seria tanto ilegal como antiética. Até esta data não recebi nenhuma resposta a essa carta. Uma cópia fidedigna e correta dessa carta encontra-se em anexo como Documento M.

75. Assim sendo, em 5 de setembro de 2007, voltei a escrever para o Sr. Wiener para reiterar a posição da CNO, de que não liberaria a General Electric da disposição de confidencialidade nem da disposição de exclusividade do Acordo.  Também expliquei que, em virtude da natureza do Projeto, as disposições de exclusividade e confidencialidade são mutuamente dependentes e que não seria possível a General Electric participar de uma proposta concorrente no Projeto Rio Madeira sem usar, direta ou indiretamente, informações confidenciais.  Uma cópia fidedigna e correta dessa carta encontra-se em anexo como Documento N.  Até esta data não recebi nenhuma resposta a essa carta.

76. Não obstante as correspondências da CNO e as reuniões, e com a data do leilão de Santo Antônio a menos de sessenta dias, recebemos indicações de que a General Electric está cooperando com uma proponente concorrente, em violação às suas obrigações de exclusividade.

77. Em carta datada em 20 de agosto de 2007, a IESA informou o Ministério das Minas e Energia sobre sua firme intenção de participar de um consórcio com a General Electric, entre outras empresas, para apresentar uma proposta para o Projeto Rio Madeira.  Discussões no setor, minha própria experiência no setor, assim como matérias jornalísticas levam-me a acreditar que esse consórcio está sendo liderado pela Camargo Corrêa.  A IESA também afirmou que tem trabalhado no projeto há mais de um ano com todas as empresas membros de seu consórcio, inclusive a General Electric.  A IESA destacou ainda a importância da vasta experiência da General Electric com a tecnologia da turbina bulbo.  A IESA também comunicou ao Ministério que não acredita ser possível apresentar uma

28

proposta a menos que a General Electric seja liberada de seu acordo de

exclusividade com a CNO.  Entendo que, se as afirmações da IESA forem

verídicas, a General Electric está em violação de suas obrigações nos termos do

Acordo de 11 de Janeiro de 2006.  O Documento O em anexo à presente

Declaração é uma cópia fidedigna e correta da carta datada em 20 de agosto de

2007, de Atilano de Oms, Presidente da IESA, para Márcio P. Zimmermann,

Secretário de Planejamento e Desenvolvimento Energético, Ministério das Minas

e Energia, juntamente com uma tradução desse documento, em inglês, e a

certificação da tradução.

78. A CNO sentiu-se confiante de que o tempo, dinheiro e esforço despendido na

elaboração de um plano técnico e financeiro próprio para o Projeto Rio Madeira

seriam recompensados na apresentação de uma proposta vastamente superior à de

qualquer de suas concorrentes.  A General Electric, é claro, tem conhecimento das

exatas informações que dão aos planos da CNO sua vasta superioridade em

relação aos de qualquer outra empresa.   Se uma concorrente obtivesse acesso às

informações exclusivas e confidenciais da CNO, que estão em posse da General

Electric, as vantagens duramente conquistadas pela CNO poderiam perder-se.

79. Em 31 de julho de 2007, a General Electric escreveu para a CNO para dizer que a

General Electric e a General Electric do Brasil Ltda. iriam entregar o Acordo de

11 de Janeiro de 2006 ao governo brasileiro.  A carta é assinada por Stanley Smith

em nome da General Electric.  Acredito que o Sr. Smith seja um executivo da GE

Energy, uma divisão da General Electric Company nos Estados Unidos.  Essa

carta foi assinada separadamente por dois representantes da General Electric do Brasil Ltda.

80. Além disso, fomos informados de que, no último mês, dois gerentes técnicos superiores e um gerente técnico da Alstom (um membro do Consórcio EPCista associado ao grupo proponente da CNO/Furnas), que participaram diretamente das soluções de projeto técnico para o Projeto Rio Madeira, foram contatados por "headhunters" representando uma "grande Empresa Multinacional de Energia baseada na região de Campinas, Estado de Sao Paulo, Brasil". A principal empresa que se enquadraria nessa descrição é a *Joint Venture* da GE. O Documento P em anexo à presente Declaração é uma cópia fidedigna e correta de três declarações, datadas em 10 de setembro de 2007, desses funcionários que foram recrutados pelo "headhunter". Também soubemos que três funcionários de nível mais inferior da Alstom, que também tinham informações confidenciais relacionadas ao Projeto Rio Madeira, haviam sido contratados pela *Joint Venture* da GE. O Documento Q em anexo à presente Declaração é uma cópia fidedigna e correta de uma carta datada em 20 de agosto de 2007, do escritório de advogados Lobo & Rizzo para a General Electric do Brasil Ltda. e a *Joint Venture* da GE, advertindo-as sobre a ilegalidade de seus atos.

81. Em vista do tempo limitado que as potenciais proponentes têm disponível antes da data do leilão, tendo começado a elaborar uma proposta apenas no último ano, a contribuição mais importante que a General Electric pode oferecer a um grupo concorrente não é sua capacidade técnica de fabricar turbinas – um nicho que pode ser preenchido por várias entidades no mundo inteiro – mas seu

conhecimento de informações confidenciais e exclusivas acerca do projeto e da proposta da CNO. É esse conhecimento que poderia abrir a oportunidade para uma proponente concorrente pular o processo, necessário em outras circunstâncias, de desenvolver (no decorrer de um período considerável) uma proposta técnica e financeiramente sólida para a execução do Projeto Rio Madeira.

82. O fato de que a IESA informou o governo brasileiro que poderia avançar apenas com a participação da General Electric confirma esta conclusão da CNO. A IESA, é claro, é uma proprietária da Inepar, uma participante da *Joint Venture* da GE. Se a IESA, para apresentar uma proposta, precisasse simplesmente de uma fabricante de turbinas e geradores com tamanho e sofisticação suficientes para atender aos requisitos técnicos e financeiros do Projeto, há várias opções para o Projeto além da General Electric. Especificamente, a Ingehydro, uma sociedade espanhola, a CKD Blansko, uma sociedade tcheca, a Skoda Energo, uma sociedade tcheca, a Toshiba, uma sociedade japonesa, a Hitachi, uma sociedade japonesa, a Mitsubishi, uma sociedade japonesa, a Litostroj, uma sociedade eslovena, a Bharat Heavy Electricals Limited, uma sociedade indiana, a Power Machines, uma sociedade russa, a Dong Fang, uma sociedade chinesa, a Harbin, uma sociedade chinesa, e a Kharkov, uma sociedade russa, entre outras, têm a capacidade de fornecer turbinas para o Projeto Rio Madeira. Com base em pesquisas realizadas por um consultor, soube que algumas dessas empresas – Power Machines, Hitachi, Toshiba, Dong Fang, Harbin e Kharkov – contam com mais experiência em projeto de turbinas bulbo do tamanho necessário para o

31

Projeto Rio Madeira do que a General Electric. Com efeito, a Suez Energy Brasil, uma grande empresa de energia que também planeja apresentar uma proposta para o Projeto, afirmou publicamente que, se ganhar a concessão de construção de Santo Antônio e continuar impedida de trabalhar com os fornecedores de turbinas já comprometidos por acordos de exclusividade, não terá problemas para encontrar um fornecedor de turbinas não comprometido na China ou Rússia para realizar o trabalho para o Projeto. O que torna a General Electric distintamente útil para qualquer proponente de última hora para o Projeto Rio Madeira é seu conhecimento de informações exclusivas e confidenciais da CNO.

IX. **A CNO SOFRERÁ DANOS IRREPARÁVEIS SE A GENERAL ELECTRIC VIOLAR AS DISPOSIÇÕES DE CONFIDENCIALIDADE E EXCLUSIVIDADE DO ACORDO DE 11 DE JANEIRO DE 2006**

83. A General Electric teve acesso a informações confidencias de engenharia e finanças da CNO. Essas informações serão disponibilizadas às concorrentes da CNO caso se permita que a General Electric participe de um grupo proponente rival. Exacerbando os danos ainda mais, a General Electric tem informações sobre os preços que a CNO pagará a outros fornecedores por turbinas e geradores. Estima-se que o custo de turbinas e geradores represente cerca de 35% do custo geral de construção. De posse dessas informações, uma concorrente sofisticada, com experiência no setor de construção civil, poderia fazer um cálculo aproximado dos custos da CNO e, assim, calcular uma estimativa razoável do lance final da CNO. Isso constituiria não só uma concorrência desleal, mas tal conduta levanta sérias questões antitruste.

84. A proibição contratual de qualquer participação da General Electric no Projeto foi concebida para servir como uma proteção infalível para a CNO. Foi uma medida

profilática indubitável adotada para prevenir qualquer conflito de interesses ou eventual diluição da vantagem competitiva da CNO como resultado de suas negociações com a General Electric.

85. O Projeto Rio Madeira é um dos maiores projetos energéticos já empreendidos no Brasil. O contrato será outorgado ao grupo que apresentar o menor lance e o vencedor ficará com a totalidade do contrato. As possibilidades são enormes para as partes e a tentação de tomar atalhos é óbvia. A vencedora desse leilão terá uma vantagem inestimável no leilão do Projeto subseqüente de Jirau. Se uma concorrente vencesse o primeiro leilão, para o projeto inicial de Santo Antônio, usando informações confidenciais da CNO, esta sofreria graves danos à sua reputação, pois a CNO tem sido o promotor do Projeto desde o início. A resultante perda de impulso e prestígio no mercado poderia causar graves danos em termos de perdas de negócios futuros.

86. A menos que este tribunal conceda uma medida cautelar para impedir a General Electric nos Estados Unidos de violar as disposições de exclusividade do Acordo de 11 de Janeiro de 2006, a General Electric poderia facilmente contornar suas obrigações contratuais, atuando indiretamente, por meio de divisões e subsidiárias distintas.

Declaro, sob pena de perjúrio nos termos das leis dos Estados Unidos da América, que a declaração acima é fidedigna e correta.

Firmado em 12 de SETEMBRO, 2007

JOSÉ BONIFÁCIO PINTO JÚNIOR

33