UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  10/12/07
```

——————— ——————— ——————— ———————x

CONSTRUTORA NORBETO ODERBRECHT S.A.,

          Plaintiff,

      -against-

GENERAL ELECTRIC COMPANY, GENERAL
ELECTRIC INTERNATIONAL, INC., GE
INFRASTRUCTURE, INC., GE POWER
SYSTEMS, INC., GE ENERGY LLC and GE
HYDRO POWER, INC.,

          Defendants.

——————— ——————— ——————— ——————x

07-CV-8014 (CM)

## DECISION AND ORDER
## GRANTING DEFENDANTS' MOTION TO DISMISS
## AND DENYING DEFENDANTS' REQUEST FOR SANCTIONS

McMahon, J.:

      Plaintiff Construtora Norbeto Oderbrecht S.A. ("CNO") brings this diversity action against

defendants General Electric Company, General Electric International, Inc., GE Infrastructure, Inc.,

GE Power Systems, Inc., GE Energy LLC and GE Hydro Power, Inc. (collectively the "General

Electric" defendants). CNO seeks to enjoin the General Electric entities from breaching an

exclusivity agreement entered into with CNO with respect to a Brazilian public-works project

known as the "Rio Madeira Project." The agreement was negotiated in Brazil and is governed by

Brazilian law.

      Nonetheless, plaintiff chose to file suit in this District. In doing so, plaintiff failed to

mention in its Complaint that CNO has been the subject, since at least June 2007, of a major

antitrust investigation in Brazil in which the Brazilian antitrust agency, the Secretariat of

Economic Law (the "SDE"), has been investigating the plaintiff's conduct in connection with the
very non-compete clause it presently seeks to enforce against the General Electric entities.
(Technical Note, translation attached to the Broderick Affidavit as Exhibit A.) CNO is aware of
the SDE's review and provided documents and other information to the SDE in connection
therewith.

Since this action began, a full-fledged legal battle (or, perhaps, a turf war) between the
SDE and the Brazilian courts has ensued regarding the enforceability, under Brazilian law, of the
exclusivity clause at issue in this suit. In the past month, the SDE issued an order nullifying the
exclusivity clause at issue; a lower Brazilian court set aside the initial SDE Order; a Brazilian
federal prosecutor has filed papers supporting the SDE Order; the same lower Brazilian Court
reinstated the SDE Order; CNO appealed the reinstatement of the SDE Order; an intermediate
Brazilian court annulled the SDE Order; the SDE issued a second order purporting to cure defects
in the first order; and the same intermediate Brazilian court promptly enjoined the new SDE
Order. Almost daily, this Court receives battle updates from whichever side prevailed in Brazil
the day before.

Before this court is a motion by defendants to dismiss the Complaint under *forum non
conveniens*. Additionally, defendants move for dismissal because plaintiff filed this action in
violation of an exclusive forum selection clause. Defendants also seek the imposition of sanctions
on plaintiff.

For the reasons stated below, defendants' motion to dismiss the Complaint is GRANTED
on *forum non conveniens* grounds. Defendants' request for the imposition of sanctions is
DENIED.

2

## II. Underlying Facts

On a motion to dismiss pursuant to *forum non conveniens,* a court considers not only the allegations of the pleadings but all evidence before it, and does not presume the facts pleaded to be true. In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 200 (S.D.N.Y. 1999).

### A.    *The Parties*

Plaintiff CNO is a corporation organized under the laws of Brazil, with its principal place of business in Brazil. Defendant General Electric Co. is a corporation organized under the laws of New York with its principal place of business in Connecticut. Defendants General Electric International, Inc., GE infrastructure, Inc., GE Power Systems, Inc., GE Energy LLC are all corporations organized under the laws of Delaware, with their principal places of business in New York. Defendant GE Hydro Power, Inc. is a corporation organized under the laws of California. Its principal place of business is in California, but it transacts business in New York. Two GE witnesses, Jeffrey Wiener[1] (who negotiated one of the contracts at issue) and Stanley Smith (General Manager for Power Generation Sales for GE Energy, who has been in contact with the Brazilian government in recent months) both work in Schenectady, New York.

---

[1]It is unclear which GE entity (or entities) Mr. Wiener works for in Schenactady, New York. Plaintiff claims that, over the course of the negotiations, Mr. Wiener represented himself as a representative of GE Hydro, GE Energy, General Electric International, Inc., and "General Electric" generally. (Compl. at ¶ 59.). On June 18, 2007, Mr. Wiener wrote a letter to Mr. Pinto on "GE Energy" letterhead, identifying himself as "Manager–Hydro Sales and Commercial Operations" for "GE Energy," and included a footnote identifying an additional affiliation between Mr. Wiener and "General Electric International, Inc." (Letter attached as Ex. L to Declaration of José Bonifácio Pinto Júnior ("Pinto Decl.").) In a February 10, 2006 email "Minutes of Meeting" for a meeting held in São Paulo on February 9, 2006, Mr. Wiener is listed as a participant representing GE Hydro. All I know for sure is that he is based in upstate New York.

## *B.    The Project*

This dispute concerns a project for the construction and operation of hydroelectric power plants at two locations on the Madeira River in Brazil (the "Project"). The Project is part of the Economic Growth Acceleration Plan proposed by the Brazilian government to address the country's expected infrastructure needs over the next decade. The Brazilian government has played a central role in the Project since its inception, in part because the Project will use public lands and waterways and will require government concession to operate the resulting power facility. The Project is of critical importance to Brazil and its citizenry because it will provide state-of-the-art power plants with minimal environmental impact and will generate power to meet the growing demand for power in Brazil, where the GDP is expected to grow at 4% per year and the energy demand increase an average of 5% per year each over the next ten years.

The Brazilian government required that three separate preliminary studies be conducted and accepted before the government would set a date to auction the concession. CNO obtained permission for the Agência Nacional de Energia Eléctrica ("ANEEL"), Brazil's national electric power agency, to conduct these three studies. CNO invited Furnas Centrais Eléctricas, S.A. ("Furnas") to participate in the development of these studies. While conducting these studies, CNO and Furnas began to put together teams to develop a confidential and proprietary technical design and financial strategy for purposes of bidding for the concession to construct and operate hydroelectric plants at the Santa Antonio and Jirau sites of the Medeira River.

To develop these plans, CNO sought engineering firms and electromechanical equipment manufacturers who could be part of an "EPC Consortium" that would be responsible for the

4

construction and operation of the hydropower plants should CNO and Furnas win the government

concessions for the Project. To this end, in mid-2005, CNO reached out to a number of leading

suppliers of electromechanical turbines and generators. CNO informed each supplier, however,

that before negotiations could begin, CNO would require the supplier to execute a Non-Disclosure

Agreement, so that CNO could provide the supplier with certain technical information about the

Project that was proprietary to CNO.

## C.    *GE Agrees to Participate in CNO's Bid*

On May 16, 2005, GE Hydro Inepar do Brasil, S.A. (the "GE Joint Venture") – a joint

venture between General Electric do Brasil Ltda. ("GE Brasil"). a Brazilian subsidiary of General

Electric Co., and Inepar S.A. Industria e Construcoes ("Inepar"), also a Brazilian corporation –

signed a Non-Disclosure Agreement ("NDA") with CNO. All of the signatories to the NDA were

Brazilians. The NDA contains an exclusive forum selection clause, which states: "The central

court of the City of São Paulo" has "jurisdiction to resolve any disputes arising from the [NDA],

to the exclusion of any other, no matter how privileged." (NDA at ¶ 19.) No claim has been

brought for violation of the NDA, and no Brazilian entity has been sued. At the argument on the

TRO, plaintiff conceded that any such claim would have to be brought in Brazil.

After the initial round of negotiations. CNO chose to negotiate with a smaller subset of

suppliers, one of which was the General Electric Joint Venture. The chief representative with

whom CNO exchanged information and negotiated was Mr. Wiener. Because of the highly

confidential nature of information provided under the NDA, CNO insisted that the General

Electric entities agree to work exclusively with CNO on the Rio Madeira Project.

On January 11, 2006, a new Minutes of Meeting Agreement ("MOM") was executed by by José Bonifácio Pinto Júnior and Edwaldo Tamberg of Odebrecht, and Luiz Kuster of GE Hydro and Jeff Wiener of "General Electric" (not defined).

The MOM provided that in the event "GE" (not defined) exited the construction consortium, "GE" would "maintain the Confidentiality Agreement until its expiry and further agrees not to pursue this Project with any other Party." (MOM at ¶5(a).) The MOM also provided that it was "subject to the Confidentiality Agreement [i.e., the NDA] signed by the parties and currently in force." (Id.) Other than through its incorporation of the NDA, the MOM contained no provision regarding the confidentiality of any information exchanged by the parties concerning the Project.

Because the MOM only refers to "GE" or "General Electric" generally, it is unclear which GE entities Mr. Wiener represented when signing the MOM. Eduardo Ribereiro Santos and Dalmon Rogério de Moraes Sapata of the Joint Venture specifically acknowledged, in a letter dated July 27, 2007, that the GE Joint Venture was not a party to the MOM (Translation of Letter attached as Ex. K to the Pinto Decl.), and plaintiff agrees. Yet the MOM refers to the NDA "signed by the parties," and the GE Joint Venture was the only General Electric entity that signed the NDA. However, the GE entities do not appear to dispute that they are bound by the NDA and the MOM.

## D.   *GE Joins Forces with a New Partner*

On March 15, 2006, Mr. Wiener wrote a letter informing CNO that "GE" (not defined)

6

was voluntarily withdrawing from participation in the Project with CNO.[2] (Letter attached as Ex. G to Pinto Decl.)

According to plaintiff, "General Electric" conveyed its intent to join a competitor by a letter from Mr. Wiener to Mr. Pinto dated June 18, 2007. (Compl. at ¶ 83; Letter attached as Ex. L to Pinto Decl.) Mr. Wiener's June 18th letter was on "GE Energy" letterhead. It identified him as "Manager–Hydro Sales and Commercial Operations" for "GE Energy," and included a footer identifying an additional affiliation between Mr. Wiener and "General Electric International, Inc." ( Letter attached as Ex. L to Pinto Decl.) In the letter, Mr. Wiener acknowledged that "General Electric" is bound by the exclusivity obligation arising from the MOM, but asked CNO to release General Electric from that obligation. (Id.) CNO declined.

Plaintiff believes that Camargo Corrêa, CNO's competitor in the construction and infrastructure business, actively courted General Electric as a potential member of Camargo's EPC Consortium, and that GE is cooperating with Camargo. Plaintiff also believes that any such participation would necessarily require GE to violate both its exclusivity and its confidentiality obligations to CNO.

## E.    *The SDE Investigation*

On July 24, 2007, Mr. Pinto and Mr. Sapata of the GE Joint Venture sent a letter to CNO attaching a request from the SDE, pursuant to its investigation of the exclusivity clause at issue here, for a copy of any exclusivity agreement it had entered into with CNO. (Letter attached as

---

[2]The letter was written on "GE Energy" letterhead with a "GE International Inc." footer, and Mr. Wiener signed as "Hydro Commercial Operations Manager."

Ex. I to Pinto Decl.) The letter stated that the GE Joint Venture would be providing the MOM to the SDE. (Id.) The GE Joint Venture also sent this letter to IESA Equipamentos e Montagens, S.A. ("IESA"), which CNO argues had no right to the MOM or to any of the highly confidential information contained therein. (Id.) On July 31, 2007, two representatives of GE Brasil and Stanley Smith of GE Energy wrote CNO to say that "General Electric" and GE Brasil would be turning the MOM over to the Brazilian government. (Compl. at ¶ 91.)

On August 9, 2007, CNO held a meeting the CEO of GE Brasil, Mr. Alexandre Silva, and GE Brasil's General Counsel, Ms. Josie Jardim. CNO asked the GE Brasil representatives whether "General Electric" would be willing to make a representation to the Brazilian government that it would be difficult for "General Electric" to protect all confidential information if General Electric participated in the EPC Consortium of another bidder, and to declare to the government that it would thus be unable to compete even if released from its exclusivity agreement. (Compl. at ¶ 85.) A few days after the meeting, plaintiff alleges that Mr. Silva called the CFO of CNO's holding company, Odebrecht S.A., Alvaro Novis, to inform Mr. Novis that the matter was being handled solely by General Electric's U.S. entities, and that GE Brasil would not be able to provide any assurances to CNO. (Compl. at ¶ 86.)

On August 16, 2007, plaintiff alleges that Mr. Pinto wrote a letter to Mr. Silva of the GE Joint Venture, the General Electric Corporate Ombudsman and the individual members of General Electric Co.'s Board of Directors, with a copy of the letter to Mr. Wiener, stating that any cooperation with a competitor of CNO on the Project would be "illegal" and "unethical." (Compl. at ¶ 87.) Plaintiff claims it received no response.

8

On August 20, 2007, IESA sent a letter to the Brazilian Ministry of Mines and Energy

stating its intention to participate in a consortium with, among others, "GE." (Translation of

Letter attached as Ex. O to Pinto Decl.) IESA also informed the Ministry that GE is "impeded by

a non-compete clause in a document signed by [CNO], which is protected under a non-disclosure

agreement," and that it would be difficult for the consortium to submit a bid unless "GE" were

released from this commitment. (Id.)

On September 5, 2007, Mr. Pinto wrote a letter to Mr. Wiener at GE Energy and General

Electric International, Inc. reiterating that CNO would not release "General Electric" from either

the confidentiality provision or the exclusivity provision of the Agreement. (Letter attached as

Ex. N to Pinto Decl.)

## *F.    The Instant Lawsuit*

On September 12, 2007, CNO filed a Complaint in this Court to enjoin the General

Electric defendants from breaching the exclusivity agreement it undertook with CNO via the

MOM. Plaintiff seeks to enforce the clause from paragraph 5(a) of the MOM quoted above

regarding exclusivity, and asserts that its claims do not arise under the NDA. As defendants point

out, however, a number of the allegations in the Complaint concern the alleged misuse of

confidential information, which would implicate a breach of the confidentiality provisions of the

NDA. Plaintiff specifically alleges that, were General Electric to give a competitor to CNO

access to CNO's proprietary and confidential information, either directly or indirectly, CNO's

competitive advantage could be lost. (Compl. at ¶ 76.)

A TRO hearing was held on September 13, 2007. The Court denied the TRO application

9

because there were a number of open questions, including whether the Court had jurisdiction over the lawsuit, and whether, even if the Court had jurisdiction, it should exercise that jurisdiction.

The very next morning, the SDE issued a preliminary order declaring the "immediate cancellation" of the exclusivity clause in the MOM. It ruled that CNO would be liable for 100,000 Reais per day as a fine for non-compliance with the order. The SDE order also: (1) accepted the SDE's 42 page Technical Note; (2) initiated a formal investigation into whether CNO had violated Brazilian antitrust law; (3) partially canceled the exclusivity clause between CNO and other suppliers of turbines and generators; and (4) provided that CNO would have five days to appeal the SDE Order.

The first business day after the SDE Order was published, a Brazilian federal court set it aside. Thereafter, a federal prosecutor in Brazil filed papers before the Brazilian federal court arguing that the SDE Order should be reinstated. The Administrative Council of Economic Protection (the "CADE") – the Brazilian antitrust tribunal – filed an amicus brief that supported the reinstatement of the SDE Order. On September 20, the same federal court that had set aside the SDE Order reinstated the Order.

CNO appealed this ruling to the Brazilian Federal Appeals Court for the First Region. Judge Prudente issued a ruling on October 1, 2007. He found that the SDE exceeded its authority in issuing the September 13, 2007 Order, and he annulled the Order to the extent that it purported to invalidate the exclusivity clause in effect between General Electric and CNO. The court reasoned that only the CADE could nullify the exclusivity clause.

That same day, the SDE issued a second order, this time suspending, rather than

nullifying, the exclusivity clause at issue pending a ruling by the CADE. On October 8, 2007,
Judge Prudente issued a "clarifying" order stating that the second SDE Order was inconsistent
with his October 1 ruling and holding that the exclusivity clause would remain valid until
reviewed by the CADE.

Despite all this activity in Brazil concerning the validity of the clause that plaintiff here
seeks to enforce – and despite the plaintiff's admission that this court cannot adjudicate violations
of the NDA – plaintiff insists that New York is the proper venue for this lawsuit, and that a
balancing of conveniences supports retention of the action here. Plaintiff claims that the forum
selection clause of the NDA does not apply to the exclusivity clause of the MOM and urges that
the validity of the exclusivity clause should be litigated here even though this court cannot
determine violation of the NDA–which are alleged to be one of the ills resulting from GE's
arrangements with new partners.

For the reasons stated below, defendants' motion to dismiss the complaint on *forum non*
*conveniens* grounds is GRANTED and defendants' request for sanctions is DENIED.

### III. Discussion

#### A. *Motion To Dismiss On* Forum Non Conveniens *Grounds*

"The principle of *forum non conveniens* is simply that a court may resist imposition upon
its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Gulf
Oil Corp. v. Gilbert, 330 U.S. 501 (1947). In Iragorri v. United Technologies Corp., 274 F.3d 65
(2d Cir. 2001), the Second Circuit adopted a three-part inquiry to govern analyses of motions to
dismiss for *forum non conveniens*. See Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d

11

146, 153 (2d Cir. 2005); see also Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 70

(2d Cir. 2003); DiRienzo v. Philip Services Corp., 294 F.3d 21, 28 (2d Cir. 2002). "The defendant

bears the burden to establish clearly each factor ... and to demonstrate that the balance tilts

strongly in favor of the purported alternative forum." PT United Can Co., Ltd. v. Crown Cork &

Seal Co., Inc., 138 F.3d 65, 74 (2d Cir. 1998) (internal citations omitted).

### *i. Level of deference*

The "first level of inquiry" in *forum non conveniens* analysis is "determining whether the

plaintiff's choice [of forum] is entitled to more or less deference." Pollux, *supra*, 329 F.3d at 70

(quoting Iragorri, *supra*, 274 F.3d at 73). Although the Supreme Court has held that a plaintiff's

choice of forum is not given substantial deference by courts when the plaintiff is foreign, Piper

Aircraft Co. v. Reyno, 454 U.S. 235, 256 (1981), the Second Circuit has held that, "when a treaty

with a foreign nation accords its nationals access to our courts equivalent to that provided

American citizens, identical forum non conveniens standards must be applied to such nationals by

American courts." Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 981 (2d Cir. 1993);

see also Mendes Junior Intern. Co. v. Banco Do Brasil, S.A., 15 F. Supp. 2d 332, 337 (S.D.N.Y.

1998). The U.S. and Brazil have such a treaty, see Treaty with Brazil, Dec. 12, 1828, U.S.-Brazil,

art. XII, 8 State. 390, 392, which guarantees Brazilian citizens equal access to American courts.

Mendes, *supra*, 15 F. Supp. 2d at 337. Accordingly, a traditional *forum non conveniens* analysis

will apply in assessing the level of deference to accord plaintiff's choice of forum.

District courts are to make this deference determination on the "flexible sliding scale"

approved in Iragorri, where the general presumption in favor of a plaintiff's choice of forum may

not control depending on the circumstances. See Norex, *supra*, 416 F.3d at 154. This sliding scale considers factors such as forum-shopping and convenience and is evaluated under the totality of the circumstances. Id. at 154. "To facilitate totality review, Iragorri identified factors frequently relevant to determining whether a forum choice was likely motivated by genuine convenience[.]" Id. at 155.

The factors to be considered include: "the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." Iragorri, *supra*, 274 F.3d at 72. On the other side of the equation, circumstances "generally indicative of forum shopping," see Norex, *supra*, 416 F.3d at 155, include "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum," Iragorri, *supra*, 274 F.3d at 72.

A district court is not required to consider every single factor specifically in making this determination. Norex, *supra*, 416 F.3d at 155. Where the plaintiff's choice is determined to stem more from concerns of convenience, it is entitled to greater deference; where the choice indicates forum-shopping, it is entitled to less deference. Iragorri, *supra*, 274 F.3d at 71-72; Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs.. Corp., 421 F. Supp. 2d 741, 755 (S.D.N.Y. 2006). Less deference is given to plaintiff's choice when the action is not in tort, when the plaintiff sought out the transaction giving rise to the suit, when suit in the international forum was

13

foreseeable in light of the transaction, and when the plaintiff is an organization – rather than an individual – that can easily handle the difficulties of engaging in litigation abroad. ICC Industries Inc. v. Israel Discount Bank, Ltd., 170 Fed.Appx. 766, 767 -768 (2d Cir. 2006).

Here, defendants assert that plaintiff's choice of forum is entitled to less deference because (i) there is no genuine connection between plaintiff's U.S. activities and the events at issue in this forum, and (ii) plaintiff's choice of a U.S. forum was a tactical move to circumvent the adverse order it anticipated from the SDE in Brazil. (Defendants' Memo at 17.)

Defendants have offered sufficient proof that plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons. Plaintiff is a Brazilian corporation, based in Brazil, and the dispute relates entirely to a Brazilian infrastructure project that is subject to agreements governed by Brazilian law. Neither witnesses nor other evidence relevant to the trial of this action would have any connection to this district. Indeed, plaintiff has only identified two witnesses located in the United States, Mr. Wiener and Mr. Smith, both of whom are located in Schenectady, New York, which is in the Northern, not the Southern District of New York.

The pending SDE investigation and related litigation in Brazil further suggest a likelihood that plaintiff's selection of forum was made for forum-shopping reasons. This Court will not entertain plaintiff's attempt to circumvent and frustrate the Brazilian government's ongoing investigation. Nor will it permit the plaintiff to use this court of the United States as an end-run around a major investigation by the Brazilian authorities surrounding this and other projects in Brazil. The fact that there are disputes in Brazil about the enforceability of a contract clause under Brazilian contract law relating to a Brazilian project of great interest to the Brazilian government,

14

which disputes are the subject of ongoing litigation in Brazil weighs heavily against retaining this case in New York

Additionally, almost all of the Iragorri factors relating to convenience and expense weigh heavily against Plaintiff's choice of this forum. Plaintiff resides in Brazil. Both parties clearly contemplated litigation in Brazil, as the forum selection clause contained in the NDA specifically provided for litigation in Brazil. Appropriate legal assistance is readily available to Plaintiff in Brazil, where it successfully appealed the SDE Order. Defendants face the increased inconvenience and expense of litigating here, as it must bring witnesses and evidence from Brazil here to mount its defense. Moreover, the numerous Brazilian non-party witnesses whose testimony is highly relevant to this suit are not subject to subpoena in New York, and could not be compelled to testify in this Court. As a matter of fact, the Schenectady witnesses (the key American witnesses for GE identified by plaintiff) are outside the subpoena power of this Court and cannot be compelled to testify here.

Defendants have offered sufficient proof that plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons, and factors relating to convenience or expense generally weigh heavily against the plaintiff's choice. Pollux, supra, 329 F.3d at 71. Accordingly, I grant plaintiff's choice of this forum little deference.

### ii.    Existence of an Adequate Alternative Forum

The next step in the Gilbert analysis is determining the existence of "a presently available alternative forum in which plaintiff can litigate its claim." Norex, supra, 416 F.3d at 160; see also Iragorri, supra, 274 F.3d at 73. The defendants bear the burden of establishing the existence of an adequate alternative forum. USHA (India), Ltd. v. Honeywell Int'l, Inc., 421 F.3d 129, 135 (2d

15

Cir.2005) (citing Aguinda v. Texaco, Inc., 303 F.3d 470, 476 (2d Cir.2002)); see also Wiwa v.
Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000). "An alternative forum is generally
adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits
litigation of the subject matter of the dispute." Bank of Credit and Commerce Int'l (Overseas) Ltd.
v. State Bank of Pakistan, 273 F.3d 241, 246 (2d Cir.2001) (internal quotation and citations
omitted). "'In rare circumstances, however, where the remedy offered by the other forum is clearly
unsatisfactory, the other forum may not be an adequate alternative...'" Aguinda, *supra*, 303 F.3d
at 476-77 (quoting Piper, *supra*, 454 U.S. at 255 n. 22).

The defendants claim that Brazil is an adequate alternative forum because (i) courts in this
Circuit have deemed Brazil to be an adequate forum for the adjudication of the cause of action
asserted here, and (ii) the Brazilian government is already conducting proceedings – in which
plaintiff is participating – regarding the enforceability of the contractual provision at issue in this
matter.

Plaintiff argues that Brazil is not an adequate forum because the available remedies are
unsatisfactory. First, plaintiff claims that service of a Brazilian complaint on U.S. defendants
through the use of required letters rogatory is a process which can take up to a year or more.
Thus, by the time service is complete, the bidding for the sites would be over and CNO would be
left without any effective relief. Second, plaintiff argues that enforcement in the U.S. of any
injunctive relief obtained in Brazil prior to service on GE is doubtful.

Plaintiff does not argue that Brazil could not maintain jurisdiction over the parties.
Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir.1996) (finding alternative forum
appropriate where plaintiffs did not dispute that the alternative forum's courts could maintain

16

jurisdiction over the parties). Plaintiff's argument that service of a Brazilian complaint on U.S. defendants through the use of required letters rogatory would leave plaintiff without any effective relief is unconvincing. First, plaintiff admits to a lack of immediacy, telling this Court that it no longer believes it is appropriate to proceed with a preliminary injunction hearing. (Plaintiff's Memo at 4.) Given this lack of immediacy, and the clear interest Brazil has in adjudicating the dispute, there is no reason why plaintiff cannot pursue this action in Brazil.

Second, any potential delay is a result of plaintiff's own inaction. GE terminated its relationship with plaintiff in March 2007. Plaintiff admits that in or around May 2007, it became "increasingly apparent to CNO that General Electric was interesting in working with a competing bidder for the Rio Madeira Project." (Compl. at ¶ 79.) Any doubt was removed on June 18, 2007, when GE wrote a letter to CNO conveying its intent to join a competitor. Plaintiff chose to wait until September 12, 2007, the day before the SDE issued a decision adverse to plaintiff, to file its complaint requesting injunctive relief. An action could have been filed in Brazil at least four months earlier. While it is true that service cannot be completed by the State Department within a few weeks, the State Department can surely serve a U.S. defendant within several months. It is not as if plaintiff wishes to serve a defendant in Mongolia or the Congo.   And the Brazilian GE entities (not sued here) do no need to be served in Brazil by letters rogatory; they are local companies who can be served readily in São Paolo. Furthermore, plaintiff's argument that the procedures in Brazil are onerous is undercut by the fact that plaintiff chose Brazil as its designated forum. See Braspetro Oil Services Co. v. Modec (USA), Inc., 2007 WL 1425851, at *5 (5th Cir. 2007); see also Mendes, *supra*, 15 F. Supp. 2d at 338. Plaintiff is a sophisticated party that drafted the contract containing the forum selection clause. See Braspetro, *supra*, 2007

17

WL 1425851, at *5. In short, plaintiff cannot now complain Brazil, its home forum, is inadequate. See id. If plaintiff had commenced this suit earlier, it would not have to worry about the possibility of a U.S. court not enforcing injunctive relief obtained in Brazil prior to service on GE because but for plaintiff's delay, GE would have already been served.

With respect to the second requirement, federal courts have recognized Brazil to be an adequate alternative forum for various contract claims. See. e.g., Mendes, *supra*, 15 F. Supp. 2d at 338. Plaintiff does not contest that its contract claims may be heard in a Brazilian court. Accord Irwin v. ZDF Enterprises GmbH, 2006 WL 374960 at *13 (S.D.N.Y. Feb. 16, 2006). Moreover, the Brazilian government is already conducting proceeding – in which plaintiff is participating – regarding the enforceability of the exclusivity provision at issue here.

### *iii.* *Balancing factors*

The last step in assessing the convenience of plaintiff's chosen forum is to balance the factors identified by the Supreme Court in Gilbert: the private interest factors reflecting the interests of the parties at bar and the public interest factors reflecting the interests of the public. To prevail, a defendant normally has the burden to demonstrate that both the private and public interest factors "strongly" favor dismissal. Metito (Overseas) Ltd. v. General Elec. Co., 2006 WL 3230301, at *5 (S.D.N.Y. Nov. 7, 2006) (quoting DiRienzo, *supra*, 294 F.3d at 30-31). "[A] lesser degree of deference to the plaintiff's choice ... does not guarantee dismissal.... The action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the [alternative] forum significantly preferable." Iragorri, *supra*, 274 F.3d 74-75.

### a.    *Private Interest Factors*

As listed by the Supreme Court, the private interest factors to be assessed include

> [T]he relative ease of access to sources of proof; availability of
> compulsory process for attendance of unwilling, and the cost of obtaining
> attendance of willing, witnesses; possibility of view of premises, if view
> would be appropriate to the action; and all other practical problems that
> make trial of a case easy, expeditious and expensive.

Gilbert, *supra*, 330 U.S. at 508. The defendants argue that (i) all but two of the relevant witnesses

reside in Brazil (as noted above, the other two reside in the Northern District of New York,

outside the subpoena power of this Court), (ii) the two U.S. witnesses to whom plaintiff points

were not involved in the supposedly wrongful conduct, (iii) virtually all of the relevant party and

non-party documentary evidence is located in Brazil, including the confidential information

disclosed within the EPC Consortium referenced in ¶¶ 55-57 of the Pinto Declaration, (iv)

important non-party witnesses who reside in Brazil are not subject to subpoena in New York, and

(v) the costs, inconvenience, and disruption of bringing the non-party witnesses in from Brazil

would be enormous.

Plaintiff replies that (i) the issues to be litigated concern the commitment of GE's U.S.

entities not to complete against CNO, (ii) the matter can be adjudicated without substantial

discover of documents found only in Brazil, (iii) any documentary proof is easily transportable,

(iv) the matter can be adjudicated without the need to compel the appearance of third-party

witnesses from Brazil, and (v) litigating in this District presents no hardship to GE. (Plaintiff's

Opp. Memo. at 17-18.)

The Court finds plaintiff's first argument unconvincing. The litigation concerns General

19

Electric's commitment not to compete against CNO. Some confusion arises because of the tendency to refer to any GE entity as "General Electric." However, the facts are clear that the relevant events giving rise to this dispute occurred in Brazil, not the United States, as plaintiff insists. Plaintiff argues that GE's alleged breach of the NDA took place because of GE's participation in Brazil in a consortium being led by a Brazilian company Camargo Corrêa, with Brazilian participants. (Compl. at ¶ 4; Pinto Decl. at ¶ 77.) The MOM was negotiated at a meeting in Brazil. Mr. Pinto's August 16, 2007 letter warning GE not to cooperate with a competitor of CNO was sent to Mr. Silva of the GE Joint Venture, as well several U.S. GE entities. (Compl. at ¶ 87.) In addition, plaintiff claims that "IESA's statements" to the Ministry of Mines and Energy in a letter dated August 20, 2007 confirms that GE is in breach of the MOM. (Pinto Decl. at ¶ 77). But "IESA", a party to the NDA, not the MOM, is a <u>Brazilian</u> corporation that partially owns Inepar. (Pinto Decl. at ¶ 39.) Thus, any communications that took place occurred between GE Joint Venture employees, a Brazilian corporation, and the Brazilian government.

The defendants have met their burden of demonstrating that the remaining <u>Gilbert</u> factors weigh heavily against plaintiff's choice of forum. The parties clearly contemplated litigation in Brazil; non-party Brazilian witnesses are not subject to New York subpoena power; most, if not all, of the relevant evidence will have to be produced in Brazil; all but two of the witnesses reside outside of the United States; the two witnesses who reside in the United States are located in the <u>Northern</u> District of New York; important non-party witnesses who reside in Brazil are not subject to subpoena in New York; and the costs, inconvenience, and disruption of bringing the non-party witnesses in from Brazil would be substantial. Additionally, although plaintiff insists that it seeks

20

to enjoin the General Electric defendants from breaching the exclusivity agreement it undertook with CNO via the MOM, a number of plaintiff's allegations concern the alleged misuse of confidential information, which would implicate a breach of the confidentiality provisions of the NDA. This Court, as plaintiff concedes, cannot adjudicate violations of the NDA.

### b.    Public Interest Factors

The public interest factors to be assessed include (i) administrative difficulties caused by court congestion, (ii) the local interest in having localized controversies decided at home, (iii) the burden of jury duty on a community unrelated to the litigation, and (iv) the appropriateness of having a court familiar with the governing law adjudicate the dispute. See Gilbert, supra, 330 U.S. at 508-09.

I cannot make any determination about the issue of relative court congestion because I know nothing of court conditions in Brazil. The third factor is irrelevant since the claim originally before me –for injunctive relief – would not be tried to a jury.

However, it is clear that this District has no interest in adjudicating this dispute. This is not a private project, but governmental one. It is part of the Economic Growth Acceleration Plan proposed by the Brazilian government to address the country's expected infrastructure needs over the next decade. The Brazilian government has played a central role in the Project since its inception, and the Project will use public lands and waterways and will require government concession to operate the resulting power facility. As CNO itself argues in its Complaint, the Project is of critical importance to Brazil and its citizenry because it will provide state-of-the-art power plants with minimal environmental impact and will generate power to meet the growing

21

demand for power in Brazil. (Compl. at ¶ 42.) Thus, the public interest that is being protected is the public interest of Brazil.

Moreover, this Court is drowning in faxes updating me on the legal battle between the SDE and the Brazilian courts regarding the enforceability under Brazilian law of the very non-compete clause it presently seeks to enforce against GE.[3] The Brazilian Government has professed a strong interest in this Project and is already deeply involved in the resolution of this dispute. In less than a month, the Brazilian Federal Appeals Court for the First Region has issued two orders regarding the enforceability under Brazilian law of the exclusivity clause at issue in this matter. At the same time, the SDE has issued two orders: one nullifying the exclusivity clause at issue, and, the second, after the Brazilian court annulled the SDE order, suspending the effectiveness of the exclusivity clause. The CADE has submitted an amicus brief to the Appeals Court, supporting the SDE's right to issue an order suspending the contract pendente lite. (The Brazilian court appears unimpressed with their argument.)

Clearly, there is a heated legal debate between the relevant Brazilian authorities and the Brazilian courts regarding this very issue plaintiff wishes me to decide. This is a Brazilian contract, governed by Brazilian law, and the enforceability of the exclusivity clause is presently being litigated in Brazil. This Court should and will stay its hand.

The motion to dismiss is granted.

---

[3] Even more persuasive, the courts are not debating the substance of the SDE orders, but rather the authority of the SDE, instead of the CADE, to nullify the exclusivity clause. The SDE's order is only suspended until the "CADE has reviewed and issued an opinion on the administrative proceeding installed at that body, observing due process of law." (Translation of Brazil Decision #1 at 15.)

22

## *B.    Defendants' Request for Sanctions*

The defendants ask the Court to impose sanctions pursuant to its inherent authority and 28 U.S.C. § 1927 in the form of costs, expenses and attorneys' fees.[4] They argue that sanctions are warranted because plaintiff: (1) did not have a good faith basis to file suit in the Southern District of New York; (2) failed to disclose the SDE investigation to the Court, (3) filed an affidavit of Mr. Muriel, who has personally been representing GE in an active litigation for the past two years and failed to withdraw the affidavit after being made aware of the conflict; and (4) failed to dismiss the case even after the SDE had issued the first order canceling the exclusivity provision.

Courts have inherent power, Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991), as well as statutory authority under Title 28, section 1927 of the United States Code, to impose sanctions on any attorney who "so multiplies the proceedings in any case unreasonably and vexatiously." "[T]he only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is ... that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir.1986), cert. denied, 480 U.S. 918 (1987).

To impose sanctions pursuant to its inherent authority, the Court must find: "(1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay." Schlaifer Nance & Co. v. Warhol, 194 F.3d 323, 336 (2d Cir. 1999); see also Milltex Indus. Corp. v. Jacquard Lace Co., 55 F.3d 34,

---

[4]Defendant has not filed a Rule 11 motion.

23

38 (2d Cir.1995). Likewise, sanctions are warranted under § 1927 when "there is a clear showing of bad faith on the part of an attorney." Shafii v. British Airways, PLC, 83 F.3d 566, 571 (2d Cir. 1996) (citing Oliveri, *supra*, 803 F.2d at 1273. Under both grounds for sanctions, bad faith may be inferred "only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Shafii, *supra*, 83 F.3d at 571 (internal quotation marks omitted); see also People of the State of New York v. Operation Rescue Nat'l, 80 F.3d 64, 72 (2d Cir. 1996), cert. denied, 519 U.S. 825 (1996).

Plaintiff's claim, whether brought here or in Brazil, is certainly colorable. And regardless of the Court's ruling that this District is not a convenient forum, this Court has jurisdiction over the matter; at least to the extent of having the power to decide whether or not the GE defendants are bound by the forum selection clause (an issue I need not reach in view of my disposition of the *forum non conveniens* motion). Since I cannot find that there was no colorable claim, an award of sanctions would be inappropriate.

It is true that plaintiff's attorneys should have given the Court much more information about the SDE investigation in its moving papers. However, the investigation was mentioned in the First Pinto Declaration. I intuited its existence when I first read the papers. Since then, plaintiff has been extremely forthright in sharing information with the Court regarding the investigation and related litigation in Brazil.

The submission of Mr. Muriel's affidavit also does not warrant the imposition of sanctions. CNO was unaware of the facts giving rise to Mr. Muriel's purported conflict prior to the time its counsel, Boies Schiller, received Mr. Broderick's letter of September 14, 2007 (Decl. of Howard L. Vickery ("Vickery Decl" at ¶ 4).) Upon receiving Mr. Broderick's letter, Mr.

24

Vickery made efforts to ascertain whether a conflict existed. He was told by Mr. Muriel that Muriel's submission was entirely consistent with his ethical obligation under Brazilian law. (Id. at ⁦5.) Mr. Muriel provided Boies Schiller with legal authority in support of his position. (Id.) Plaintiff's conduct does not sink to the level of bad faith, especially in view of Boies Schiller's prompt inquiry. In any event, CNO has since submitted the declaration of a new expert on the same point. (See Declaration of João Grandino Rodas.)

Finally, CNO's failure to withdraw the litigation upon receipt of the SDE's first Order nullifying the exclusivity clause in effect between General Electric and CNO does not warrant the imposition of sanctions. The clause is currently valid, per the October 1, 2007 ruling of the Brazilian Federal Appeals Court for the First Region. Given the legal battle between the Brazilian government and the Brazilian courts regarding this issue, plaintiff could have harbored a good faith belief that it had the right to continue this litigation.

## V. Conclusion

For the foregoing reasons, defendants' motion to dismiss the complaint on *forum non conveniens grounds* is GRANTED. Defendants' request for sanctions is DENIED.

This constitutes the decision and order of the Court.

Dated: October 11, 2007

U.S.D.J.

BY ECF TO ALL COUNSEL

25